POPULAR DEMOCRATIC PARTY, Petitioner, *v.* LUIS A. FERRÉ, GOVERNOR OF THE COMMONWEALTH OF PUERTO RICO, Respondent.

No. O-69-98.    Decided February 2, 1970.

*Rafael Hernández Colón, José Trías Monge, Rubén Rodríguez Antongiorgi, Juan Cancel Ríos, Francisco Aponte Pérez* for petitioner. *Santiago C. Soler Favale, Secretary of Justice, J. F. Rodríguez Rivera, Acting Solicitor General, Gilberto Gierbolini Ortiz, Assistant Secretary of Justice, Nellie Ortiz Torres, Head, General Litigation Division,* and *Arturo Aponte Parés, attorney, General Litigation Division, Department of Justice,* for respondent.

### JUDGMENT

On the grounds set forth in the opinions delivered on this date by Mr. Chief Justice Negrón Fernández, Mr. Justice Santana Becerra, and Mr. Justice Blanco Lugo with whom Mr. Justice Pérez Pimentel and Mr. Justice Dávila concur, the petition for the writ of mandamus is hereby denied. Mr. Justice Rigau delivered a dissenting opinion in which Mr. Justice Ramírez Bages and Mr. Justice Torres Rigual concur as it appears from their separate opinions.

Mr. Justice Pérez Pimentel, Mr. Justice Dávila, Mr. Justice Ramírez Bages, and Mr. Justice Torres Rigual delivered separate opinions.

Mr. Justice Hernández Matos disqualified himself.

It was so decreed and ordered by the Court and certified by the Clerk.

(s) JOAQUÍN BERRÍOS

*Clerk*

—O—

Opinion of MR. CHIEF JUSTICE NEGRÓN FERNÁNDEZ.

San Juan, Puerto Rico, February 2, 1970

The special circumstances which have been present in Puerto Rico's life and political status for almost three quarters of a century, render this case into one to be included within the Constitutional Law in its sense of internal government, as well as within the scope of Political Law in its broadest sense, inasmuch as it is tangent to the redefinition or modification of the basic political relationship between the United States and Puerto Rico, which gave rise, through convention to the constitutional organization of our government and which owing to their very origin and nature, regulate and restrict the exercise of all the powers of our present political status.

My decision against the issuance of the writ requested is based on fundamental reasons which in their implications go beyond the litigious aspect and content of the present petition.

I

In its petition for Mandamus petitioner, the Popular Democratic Party, requests this Court, in the exercise of its coercive power, to compel respondent, as Governor of the Commonwealth of Puerto Rico, "to perform the duties imposed on him by the Plebiscite Act of 1967"[1] which, according to petitioner, had not been complied with by respondent despite the fact that such action had been requested from respondent.[2] Said duties, in synthesis, are stated by petitioner as follows:

---

[1] Act No. 1 of December 23, 1966, as amended, 16 L.P.R.A. (Supp.) 1968, § 844 *et seq.*

[2] Letters from the Popular Democratic Party to the Governor, dated January 24 and February 24, 1969, which were included as part of the petition for Mandamus.

1) The Plebiscite Act imposes on the Governor of Puerto Rico "the clear obligation to comply faithfully with the will of the people as expressed in the plebiscitary consultation" held on July 23, 1967, in which the Commonwealth formula won by 60.41 percent of the total valid votes cast, against 38.98 percent cast for Statehood and 0.60 percent for Independence; result which the former Governor of Puerto Rico, Roberto Sánchez Vilella, certified to the former President of the United States, Lyndon B. Johnson, "requesting, in addition, the joint constitution of the advisory groups recommended in the report of the Status Commission, and described in the Statement of Motives of the aforesaid Act."

2) In the discharge of his duty to comply faithfully with the mandate of the Plebiscite, the Governor, "is bound by law to complete the steps required by § 45 of the Plebiscite Act, for the joint constitution of the advisory groups recommended by the Status Commission."

3) In the discharge of his duty to comply faithfully with the mandate of the Plebiscite, the Governor "is also under the legal obligation to designate the Puerto Rican members of the advisory groups from among the persons proposed by the Popular Democratic Party", this duty being based on the clear intention of the Plebiscite Act which states "that the basic responsibility to start recommendations for the development of the winning status formula would fall on its representatives and supporters in the plebiscitary process."

4) The Plebiscite Act imposes on the Governor "the duty of proposing to the President of the United States the joint constitution of the advisory groups 'regarding the measures of development of the Commonwealth, to be considered on the basis of the authorization granted by the people at the Plebiscite,'" said authorization, "as stated in the ballot itself being utilized . . . to 'develop the Commonwealth in accordance to its fundamental principles to a maximum of self-

government compatible with a common defense, a common market, a common currency and the indissoluble link of the citizenship of the United States.' "

Respondent answered the Petition, and besides accepting and denying pleadings, which joined the issue according to his position, setting forth other pleadings to the contrary— among them the one saying "that he has not refused nor refuses to comply with the duties which the act might impose upon him" attaching a copy of the answer given by him in a letter dated May 15, 1969 addressed to the Presidential Delegate of the Popular Democratic Party, to the latter's requests of January 24 and February 24, 1969—he filed a motion to dismiss based on several affirmative defenses concerning the impropriety of the petition.

In the aforementioned letter of May 15, the Governor informed to the Presidential Delegate of the Popular Democratic Party: "You can be sure that I will comply fully with the provisions of the Plebiscite Act and I will be guided in doing so by the majority opinion of the people of Puerto Rico", stating at the same time his position regarding the exercise of his responsibilities under the Constitution and the Plebiscite Act, which, he affirmed, "cannot and should not be shared with other persons or entities by the Executive, in the absence of a clear legal provision. They are inherent to his office, for which reason any intent of extraneous intervention should be rejected in the execution thereof."

## II

It is convenient to refer to the provisions of the Plebiscite Act of 1967 pertaining to the matter under consideration, as well as to one of the conclusions and to the various recommendations included in the Report of the Status Commission closely related to this Petition. We should also make reference to other legislative provisions also mentioned therein.

In the Statement of Motives of the Plebiscite Act of 1967, there is a brief recital of the steps which finally culminated in its approval, starting with the Joint Resolution approved by the Legislative Assembly of Puerto Rico on December 3, 1962; Public Law 88-271 of February 20, 1964 providing for the creation of the United States-Puerto Rico Commission on the Status of Puerto Rico, 48 U.S.C. § 731, note, L.P.R.A., Vol. 1, p. 150; the acceptance by the Legislative Assembly of Puerto Rico of the invitation of Congress to participate in the work of said Commission—Act No. 9 of April 13, 1964—and of some conclusions and recommendations included in the report of said Commission dated August 5, 1966.

In the Statement of Motives itself the following conclusion of the Commission was mentioned:

"An expression of the will of the citizens of Puerto Rico by popular vote on the question of whether they wish to continue Commonwealth status capable of growth and development, or to change to Statehood or Independence would be helpful to all concerned. The Commission recognized, however, that it behooves the People of Puerto Rico to decide whether, when and in what manner they wish to express their preference."

Reference was also made in the Statement of Motives of the Plebiscite Act to the fourth of the following four recommendations included in the Report of the Commission:

"The above conclusions and the facts underlying them point to the need in the immediate future, for a method that provides for the consideration of proposals for improvement or growth of Commonwealth, or for change to Statehood or Independence.

"The Commission recommends that procedures be devised which will permit the establishment of ad hoc joint advisory groups upon the initiative of the President of the United States and the Governor of Puerto Rico, acting jointly.

"These ad hoc joint advisory groups would be composed of persons of the highest prestige and ability, and would consider problems affecting the relations between the Island and the

Mainland referred to them by the President of the United States and the Governor of Puerto Rico. Each joint advisory group would report its conclusions and recommendations to the President and Congress of the United States and to the Governor and Legislative Assembly of Puerto Rico. The membership of each advisory group would be determined by the nature of the particular problem under consideration.

"If the people of Puerto Rico should by plebiscite indicate their desire for Statehood or Independence, a joint advisory group or groups would be constituted to consider appropriate transition measures. If the people of Puerto Rico should maintain their desire for the further growth of the Commonwealth along the lines of the Commonwealth Legislative Assembly's Resolution No. 1, of December 3, 1962, or through other measures that may be conducive to Commonwealth growth, a joint advisory group or groups would be convened to consider these proposals."

The lines included in Resolution No. 1, of December 3, 1962, of the Legislative Assembly of Puerto Rico which were mentioned in the foregoing Recommendations of the Commission and in the Statement of Motives of the Plebiscite Act were expressed in such Resolution in the following manner:

"WHEREAS, those who support Commonwealth status conceive its maximum development, in permanent union with the United States of America under the following principles:

"1. The recognition and re-assertion of the sovereignty of the people of Puerto Rico, so that no doubt may remain of their capacity to enter into a compact under conditions of juridical equality.

"2. The assurance of the permanence and irrevocability of the union between the United States and Puerto Rico on the basis of common citizenship, common defense, common currency, free market, common loyalty to the values of democracy, and of such other conditions as may be considered in the compact of mutual benefit to the United States and Puerto Rico.

"3. The specific definition of the powers of the United States with respect to Puerto Rico, which shall exclusively be those essential to the union.

"4. All other powers shall be exercised by the constitutional organisms of the people of Puerto Rico.

"5. Participation by the people of Puerto Rico in the powers exercised under the compact, by the government of the United States, in matters affecting Puerto Rico, in a measure proportional to the scope of such powers. This may include, among other ways of implementing such participation, the right to vote for the President and Vice-President of the United States.

"6. The adoption of a formula under which the people of Puerto Rico will contribute to defray the general expenses of the United States government in a manner compatible with the stability and economic growth of Puerto Rico."

Section 1 of the Plebiscite Act provided for a plebiscite to be held on July 23, 1967 in order that the electors qualified to vote therein would choose among (a) Commonwealth (b) Statehood (c) Independence; and as to the meaning of the vote in favor of the Commonwealth, as was likewise made with respect to the significance of each one of the other two formulas, it provided the following:

"A vote in favor of Commonwealth shall mean:

"(1) The reaffirmation of the Commonwealth established by mutual agreement under the terms of Act 600 of 1950 and Joint Resolution 447 of 1952 of the Congress of the United States as an autonomous community permanently associated with the United States of America;

"(2) The inviolability of common citizenship as a primary and indispensable basis of the permanent union between Puerto Rico and the United States;

"(3) The authorization to develop Commonwealth in accordance with its fundamental principles to a maximum of self-government compatible with a common defense, a common market, a common currency and the indissoluble link of the citizenship of the United States;

"(4) that no change in the relations between the United States and Puerto Rico shall take place unless previously approved by a majority of the electors voting in a referendum held to that effect."

Section 19 of said Act provided for the printing and contents of the ballots and provided for the inclusion, regarding the Commonwealth, as well as with respect to the other two formulas in their particular meaning, the same concepts set forth in § 1.

Section 45, which we copy textually provided:

"The General Supervisor of Elections shall certify to the Governor the result of the plebiscitary consultation. The Governor, in his turn, shall certify said result to the President and the Congress of the United States, to the Resident Commissioner, and to the Legislature of the Commonwealth of Puerto Rico.

"If one of the formulas wins, as provided in section 2 of this Act, the Governor shall, in his certification to the President, ask for the joint constitution of the advisory groups recommended in the report of the Status Commission and described in the statement of motives of this Act.

"According to that report, the joint advisory groups shall consider the necessary transition measures toward statehood or toward independence, in the event one of these formulas wins. In such case the members of the advisory groups that must be appointed by the Governor of Puerto Rico *shall be designated on proposal of the party* or the Directing Committee that has represented the winning formula in the plebiscitary process. If the representation of the formula in the plebiscitary process has been dual, the party and the Directing Committee shall be entitled to propose an equal number of members.

"In the event that the Commonwealth be the winning formula, *the Governor shall propose to the President* the joint constitution of the advisory groups in conformity with the findings that from time to time may be made on the measures of development of the Commonwealth, to be considered on the basis of the authorization granted at the plebiscite.

"A majority vote in favor of any of the status formulas constitutes a mandate of the People of Puerto Rico to the Resident Commissioner, as their representative in the federal sphere, to act in the discharge of his official duties in accordance with the will of the people expressed through the said vote." (Italics ours.)

## III

The central litigious matter in this petition—considering respondent's answer and his assertion that he will fully comply with the provisions of the Plebiscite Act and that he will be guided by the majority opinion of the people of Puerto Rico, but rejecting at the same time the initiative and the absolute control claimed by the petitioner, as the political party which represented the Commonwealth formula, which won in the Plebiscite, in the designation of the Puerto Rican members of the ad hoc joint advisory groups, recommended in the Report of the Status Commission,[3] as well as in the suggestion of measures to be considered by them for the development of the Commonwealth, because he considers it to be an extraneous intervention not authorized by law in the execution of his responsibilities under the Constitution and the Plebiscite Act—boils down to determine whether under the facts and circumstances present in this case, it would be proper for this Court, pursuant to the applicable law, to exercise its coercive power to compel respondent to act in the manner claimed by petitioner or whether this Court should reject the petition to compel respondent to fulfill, in his best judgment and according to his powers under the Constitution and the Plebiscite Act, as first executive, his duty to make possible the end sought by the result of the plebiscitary consultation, for the growth and development of the Commonwealth.

## IV

Petitioner, the Popular Democratic Party, in support of its petition to require the respondent Governor to fulfill his duty to implement the result of the Plebiscite, designating the Puerto Rican members of the ad hoc committees accord-

---

[3] Report of the United States-Puerto Rico Commission on the Status of Puerto Rico, August 5, 1966, published by the Superintendent of Documents of the United States Government Printing Office, page 8.

ing to its request and proposal and to submit as an agenda thereof the subjects submitted by it to respondent, argues that, if respondent fails to do so, inasmuch as § 45 of the Plebiscite Act lacks an unqualified statement to the effect that should the Commonwealth be the winning formula the members of said committee shall be designated on proposal of the party which represented said formula in the plebiscitary consultation, the supporters of the Commonwealth formula would not be on an equal footing with the supporters of Statehood or Independence, in the event any of these formulas had won, since in regard to the latter § 45 provided in clear terms that the members of the advisory groups shall be designated by the Governor on proposal of the party or the Directing Committee that had represented said formula in the plebiscitary process. Thereupon, petitioner maintains that it is incumbent upon this Court "to fill the gap with a construction based on the principles which stem from the Report of the Status Commission, from the method designed by the lawmaker for the holding of the plebiscite and for implementing the results thereof." Consequently, petitioner maintains that the legislative intention was that in the event the Commonwealth be the winning formula the members of the advisory groups would be designated by the Governor on proposal of the party which represented said winning formula since the representative of said formula is "the one authorized by the people to fulfill the mandate of the plebiscite."

The scope of the participation of the political party in the procedures to implement the plebiscite was determined in the joint report submitted on December 17, 1966 to the Senate and House of Representatives by the special committees which studied Senate Bill 470 and House Bill 649 upon recommending its approval with amendments, when they expressed that:

"According to the bill, the participation of political parties in the procedures to implement the plebiscite is only that of each one representing, if they so decide, the political formula which

it has being supporting and defending for Puerto Rico during the political debate on status formerly mentioned. It cannot be ignored that the status question has been the fundamental ground for strife between Puerto Rican political parties.

"On the other hand, it has to be admitted that no political formula can be deemed the property of any political party. Therefore, if any political party refrains from complying with the duty of representing in the electoral bodies, in state or local level, and in the polling places the formula they have been supporting, the bill provides the most adequate means so that each formula can be represented by known supporters of said formula in all those electoral bodies." (20 Journal of Proceedings 503 (1966).)

The inequality invoked is more apparent than real. Even though, in providing that the designation of the members of the advisory groups which were going to consider the necessary transition measures towards Statehood or Independence, in the event one of these formulas would win *on proposal of the party or of the Directing Committee* which had represented the winning formula in the plebiscitary process, the Legislative Assembly displayed great circumspection in surrounding the transition measures towards Statehood or Independence to be considered by the joint advisory groups, with the utmost guarantees so that the expression of preference of any one of these two status formulas could be effectively implemented in accordance with the purpose of the plebiscitary consultation; however, for the obvious reason that neither of said two formulas won there is no need to consider herein whether or not said statutory provision could constitute a valid exercise of legislative power in delegating to the party or directing committee which had represented the Statehood or Independence formulas, in the event one of these two formulas had won, the effective administration of the procedures to be followed subsequent to the Plebiscite for implementing the same, since neither the political parties nor the directing committees representing said status formulas can

be considered constitutional entities of the established government, for which reason they cannot be entrusted with the representation of that subsequent instrumental procedure passing over the Governor in his official representation in rendering him into a mere agent of a political party or a directing committee. Therefore, the statutory provision, which could have resulted in an extraconstitutional mechanism negatory of the representative powers inherent to the governor as first executive of the established government, does not constitute a crucial point to invoke inequality. To agree with petitioner that, as the political party which represented the Commonwealth formula in the plebiscitary consultation, it was the one authorized by the people to perform the subsequent steps jointly with the representatives of the United States in the ad hoc committees, with the exclusion of the prerogatives which, by virtue of the constitutional representation of his office and of the unconditional power expressly conferred upon him by the Plebiscite Act, belong to the Governor of the Commonwealth, would imply the creation of a vacuum in the system of our constitutional government to be filled with a political party which is still linked to the ordinary electoral procedures. Although the legislative purpose in authorizing the holding of a plebiscite in conformance with the recommendations of the Status Commission was to separate the plebiscitary consultation from the ordinary general elections, with the obvious purpose that the Plebiscite vote would not have to be necessarily subject to political and party considerations, and that the choice could be expressed even away from the considerations that surround the vote in the ordinary process of the general elections, there is nothing in the Plebiscite Act or in the report of the Status Commission seeking to detach the implementation of the result of the Plebiscite from the constitutional government, in the event the Common-

wealth were the winning formula. It is so, in my opinion, even if the party that represented the Commonwealth formula in the blepiscite had won in the general elections of 1968.

## V

Taking into consideration the privileged nature of the writ of Mandamus; that the law does not expressly require that the Governor of the Commonwealth of Puerto Rico designate the members of the ad hoc joint advisory groups, on proposal of the party which represented the winning formula in the plebiscite; that the legislative history, as it appears in the joint report of the Senate and House Committees which studied the bill which became the Plebiscite Act of 1967 limits the participation of political parties in the procedures to implement the mandate of *the plebiscite* to representing the political formulas that the parties had been supporting and defending as the status for Puerto Rico, it being acknowledged that no political party could be deemed the owner of any such formulas; that because of the continuous nature of the post-plebiscitary procedures and the general principles underlying the evolution and future development of the Commonwealth for the reshaping or modification of the basic political relationship between the United States and Puerto Rico, any difference in opinion concerning the implementation of the measures for the growth and development of the Commonwealth to be considered by said committees could transfer to the judicial forum the debate regarding the political status of Puerto Rico, I believe that the issuance of the writ of Mandamus does not lie.

—O—

Opinion of MR. JUSTICE SANTANA BECERRA, in support of his vote against the issuance of the writ of mandamus.

San Juan, Puerto Rico, February 2, 1970

On May 2, 1969, petitioner Popular Democratic Party, resorted to this Court on first instance praying that a writ of mandamus be issued, directing the Governor of the Commonwealth of Puerto Rico, Luis A. Ferré, "to perform the duties imposed on him by the Plebiscite Act of 1967."[1] This prayer is substantiated by certain allegations of the complaint, to wit:

the seventh pleading, to the effect that on January 24, 1969, petitioner, Popular Democratic Party, requested the Governor of Puerto Rico, respondent herein, to designate the Puerto Rican members who were to belong to the first advisory group for the development of the Commonwealth, *"proposing the persons who should be designated and submitting, also, an agenda of the topics which in its opinion should be studied."* Copy of said letter was enclosed as part of the petition for mandamus;

the eighth pleading, to the effect that on February 24, 1969 the Popular Democratic Party requested, for the second time, the Governor of Puerto Rico "to perform the duties imposed on him by the Plebiscite Act without respondent having, up to the present time, answered directly to these requests or taken any affirmative action regarding the same." Copy of this letter was enclosed as part of the petition;

the ninth pleading, to the effect that the Plebiscite Act imposes upon the Governor of Puerto Rico "the manifest duty of faithfully complying with the will of the people as expressed in the plebiscitary consultation" and that said will is "that the Commonwealth be preserved as the political status of

---

[1] "Plebiscite Act of 1967," Act No. 1 of December 23, 1966, as amended. 16 L.P.R.A. §§ 844–938, Cum. Supp. 1968.

Puerto Rico and to proceed to its utmost development in conformance with the principles set forth in the Statement of Motives and in §§ 1, 19, and 45 of said Act." It is alleged that under this law it is not discretionary on the Governor "to delay the development of the Commonwealth or to invalidate in any other manner the result of the plebiscitary consultation";

the tenth pleading to the effect that in the discharge of his duty to faithfully perform the plebiscitary mandate, the Governor is legally bound to take the steps required *"by § 45 of the Plebiscite Act* for the joint constitution of the advisory groups recommended in the report of the Status Commission";

the eleventh pleading to the effect that in the discharge of his duty to faithfully comply with the plebiscitary mandate, the Governor has "the official obligation to appoint the Puerto Rican members of the advisory groups from *among the persons* proposed by the Popular Democratic Party" and that the manifest intention of the Plebiscite Act was that "the basic responsibility of initiating the recommendations for the development of the winning status formula should rest on its supporters and representatives in the plebiscitary process";

the twelfth pleading, to the effect that regarding the topics to be considered by the advisory groups, the Plebiscite Act imposes on the Governor the duty of proposing to the President of the United States the joint constitution of advisory groups "on the measures of development of the Commonwealth, to be considered on the basis of the authorization granted by the people at the Plebiscite";

the thirteenth pleading, to the effect that the authorization granted by the people in the plebiscite was to "develop the Commonwealth in accordance to its fundamental principles to a maximum of self-government compatible with a common defense, a common market, a common currency, and the indissoluble link of the citizenship of the United States";

the fourteenth pleading, partly, to the effect that the duty of the Governor under §§ 1, 19, and 45 of the Plebiscite Act, is to propose the constitution of advisory groups in order that they recommend the necessary amendments "for the development of the Commonwealth in accordance with its fundamental principles to a maximum of self-government compatible with such principles" or, in the alternative, for their consideration, *"of the subject matters proposed by the Popular Democratic Party"*;

finally, the fifteenth pleading, to the effect that even if it is considered, "contrary to the clear meaning of the Law," that the Governor has discretion to "propose the topics to be studied by the advisory groups," such discretion should be strictly "adjusted to the rules of law inferred from the Plebiscite Act and the process underlying it."

The letter of January 24, 1969, addressed to the Governor and signed by Severo E. Colberg as Presidential Delegate of the Popular Democratic Party, and which is part of the pleadings, contains a request to the Governor in order that the latter "without further hesitation and delay" proceed to designate the local members of the advisory groups and that "according to the clear meaning of the Law" these members should be "persons identified with the winning formula, *proposed by the Popular Democratic Party*," which was the Party which represented said formula in the plebiscitary process. To that effect, the letter of request proposed Luis Muñoz Marín, Luis Negrón López, Rubén Rodríguez Antongiorgi, Miguel Hernández Agosto, José Trías Monge, Frank Zorrilla, Rafael Durand Manzanal, Salvador Rodríguez Aponte, Francisco Aponte Pérez, Roberto Rexach Benítez, Gustavo Agrait, Arturo Morales Carrión, and Eugenio Fernández Cerra, to constitute the local representation in the first advisory group. This letter likewise points out to the Governor the duties that this first advisory group should perform and enumerates ten

specific topics for consideration in order to formulate "specific" recommendations thereon.[2]

The letter of February 24, 1969, addressed to the Governor and signed this time by Juan Cancel Ríos as Presidential Delegate of the Popular Democratic Party, and which is part of the pleadings, proposes, after referring to the letter of January 24, to meet with the Governor "to discuss such an important topic, so that the Ad Hoc Committees for the development of the Commonwealth may be constituted in order that they may start to work as soon as possible."

The Governor of the Commonwealth answered the complaint and moved for its dismissal on the ground of seven special defenses.[3] He attached to his answer a copy of a letter dated May 15, 1969, addressed by him to Juan Cancel Ríos, Presidential Delegate of the Popular Democratic Party, concerning the letter and request of January 24, 1969. The Governor states that he is familiarized with the Plebiscite Act, and furthermore, that he knows the duties of his office as First Executive of Puerto Rico, and that:

---

[2] Briefly: (1) Improvement of cabotage laws; (2) Distribution of profits and tax responsibility of enterprises operating in Puerto Rico and the United States; (3) Participation of Puerto Rico in federal programs and the "War Against Poverty"; (4) Greater contribution of the Commonwealth in the rendering of federal services in Puerto Rico; (5) Matching the minimum wage levels in Puerto Rico with those of the United States; (6) Participation of Puerto Rico in treaties of a commercial, cultural, and educational nature; (7) Measures making the Compulsory Military Service Act more just and equitable for the Puerto Ricans; (8) Protection of the agricultural products of Puerto Rico against foreign competition; (9) Clarification and improvement of the principles which govern the application of the federal laws in Puerto Rico; (10) Agenda for future advisory groups.

[3] Briefly: (1) Lack of legal standing of petitioner, Popular Democratic Party, to file the petition; (2) Impropriety of the mandamus under the doctrine of separation of powers; (3) Res judicata; (4) Political nature of the issue not susceptible to judicial decision; (5) Untimeliness of petition and because the Governor has not refused nor refuses to comply altogether with the Plebiscite Act; (6) Laches on the part of petitioner; (7) Impropriety of the petition for mandamus because it deals with a discretionary function of the Governor.

"You can be sure that I will comply fully with the provisions of the Plebiscite Act and that I will be guided in doing so, by the majority opinion of the people of Puerto Rico."

In said letter the Governor remarks—which remarks constitutes a declaration of principles concerning his constitutional functions, which is basic and essential in the consideration and decision of the issue before the Court—that:

". . . the responsibilities which the Governor may have and which flow from the Plebiscite Act and from our Constitution cannot, and should not be shared with other persons or entities by the Executive *in the absence of a clear legal provision.* They are inherent to his office, for which reason any intent of extraneous intervention should be rejected in the execution thereof."

—I—

From the very beginning it is necessary to set this controversy where, in my opinion, the right place is. Taking into consideration the prayer requesting this Court to direct the Governor "to perform the duties imposed on him by the Plebiscite Act of 1967," as substantiated by the pleadings, I understand that this Court is requested to issue an order directing the Governor to proceed to appoint the specific persons designated or that may be designated by the Popular Party, and none others, to constitute the advisory groups recommended by the Status Commission, on the assumption that the Popular Party was the one which supported the Commonwealth formula at the plebiscite; and under the same assumption, an order requesting the Governor to submit to the consideration and study of the first advisory group, for their recommendations, the topics submitted by petitioner, Popular Party, and none others.[4]

---

[4] The position, of public knowledge, assumed, pending this suit, by distinguished spokesmen of the Popular Party, in connection with the Governor's proposal to submit the problem of the presidential vote to an advisory group, sphere of action not included among the ten topics

Having set this litigation in the proper place, I do not believe petitioner's purpose and interest is to obtain a pronouncement of this Court warning the Governor that he has to comply with the duties imposed on him by the laws. I do not believe this is a proper way to exercise the judicial function, particularly there being in counterbalance the proper rule of conduct which should be maintained among the hierarchies of the three constitutional powers of the Commonwealth which, pursuant to § 2 of Art. I of the Constitution which governs it, are *equally* subordinate to the sovereignty of the people of Puerto Rico. The Governor has implicitly manifested in a document attached to his answer that he is familiarized with the law and that he knows his duties inherent to his office of First Executive of Puerto Rico.

The precise determination as to what is the judicial decision sought by petitioner in this suit has another fundamental importance which concerns the very authority of this Court to render a judgment. This is so because we are acting on original jurisdiction. Pursuant to Article V, § 3 of our Constitution, the Supreme Court is only a court of last resort with the exception provided by the Constitution itself. According to the constitutional mandate, the law that organizes the judicial power, Judiciary Act of 1952, likewise provides that the Supreme Court shall be a court of last resort, and creates as courts of first instance, the Superior and District Courts. By way of an exception, Article V, § 5 of the Constitution authorizes the Supreme Court or its justices to hear in the first instance petitions for habeas corpus and such other causes and proceedings as *determined by law*.

---

submitted by the Popular Party in the letter and request of January 24, 1969, when said leaders and spokesmen failed to express a frank acceptance to said proposal, and even their attack thereto, convince me that my conclusion, as to what petitioner is actually requesting in this suit, and what it wants the Court to direct the Governor to do, is correct.

The jurisdiction and power of this Court to hear this suit in the first instance and to decide it stems from § 1 of the Act of March 12, 1903, which establishes the writ of mandamus. Section 649, Code of Civil Procedure, 1933 ed., 32 L.P.R.A. § 3421.

Since the Court has jurisdiction and authority to hear this controversy in first instance only by way of constitutional exception, different from what could occur in the courts of first instance under the modern procedural liberalism—see Rules 6.5(b) and 10.2(5) of the Rules of Civil Procedure of 1958—this Court must strictly and rigorously follow the procedural and substantive provisions *on this matter* imposed by the lawmaker in authorizing this *writ*, according to a special and extraordinary writ described by the very law which creates it, as a high prerogative writ and which, as I shall discuss later, has a classical and particular feature unmistakable at law which has been secularly established. In the exercise of its jurisdiction and authority to hear this suit in first instance by way of constitutional exception, this Court cannot extend itself with regard to *this matter* beyond the scope permissible by the Act which creates this extraordinary writ, law which in the case at bar constitutes the source of law which enables us to exercise the jurisdiction in first instance.[5]

---

[5] Since the power to decide judicially a litigious question is the very essence of judicial duty, the question of jurisdiction should be strictly analyzed. *Marbury* v. *Madison*, 5 U.S. (1 Cranch) 137. A state of facts where it was proper that the Secretary of State deliver to the applicant Marbury the commission of his office, having been declared by the Supreme Court, and the original action having been brought before the Supreme Court by virtue of an Act of Congress authorizing it, Marshall, in his historical decision of 1803, refuses to do so on the ground that the original jurisdiction of the Supreme Court of the United States was given by the Constitution—Art. III, § 2, par. 2—and Congress was not empowered to enlarge it by adding a writ of mandamus. Our Constitution permits, by exception, what the Federal Constitution does not permit, but the statute must be strictly complied with, particularly in its substantive provisions.

In the first case of mandamus elucidated in the Colony of Massachu-

If from the facts, the applicable statute, and rule of law it appears that it is proper to issue a judicial order compelling the Governor to perform the acts which the petitioner requests us to direct him to perform as a duty of his office, and which in my opinion are none other than to appoint persons designated by the petitioner party for the first advisory group, and to assign them the consideration of the matters which said party submits, such order should be issued.

If, on the contrary, from the facts, applicable statute, and rule of law it appears that said judicial order compelling the Governor to perform such acts does not lie, this Court should deny it.

Any other determination or decision of this Court in the first instance, except for those aforementioned, are, in my opinion, wanting of jurisdiction and constitutional power therefor.

## —II—

In the light of the special defenses presented by the Governor in his answer, among them that the subject matter involved in this litigation is a nonjusticiable controversy, that is, that it is not subject to action of court because of its

---

setts in the year 1729, the jurisdictional question is analyzed more dramatically than in *Marbury*, and an extraordinary wrangle occurred between the Executive, Legislative, and Judicial powers. A Committee of Arbitration decided that the Meeting House of Malden should be located in a certain place. The Legislature affirmed the Committee. In view of the disobedience of the South sector, the North sector resorted to court and the latter issued a writ of mandamus commanding the obedience of the decision of the Committee. It was requested from the Legislature, as an appellate body composed of a House of Representatives and an Executive Council, to dismiss that *writ* of mandamus and the Legislature was divided. The Council sustained the judicial decision, the House of Representatives reversed it against a strong opposition by the Council, on the ground that the court (predecessor of the Supreme Judicial Court of Massachusetts) lacked *original jurisdiction* to grant the mandamus. Finally, the House prevailed. 1 The American Journal of Legal History, *"Mandamus in the Colonies"* 328 *et seq.*, 1957.

political nature; and that the writ is contrary to law under the principle of separation of powers, I believe it is necessary to set this controversy in the proper place in relation to the doctrines established in the leading cases of *Baker* v. *Carr*, 369 U.S. 186 (1962), and *Powell* v. *McCormack*, 395 U.S. 486 decided on June 16, 1969. Both parties invoke and discuss these cases.

I believe that there is a substantial difference on the merits of these cases and the case at bar, and I think that, before considering the merits of this case, it is proper to discuss that difference.

## Baker v. Carr

On the merits of the case of *Baker* v. *Carr*, there arises the delicate never-ending problem in the federative system of the Union concerning the relations between the Federal Sovereignty and the sovereignty of the States regarding the extent to which the Federal Judicial Power can and should intervene or properly abstain from intervening in the governmental or official action of the States in the exercise of their sovereignty. There is no such problem in the case at bar.

Residents of five counties of the State of Tennessee, allegedly qualified voters, brought suit on their own behalf and on behalf of other voters similarly situated against State officials of said State in a three-judge Federal District Court. Their action was filed under the authority of §§ 1983 of Title 42 and 1343(3) of Title 28, U.S.C., to redress the alleged deprivation of their constitutional rights by the State.[6]

---

[6] Section 1983 of Title 42 establishes that every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

Section 1343(3) of Title 28 establishes that the district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person to redress the deprivation, under color of any

After presenting the pleadings and the facts on the merits, 369 U.S. 187 to 193, the opinion of the Court delivered by Mr. Justice Brennan refers to plaintiffs' prayer as follows: (at p. 193)

"The complaint concludes that. 'these plaintiffs and others similarly situated, are denied the equal protection of the laws accorded them by the Fourteenth Amendment to the Constitution of the United States by virtue of the debasement of their votes.' "

In footnote 15 following the preceding statement, the Court points out that it is clear that the constitutional claims rest exclusively on an alleged violation of the Fourteenth Amendment, violation of the Equal Protection Clause of that amendment, and, furthermore, it explains that the Court shall not consider the political allegations to the effect that the action of the State was contrary to the philosophy of government in the United States and all Anglo-Saxon jurisprudence.

The District Court dismissed the action based on the grounds of (1) lack of jurisdiction of the subject matter, and (2) that the complaint failed to state a claim upon which relief could be granted. This second reason was considered in the opinion in the sense that the District Court had decided that the complaint failed to state a justiciable cause of action or subject to action of court.

In the elaborate discussion which follows regarding the jurisdiction on the subject matter, the standing or right to sue of those plaintiffs and the justiciable or not justiciable nature of the claim, it was clearly established that *Baker* v. *Carr* settled a problem of personal and individual rights of the citizens of Tennessee, rights which were protected against state action by the Federal Constitution, in that case, by the Equal Protection Clause of the Fourteenth Amendment. The opinion repeatedly discards any view that the Court had

State law, ordinance, etc., of any right, privilege or immunity secured by the Constitution of the United States.

under consideration a political question, in such a case non-justiciable, or that the constitutional Guaranty Clause of a Republican form of government was involved therein. (Article IV, § 4.) "Our conclusion, see pp. 208–237, *infra*, that this cause presents no nonjusticiable 'political question' settles the only possible doubt that it is a case of controversy." (P. 198.) "These appellants seek relief in order to protect or vindicate an *interest of their own* and of those similarly situated." (P. 207.) "The injury which appellants assert is that this classification disfavors the voters in the counties in which they reside, placing them in a position of constitutionally unjustifiable inequality vis-a-vis voters in irrationally favored counties." (P. 207.) "A citizen's right to a vote free of arbitrary impairment by state action has been judicially recognized as a right secured by the Constitution." (P. 208.)

Under the view of the justiciability: "Of course, the mere fact that the suit seeks protection of a political right does not mean it presents a political question. Such an objection 'is little more than a play upon words.' " (P. 209.) "The question here is the consistency of state action with the Federal Constitution. We have no question decided, or to be decided, by a political branch of government coequal with this Court." (P. 226.)

Mr. Justice Douglas, concurring, is likewise explicit as to the fact that this suit involves the protection of a personal and individual interest. "I put to one side the problems of 'political' questions involving the distribution of power between this Court, the Congress, and the Chief Executive. We have here a phase of the recurring problem of the relation of the federal courts to state agencies. More particularly, the question is the extent to which a state may weight [*sic*] one person's vote more heavily than it does another's." (P. 241.)[7]

---

[7] Mr. Justice Clark's recital in his concurring opinion, 369 U.S. 253–259, gives an exact idea of the violation, by the State of Tennessee, of the constitutional right of plaintiffs, whose protection was claimed in court.

Thus, it is clear that *Carr* involves the vindication of the individual rights that the Court held were protected by the Federal Constitution against unreasonable action of the State, and that, therefore, plaintiffs were entitled to a trial and a decision on its merits.

## *Powell* v. *McCormack*

In this case, different from *Baker* v. *Carr*, the action arises and develops within the federal sovereignty itself. The problem of the nonjusticiable political question arises more evidently. Contrary to *Baker's* explanation as to said action— 369 U.S. 226—in this *Powell* case there is a question settled by another political branch of the government "coordinate" or having the same authority as the Judicial Branch.

Representative Powell was elected to Congress in November 1966, from a district of New York. In January 1967 he was not permitted to take oath or to take his seat pending the report of a Select Committee appointed to determine whether the Congressman Powell could or could not take his seat. In February 1967 the Committee reported that Powell *met the constitutional qualifications to take office*, but for some reasons set forth the Committee recommended that he be sworn and seated, but that he be censured by the House later and fined $40,000, and deprived of his seniority. On the contrary, the House decided to exclude Powell and directed that the Governor of New York be notified that the seat was vacant.

So, this suit arose in a Federal District Court which dismissed the complaint for want of jurisdiction of the subject matter. Powell instituted this suit against five representatives named individually and representing the House, including its Speaker, jointly with the Clerk, Sergeant at Arms, and the Doorkeeper of the House, not lawmakers. The Clerk, because he refused to perform the services to which a Con-

gressman is entitled; the Sergeant at Arms, because he refused to pay Powell his salary; and the Doorkeeper, because he denied Powell admission to the House Chamber.

In view of the contention that the suit had become moot and had lost its efficacy, because in January 1969, pendente lite Powell had been seated by a subsequent Congress, the Court refused to dismiss the action.

The reasons stated for refusing to decree that the suit was moot and to dismiss it, 395 U.S. 495–500, emphasized the fundamental difference, which I am trying to point out, between those two cases and the case at bar. The only dissenting opinion, that of Mr. Justice Stewart, precisely centers upon this aspect. (P. 574.)

The defense that the Speech or Debate Clause of the Constitution, Art. I, § 6, was an absolute bar to the action,[8] having been invoked, the Court dismisses the case against the defendant congressmen. (Pp. 506–550.) The Court ruled that the respondents, legislative employees, were not immune under said clause against suits to answer for *unconstitutional actions*, even though they acted in the execution of orders or mandates of the Houses.

Discussing the want of jurisdiction of the subject matter, ground on which the District Court relied for dismissing the case, the Court states at p. 512:

"As we pointed out in *Baker* v. *Carr*, 369 U.S. 186, 198 (1962), there is a significant difference between determining whether a federal court has 'jurisdiction of the subject matter' and determining whether a cause over which a court has subject matter jurisdiction is 'justiciable'. The District Court determined that 'to decide this case on the merits . . . would constitute a clear violation of the doctrine of separation of powers' and then dismissed the complaint 'for want of jurisdiction of the subject matter.' [Citation.] However, as the Court of Appeals

---

[8] ". . . and for any Speech or Debate in either House, they shall not be questioned in any other Place."

correctly recognized, the doctrine of separation of powers is more properly considered in determining whether the case is 'justiciable.' We agree with the unanimous conclusion of the Court of Appeals that the District Court had jurisdiction over the subject matter of this case. However, *for reasons set forth in Part VI, infra,* we disagree with the Court of Appeals' conclusion that this case is not justiciable."

Considering the justiciability of the case, the Court concludes that the litigation does not involve a political question which under the doctrine of the separation of powers would render it unjusticiable, according to the interpretation given to § 5, Art. I of the Constitution.[9] It concludes that the textually *demonstrable constitutional commitment* by the Constitution to Congress—another "coordinate" political branch of the government—to judge the qualifications of its members was limited, in an *exclusion* case (it determined that this case was such) and not in an *expulsion* case, to judge those qualifications expressly established by Art. I, § 2, Cl. 2, of the Constitution and none others.[10]

Mr. Justice Douglas expresses this idea more clearly in his concurring opinion: "Contests may arise over whether an elected official meets the 'qualifications' of the Constitution, in which event the House is the sole judge. But the House is not the sole judge when 'qualifications' are added which are not specified in the Constitution."

—III—

I want to refer now to the basic and fundamental difference between *Baker* v. *Carr* and *Powell* v. *McCormack,* and other cases cited therein, on one hand, and the contro-

---

[9] "Each House shall be Judge of the Elections, Returns and *Qualifications* of its own members."

[10] "No person shall be a Representative who shall not have attained to the age of twenty-five years, and been seven years a citizen of the United States, and who shall not, when elected, be an Inhabitant of that State in which he shall be chosen."

versy before this Court, on the other. In *Baker*, as well as in *Powell*, the judicial cause of action is brought to remedy or redress individual rights, personal rights of the citizen, guaranteed in both cases by the Constitution, even though they were political rights guaranteed by the Constitution. In the first case, redress against a State's constitutionally unreasonable action concerning a citizen's right to vote; in the second case, relief against an unconstitutional action of another political "coordinate" branch of Government as to the right of a citizen to hold public office which is constitutionally protected. ". . . the mere fact that the suit seeks protection of a political right does not mean it presents a political question." *Baker* v. *Carr*, 369 U.S. 209.

The fundamental point in the *Powell* decision is not precisely its final result. The Court held that the controversy was justiciable against the defense of political question and, therefore, of the doctrine of separation of powers, as a result of the form in which the Court interpreted and applied § 5 of Art. I, in an *exclusion* case. If the Court had construed and applied said section contrariwise, that is, that in the exercise of its constitutional powers granted to Congress by § 5, Art. I, the Congress was not limited by the express provision of § 2, Cl. 2 of Art. I, the final decision would have been completely opposite, that is, that it was a function committed by the Constitution to other "coordinate" branch of Government and the controversy was not justiciable under the theory of a political problem and the separation of powers.

The fundamental point in the *Powell* decision is the fact that because it dealt with a claim of a *personal* and *individual* right of the citizen allegedly protected by the Constitution, the Supreme Court could not surrender its duty *to interpret* the constitutional provisions involved in the controversy and so dismiss the case without more, as it was done in first

instance, on the ground that because it was an action arising in another political branch of government within its own operation, the controversy was not justiciable under the political question and the doctrine of the separation of powers. The fact that under the conflicting circumstances of this case the Supreme Court did not refrain from interpreting the Constitution for the protection of *individual rights*, is the fundamental thing in the decision of *Powell* v. *McCormack*.

Chief Justice Warren says: (395 U.S. 548)

"But, as our interpretation of Art. I, § 5, discloses, a determination of petitioner Powell's right to sit would require no more than an interpretation of the Constitution. Such a determination falls within the traditional role accorded courts to interpret the law, and does not involve a 'lack of the respect due [a] co-ordinate [branch] of government,' nor does it involve an 'initial policy determination of a kind clearly for nonjudicial discretion.' *Baker* v. *Carr*, 369 U.S. 186, at 217. Our system of government requires that federal courts on occasion interpret the Constitution in a manner at variance with the construction given the document by another branch."

Upon examining the pleadings, the facts involved, and the applicable statute and the law, I am convinced that different from *Baker* and *Powell*, difference which in my opinion is fundamental, the suit at bar does not involve any personal or individual right whatsoever of a natural or juridical person, protected by the Constitution or by the laws of the Commonwealth—or by any other legal body which could be invoked and be applicable—that should be protected or vindicated by the courts.

Different from *Baker* and *Powell*, we are not considering a judicial action to defend and protect personal and individual *political rights* of the citizen, in which case this Court, I am referring to the judicial power, cannot surrender its constitutional duty to protect and assist, but that, on the

contrary, this Court is considering a case which deals with a *subject matter* entirely political, which is the development or improvement of the political system governing over the citizens of Puerto Rico; subject matter which under the appropriate constitutional standards in a Republican form of government, and Congress determined that the Commonwealth is such,[11] is clearly committed to its two political branches, the Legislative and the Executive Branches, more reasonably in view of the fact that the advancement and political improvement of the Commonwealth does not depend exclusively on the will of the people of Puerto Rico, but that, in this process, the will of Congress and of the people of the United States come also into play.

Only to the political branches of the government, the Legislative and the Executive, is the initial determination of the policy to be followed in the process of improvement of the Commonwealth committed, such determination being immune from judicial discretion and it corresponds exclusively to such political branches, in said process, to establish the understanding and comprehension with the Congress and the people of the United States. As a part of the preceding conclusions I add ANNEX I, which I attach to this opinion.

After considering the pleadings, the facts and the applicable statute and the law, my conclusion is that the *subject matter* of this suit—where there are no individual rights of the petitioner, nor of any other person to be asserted by way of the judiciary, and where neither the petitioner nor any other person has standing or a right or reason to demand[12]— the same is not justiciable as a *political* question and its corollary of separation of powers.

The fact that the writ of mandamus has been used as a means does not alter a bit the entirely political nature of the

---

[11] Public Law No. 447 of July 3, 1952, 66 Stat. 327.

[12] Legal criterion of *"standing"* as discussed in *Carr* and *Powell*.

*subject matter* involved, nor the conclusion that it is not justiciable. Because under the circumstances of fact and of law which surround this case, the pure executive function, political par excellence, is exercised—of which the Governor, as Chief of the Executive Branch, is the trustee and sole judge—only in conformance with conscience, good judgment, and sound discretion of the Executive, and entirely free of judicial intervention as has been long established by a secular rule of public law. This political function is named by the Constitution, the "Executive Power" and is vested on the Governor. Article IV, § 1.[13]

---

[13] In the beginning of the century the majority of the decisions were in favor of proscribing the issuance of a mandamus against a State Governor, irrespective of whether or not it was a ministerial duty, and even though it dealt with a ministerial duty, prohibition which was consistent with the political reasons of separation of powers in the State Constitutions. Merrill, Law of Mandamus 102 *et seq.* (1892). Merrill compares *People* v. *Governor*, 29 Mich. 320, decided by Mr. Justice Cooley, with *Martin* v. *Ingham*, 38 Kan. 641, as representing the views in one sense or the other. See, *Lutz* v. *Post, Governor of Porto Rico*, 14 P.R.R. 830, 834 *et seq.* (1908). One of the views expressed in *Lutz*, at p. 834, is that here the courts, as well as the Governor, derived their power from the Organic Act, that is, that the Governor, as well as the courts, acted as agents of the same grantor of power, the Congress of the United States.

Up to 1946 twenty states had decided that the Governor was not immune to mandamus for the sole constitutional political reason. Eighteen states granted absolute immunity. All of these states are mentioned in *"Mandamus to Review State Administrative Action,"* 45 Mich. L. Rev. 126.

Aside from what we said in 1944 in *Banco Popular de Puerto Rico* v. *District Court*, 63 P.R.R. 63, as to the fact that the political doctrine of constitutional separation of powers governed in Puerto Rico, when the Constitution of the Commonwealth went into effect on July 25, 1952, such constitutional separation of powers was consecrated in Art. I, § 2, upon establishing that the Government of the Commonwealth shall be republican in form "and its legislative, judicial, and executive branches, as established by this Constitution, shall be *equally* subordinate to the sovereignty of the people of Puerto Rico."

Nevertheless, I shall not reexamine now *Lutz* v. *Post*, nor evaluate the two trends of authority in the light of our Constitution. It is not necessary because the position I assume is not to dismiss the case flatly for *want of jurisdiction.* I have reached by conclusions against the propriety of the mandamus after examining and weighing the merits.

My dissenting vote when the Governor was directed to answer the

## —IV—

Upon formulating the foregoing conclusions, I have mentioned the examination of the pleadings, the facts, the statute, and the rules of law applicable to this case.

On August 5, 1966, the United States-Puerto Rico Commission on the Status of Puerto Rico[14] submitted its report to the President and to the Congress of the United States, and to the Governor and the Legislative Assembly of the Commonwealth of Puerto Rico, with the following recommendation:

"The above conclusions and the facts underlying them point to the need, in the immediate future, for a method that provides for the consideration of proposals for improvement or growth of the Commonwealth, or for change to Statehood or Independence.

"The Commission recommends that procedures be devised which will permit the establishment of ad hoc joint advisory groups upon the initiative of the President of the United States and the Governor of Puerto Rico, acting jointly.

"These ad hoc joint advisory groups would be composed *of persons of the highest prestige and ability,* and would consider problems affecting the relations between the Island and the Mainland referred to them by the President of the United States and the Governor of Puerto Rico. Each joint advisory group would report its conclusions and recommendations to the

---

petition for mandamus was not due to a view of want of jurisdiction, but to the fact that in the light of the pleadings, assuming that they were true and correct, and with my most favorable attitude towards them and since only a question of law was involved, at that time I thought I was in a condition to render my opinion *on said pleadings.*

Upon examining our decisions in cases of mandamus against the Governor, there always arises a right or individual and beneficial interest of a person who seeks judicial relief. This is consistent with an indispensable requirement from the origins of this extraordinary writ, so that it may be issued. In *Lutz,* we rejected the idea that the mere role of public informer as owner of a newspaper would give plaintiff that right or basic individual interest.

The present case is unique.

[14] In ANNEX I attached hereto, I refer to the antecedents and creation of this Commission.

President and the Congress of the United States and to the Governor and the Legislative Assembly of Puerto Rico. *The membership of each advisory group would be determined by the nature of the particular problem under consideration.*

"If the people of Puerto Rico should by plebiscite indicate their desire for Statehood or Independence, a joint advisory group or groups would be constituted to consider appropriate *transition* measures. If the people of Puerto Rico should *maintain* their desire for the further growth of Commonwealth along the lines of the Commonwealth Legislative Assembly's Resolution No. 1 of December 3, 1962, *or through other measures* that may be conducive to Commonwealth growth, *a joint advisory group or groups would be convened to consider these proposals.*"[15]

On December 23, 1966 the Legislative Assembly of Puerto Rico approved Act No. 1 "To provide for the holding of a Plebiscite on the Political Status of Puerto Rico," etc. Its § 1 provided that a plebiscite be held on July 23, 1967, in which the people of Puerto Rico would express its will concerning its political status in which the electors could choose among (a) Commonwealth, (b) Statehood, and (c) Independence. It provided that a vote in favor of Commonwealth would mean:

"(1) The *reaffirmation* of the Commonwealth established by mutual agreement under the terms of Act 600 of 1950 and Joint Resolution 447 of 1952 of the Congress of the United States as an autonomous community permanently associated with the United States of America;

"(2) The inviolability of common citizenship as the primary and indispensable basis of the permanent union between Puerto Rico and the United States;

"(3) The *authorization* to develop Commonwealth in accordance with its fundamental principles to a maximum of self-gov-

---

[15] The Status of Puerto Rico, Report of the United States-Puerto Rico Commission for the Study of the Status of Puerto Rico. Puerto Rico Booklets—No. 5—Office of the Commonwealth of Puerto Rico in Washington, D.C., 1967. Translated in Status of Puerto Rico, U.S. Government Printing Office, Washington, D.C.

ernment compatible with a common defense, a common market, a common currency and the indissoluble link of the citizenship of the United States; ·

"(4) That no change in the relations between the United States and Puerto Rico shall take place unless previously approved by a majority of the electors voting in a referendum held to that effect." (Italics ours.)

That a vote in favor of Statehood would mean:

"The *authorization* to ask the Congress of the United States of America to admit Puerto Rico as a federated state of the American Union." (Italics ours.)

That a vote in favor of Independence would mean:

"The *authorization* to ask the Congress for the independence of Puerto Rico from the United States of America." (Italics ours.)

Section 19 of the Act provides how the ballots should be printed and it was established that all the way across the lower part of the same, captions identical with those of § 1, as above-copied, as to the meaning of the vote given to each of the formulas, should be inserted. However, it was ordered that the following caption not included in § 1 be inserted in the ballot:

"A majority vote in favor of any of the status formulas constitute a *mandate* of the People of Puerto Rico to the *Resident Commissioner,* as their representative in the federal sphere, to act in the discharge of his official duties in accordance with the will of the people expressed through the said vote." (Italics ours.)

In § 45 it was established that the General Supervisor of Elections would certify to the Governor the result of the plebiscitary consultation; that the Governor, in his turn, would certify said result to the President and the Congress of the United States, to the Resident Commissioner, and to the Legislature of the Commonwealth of Puerto Rico.

It was also determined that if one of the formulas should win, as provided in § 2 (the formula which would obtain more than 50% of the total sum of the number of valid votes cast for the three formulas), the Governor would, in his certification to the President, *ask for* the joint constitution of the advisory groups recommended in the Report of the Status Commission, and that according to that report, the joint advisory groups should consider the necessary *transition* measures toward Statehood or toward Independence, in the event that one of these formulas should win. The lawmaker immediately provides:

"In such case [in the event the Statehood or Independence be the winning formula] the members of the advisory groups that must be appointed by the Governor of Puerto Rico shall be designated *on proposal* of the Party or the Directing Committee that has represented the winning formula in the plebiscitary process. If the representation of the formula in the plebiscitary process has been dual, the Party and Directing Committee shall be entitled to propose an equal number of members." (Italics ours.)

In the paragraph that follows, § 45 provides that:

"In the event that Commonwealth be the winning formula, the Governor *shall propose* to the President the joint constitution of the advisory groups in conformity with the findings that from time to time may be made on the measures of development of the Commonwealth, to be considered *on the basis of the authorization granted at the plebiscite."* (Italics ours.)

Some observations are in order. The first one is to the effect that out of the four subsections of § 1 of the Act referring to what a vote in favor of the Commonwealth would mean, and which are printed in the ballot, subsections 1, 2, and 4 are only declaratory. In other words, that if the vote cast on this ballot was in favor of the Commonwealth, it had the effect of being (a) the *reaffirmation* of the Commonwealth, (b) an *expression* of the inviolability of the common

citizenship as the primary and indispensable basis of the permanent union between Puerto Rico and the United States, and (c) an *expression* that no change in the relations between the United States and Puerto Rico would take place unless previously approved by a majority of the Puerto Rican electors. Only subsection (3) involves properly an act of the elector and not a declaration. This act is his *authorization* that he gives to develop the Commonwealth as indicated in said subsection (3).

To whom is this authorization addressed? Even though the act does not state it, I believe it is addressed to the political branches of the government, the Legislative and the Executive. On the contrary, upon casting his vote the elector granted the *mandate* of the people that appears in the ballot and which covers the three formulas. A mandate *to the Resident Commissioner*, so that he, as his representative in the federal sphere, may act in the discharge of his official duties according to the will expressed by the people in said vote.

A second observation is as follows:

Section 45 of the Act provides that if one of the three formulas wins, in the certification to the President of the result of the voting, the Governor would *ask* for the joint constitution of the advisory groups recommended in the report of the Status Commission.[16]

---

[16] The evidence in the record shows that on August 17, 1967, the Governor at that time, Roberto Sánchez Vilella, complied with the previous provision of the Act by certifying to the President the result of the plebiscitary consultation:

"I therefore propose the establishment from time to time of *ad hoc* joint groups to recommend such measures as in their judgment shall promote the development of full self-government and the creation of a more perfect union between the United States and Puerto Rico, within the basic nature of Commonwealth status."

In President Johnson's answer dated the following day, the President says that he is ready to appoint the United States members of such group or groups whenever the Commonwealth of Puerto Rico may be ready to appoint the *Commonwealth* members. "I stand ready to appoint the U.S.

But § 45 mentions the act of appointing or designating, as a result of the consultation, conceivably, immediately or within a reasonable period of time thereafter, only in the event Statehood or Independence would have been the winning formula. And only on this occasion the Governor should appoint or designate, *on proposal* of the Party or the Directing Committee which would have presented the winning formula. This provision of § 45 became *functus officio* as soon as the poll ended and neither Statehood nor Independence won.

With respect to the Commonwealth, the winning political system, § 45 provided that the Governor *would propose* to the President *the joint constitution of the advisory groups* in relation to the measures of development of the Commonwealth, to be considered on the basis of the *"authorization"* granted by the people at the plebiscite.

A third observation concerning the foregoing provision of the Act. The undeniable fact remains, with regard to the aspect of the petition for mandamus concerning the *agenda*, that the *authorization* granted by the voter upon casting his vote in favor of the Commonwealth is that of subsection (3) of § 1, which by virtue of § 19 is inserted or copied in the ballot and is the one the voter reads. This subsection (3) is drafted in *general* terms with the only consideration that the

---

members of such group or groups whenever the Commonwealth of Puerto Rico may be ready to appoint the Commonwealth members."

The President closes by saying that it is fitting that the *agenda* of these groups should be proposed by the Governor of the Commonwealth.

On the date this lawsuit was filed, May 2, 1969, neither President Johnson was the President of the United States, nor Governor Sánchez Vilella was the Governor of Puerto Rico. Neither President Johnson's political party there, nor Governor Sánchez Vilella's political party here, were then in power.

In view of the nature of the judicial action of mandamus brought and of the entirely political nature of the *subject matter* involved in this lawsuit, the fact previously indicated is, in my opinion, of considerable importance.

development of the Commonwealth must be in accordance with "its fundamental principles," and be compatible with a common defense, a common market and a common currency and the indissoluble link of the citizenship of the United States.

This *authorization* so granted by the voter in the ballot when he cast his vote in favor of the Commonwealth, does not mention any subject matter, area, or specific sphere of development, nor does it mention *priorities* among those subject matters, areas, or spheres.

Under those circumstances of law, which would defeat *ab initio* any petition for mandamus, even if it were most favorably received, it is logical and reasonable that heads of government, politicians, members of the Legislative Branch, and members of the Executive Branch, attorneys at law, scholars of Constitutional and Public Law, and the citizens, honestly disagree as to ways, methods, priorities, spheres, in the process of development of the Commonwealth, *"in accordance with its fundamental principles,"* as the voter read in the ballot.

It is still more logical and reasonable that, among the principal actors who take part in the process of development, there is a sincere difference of opinion in the substantive aspect of the process, as well as with respect to the mechanism, when we consider the historic-political fact, which I explain in detail in ANNEX I, attached hereto, that there has existed and there exists an open controversy of ideas and views as to what the political system of the "Commonwealth" is or pretends to be, politically and constitutionally, controversy of ideas and views which precisely gave rise to the facts which culminated in the creation of the Status Commission and some time later in the plebiscitary consultation.

This controversy, which unquestionably led to the approval of Joint Resolution No. 2 of March 19, 1959, about

"clarifications and modifications" to the Puerto Rican Federal Relations Act, resolution which later gave rise to the Fernós-Murray Bill, which was not approved, had also a repercussion on Congress during the debates of the Aspinall Bill, which created the Status Commission.

It is still more logical and reasonable that there be an honest and inevitable difference of opinion or understanding between the principal actors in the process of development if, as to that logic and honest difference, we consider the historical fact which cannot be ignored, that on the date the petition for mandamus was filed, the "Executive Power" in Puerto Rico had been vested by the people to the representatives of a Party other than petitioner herein, the latter having strived for and later supported the Commonwealth during the plebiscitary consultation.

The fact that those logical, reasonable, honest, and inevitable differences of opinion exist among the political branches of the Government, politicians, and other citizens, does not empower this Court, the Judicial Power, to mediate in the controversy when no individual or personal right of any citizen or particular person to be protected is involved, and when the *subject matter* in litigation is entirely of a political nature. As may be seen in *Baker* v. *Carr*, at p. 208, what those petitioners were asserting therein was not *merely* a claim of the right possessed by every citizen to require that the Government be administered according to law, quoting *Fairchild* v. *Hughes*, 258 U.S. 126.

Finally, a fourth observation is that the only *mandate* that appears from the face of the ballot itself, which by virtue of § 19 the voter had before him at the time of casting his vote, and which is later ratified in § 45 after the consultation, is a mandate directed to the *Resident Commissioner* ordering him to act as their representative in accordance with the winning formula.

## —V—

Up to here, the positive law applicable. It has been necessary to make a detailed examination of the same because in this extraordinary writ of mandamus, which is a "high prerogative" and selective writ, of a brusque nature; coercive and urgent, the courts cannot take liberties under the pretext of searching for a hidden legislative intent upon interpreting the law.

The Act of March 12, 1903—"An Act to Establish the Writ of Mandamus"—provides in its § 1 that the writ is *"a high prerogative writ"* and provides in § 2 that it may be directed to any inferior tribunal, etc., or person *"obligada al cumplimiento de un acto que la ley 'particularmente ordene' como un deber resultante de un empleo, cargo o función pública; ...."* In its § 3 it provides that the writ may be issued *basado en los informes de la parte "beneficiada e interesada."*[17]

Those concepts of "a high prerogative writ," "act which the law specially enjoins," "party beneficially interested" were not used there by the lawmaker at random or extemporaneously. They collect and synthesize a series of rules accumulated in the decisions of three centuries, and those concepts are there with the purpose of limiting and restricting the judicial power to enjoin, as necessary protections by reason of the origin of this writ and its coercive nature.[18]

---

[17] The English text, which prevails, states "to compel the performance of any act which the law *'specially'* *enjoins* as a duty resulting from an office, . . . ." In § 3: "It may be issued on the information of the party *'beneficially'* interested." ("beneficially interested")

[18] Originally, the writ consisted of mandates of "I command and order" issued directly by the King. They did not admit any return or defense. Later on, tempering *its strictness,* the writ was issued by the Court of King's Bench. Before Lord Mansfield broadened its scope, it was principally used to order the restitution to a public office and was better known as a writ of restitution.

Merrill, *op. cit.,* gathering the historical antecedents that have not changed as of today, comments:

There is nothing in the Plebiscite Act of 1967, nor in any other applicable law, to impose on the Governor the clear and unavoidable duty, resulting from his office, to constitute advisory groups with persons designated by the petitioner Party, nor the unavoidable duty to submit to those persons, as their work, the topics or agenda submitted to him by the petitioner Party, the performance of said duty to be imposed on him through a writ of mandamus.

The Court cannot, as petitioner requests, in view of the facts that the Act does not mention the duty that we are requested to enjoin, include said duty in the statute by way of the search of a legislative intent, and after being included therein by the Court, and not by the lawmaker, command its compliance by means of a writ of mandamus as a "special" duty previously established by law. To do so would result in the destruction of three centuries of judicial decisions and a great principle of a good system of the Law.

Notwithstanding ho wmuch has been written, ever since, on the matter, the words of Mr. Chief Justice Chase in *State of Mississippi* v. *Johnson*, 71 U.S. 475, to the effect that it is impossible to confound the term "ministerial" with the term "executive," and that the duty, the performance of which may be required, is a simple and definite duty imposed by law, are still as effective as in 1866 when they were pronounced. (P. 498.)

Even though the Report and Recommendation of the Status Commission were given the category of *law*, as supplementary to the Plebiscite Act, the fact remains that said Commission refers to "persons of the highest prestige and

---

"The writ of *mandamus* has often been styled a high prerogative writ,* the right arm of the law, and one of the flowers of the crown. It is not lightly called into exercise. It will only be used to protect *a person* from *substantial* injury, or to secure or protect *substantial* rights. Accordingly it has been held that it will not issue unless temporal rights are involved." (P. 53.)

\* Our Law of Mandamus uses the same term: "high prerogative writ."

ability"—highest prestige and ability which the persons proposed by petitioner unquestionably possess—but not necessarily by reason of political affiliation.

In the first place, the text of § 45 of the Act is clear, diaphanous and free from all ambiguity. Section 14, Civil Code, 1930 ed. "When a law is clear and free from all ambiguity, the letter of the same shall not be disregarded, *under the pretext* of fulfilling the spirit thereof." Applying this provision of law, I stated in a former occasion that "when the lawmaker has expressed himself in a clear and unambiguous language, the text of the Act is *the perfect expression of the legislative intent." López* v. *Muñoz, Governor,* 81 P.R.R. 328, 337 (1959).

In the second place, if there is an occasion when there is no discrepancy between the text of the law and the legislative intent, and where both go hand-in-hand, it is this occasion. Section 45 of the Act is not a careless or negligent nor an ineffective piece of legislation. There are no unforeseen or unexpected omissions. On the contrary, it is consistent with a political reality and juridical truth. Why?

The Commonwealth was not one of three "formulas" for the plebiscite. It was something more. It was, as it is, the existing political regime. It was the people of Puerto Rico itself, the inhabitants of Puerto Rico, as a sovereign political entity. In the plebiscitary process, the Commonwealth was not only the members of Popular Party, petitioner herein, that defended it, but also the Commonwealth was those who voted for Statehood and those who voted for Independence, who desired a change to another political system.

The Legislature which approved the Plebiscite Act was one comfortably controlled by lawmakers who defended the Commonwealth and wanted its permanency; and the Governor in office who terminated the legislative process upon signing the Act, also supported the Commonwealth and wanted its permanency.

It is logical; the contrary would have been illogical and a nonsense, that said Legislative Assembly, supporter of the Commonwealth status, did not assume the paternity thereof, and on the contrary, eluded any participation and responsibility in relation to the *transition* process to be followed in case of a change, in the event a different status formula should win. Hence, the Act provided that the persons to be appointed to consider the *transition* measures toward another political regime should be appointed on *proposal* of those who favored that other regime, instead of leaving the responsibility on the Commonwealth itself, through its Executive. In such a case, the Governor would only act as an *agent* of that sector of opinion for the sole purpose of the constitution of the group to consider the *transition.*

On the contrary, if the Commonwealth, the existing political system, should win, as it did—the people politically organized—the victory would constitute only a declaration of reaffirmation and improvement of the system by the voter, not a change. The Status Commission itself was aware of the situation and used the term "should indicate" in relation to Statehood or Independence, and "should maintain" in relation to the Commonwealth.

The lawmaker could not provide then that the advisory groups for the development should be appointed only on proposal of the Popular Party, or of the organization which had defended that reaffirmation at the plebiscite, nor that the development would be only along areas designated by the Popular Party or by the organization defending the development, because that would imply in itself a mistaken connotating of *ownership* by a Party or by an organization, of the political regime of a people.

In the political process of the development of the Commonwealth, the Commonwealth consists of the members of petitioner Popular Party, but it also consists of those who

favor Statehood and advocate it, and also those who favor Independence and advocate it.[19]

For the same reasons it is imperative to conclude that the Popular Party, petitioner herein, has no *"beneficial"* right or interest, either particular or *"special"*, as the Law of Mandamus provides and requires, to exercise this action, different from the general interest of any citizen in seeing that the government works.

The *subject matter* of this suit is the result of a common political phenomenon, susceptible of occurrence in any systems of government where there is a periodic electoral process.

The people who voted in the plebiscite of July 1967, are the people who voted in the elections of November 1968. The Commonwealth of the plebiscite is the Commonwealth of the elections. On the one and the other occasion, and also on May 2, 1969, when this action was filed, the *executive function* of the Commonwealth was vested, as it is vested now, on the Governor. It should not be necessary to explain that I am referring to the *Institution* of governorship, not to the officer who on a certain historic moment is discharging the office.

Thus, this ideological controversy which centers around the development of the Commonwealth, brought to the consideration of this Court, is an ideological controversy of the people *versus* the people itself; of the Commonwealth *versus* the Commonwealth itself; to be elucidated in the proper political forums, the forum of public opinion, the electoral

---

[19] Petitioner's intimation that § 45 may be null by reason of the violation of the constitutional clause of the equal protection of the laws, insofar as said section did not provide that the advisory groups be appointed on proposal of said Party, because it is the supporter of this "formula" at the plebiscite, is unsubstantial in view of the reasons which the lawmaker had to provide otherwise, and the logic of the situation. As to the effect of this clause to cause nullity, the Supreme Court of the United States has rendered too many opinions in the last years, it being impossible that the precise scope of said constitutional prohibition be unknown.

forum, the forum of the political branches of the government, *to be* decided by the people itself, which historically has given its own decision.

An obvious fact which convinces us that we are considering a subject matter evidently subject to mere political views and to the properly political "executive" function of the Chief Executive, is the fact that as of August 18, 1967, when President Johnson announced to the Governor of Puerto Rico that he stood ready to appoint the U.S. members of such advisory group or groups whenever the Commonwealth would be ready to appoint the Commonwealth members, a period of 16 and a half months elapsed in which the Governor and the Legislative Assembly who approved the Plebiscite Act, both supporters of the development of the Commonwealth, did not take action to initiate the process of development, despite the fact that at that time President Johnson was still holding office.

I should not speculate as to the reasons why the historic fact is so, but I can conclude that the Governor understood that that was an "executive" function of his office, of a political nature. This fact could have more or less importance in any other type of suit. In an action for mandamus, in my opinion, it is controlling.[20]

The Secretary of Justice is not far from reality when he

[20] In the document which the Governor attaches to his reply to petitioner, he mentions this fact and states:

"I point out that, although the plebiscite was held on July 23, 1967, no request was ever made to the then Governor of the Popular Democratic Party, Roberto Sánchez Vilella, to designate the Puerto Rican members to the 'ad hoc' Committees nor to assign topics or to appoint particular persons in the constitution of said committees, even though eighteen months elapsed since the holding of the plebiscite, until Mr. Sánchez Vilella's governorship terminated.

"It was clearly unreasonable, therefore, that said matter should be raised by that Party, only 21 days after I took office and after the filing of a suit by a private citizen and in which the Popular Democratic Party was a party."

intimates that the intervention of this Court, the Judicial Power, in that controversy, would be equivalent to the administration of the process of political development of the Commonwealth. In my opinion, it would have the effect of putting under judicial trust said process of political development. This development does not belong to petitioner Party as such, nor do the areas of development belong to petitioner Party in particular.

Could the Court then deny a writ of mandamus to any citizen who would request the Governor to designate certain persons deserving the appointment, or his own designation to an advisory group in the event the Governor refuses to do so? Could the Court deny another writ of mandamus to any citizen requesting the Governor to include for study a topic not included among the ten submitted by petitioner in case the Governor refuses to do so? Could the Court then refuse to intervene in any other aspect related to the process or mechanism for the development of the Commonwealth conceived by the imagination of the people and the citizenry in general and rejected by the Governor? That would be the judicial administration of the process of development of our political system. As a matter of fact, another private citizen already filed an action against the Governor on the same *subject matter* in a court having concurrent jurisdiction with this Court. *Enrique Bird Piñero* v. *Luis A. Ferré, Governor, etc., and Popular Democratic Party,* S.C.-S.J.-69-243.[21]

I believe that any intervention would be a serious judicial error. I believe that, were I to issue a writ of mandamus under the applicable law in this case and under the circumstances thereof, I would be exercising an act of force by a constitutional branch of the government against another "co-

---

[21] In view of the conclusion which I have reached against the issuance of the writ, I do not consider it necessary to discuss the defense of res judicata by a final judgment of a court in the exercise of a jurisdiction of the same hierarchy as the one herein exercised in first instance.

ordinate" constitutional branch of the government. No person could be benefited by depreciating the Executive function, as no person would be benefited by depreciating the Legislative or the Judicial function. In all of these cases the loser would be the People, both constitutionally and politically.

For all the reasons and considerations stated in this opinion, I have concluded that the *subject matter* involved in this suit, completely political, is of the exclusive concern of the Executive and Legislative Branches of the Commonwealth and, as a consequence, unjusticiable. For this reason, I have voted against the issuance of the writ of mandamus, now or at any time in the future.

—O—

ANNEX I TO THE OPINION OF MR. JUSTICE SANTANA BECERRA

Brief historical data of the political situation
of the inhabitants of Puerto Rico

### 19th CENTURY

Ever since the beginning of the 19th Century, when by Decree of January 22, 1809 of the *Junta Suprema y Gubernativa* of Spain, Puerto Rico was admitted as an integral part of the Spanish Monarchy and its inhabitants were granted national representation before said *Junta* in the name of King Fernando VII, event which resulted in the election, on May 4, 1809, of Ramón Power to represent the Puerto Ricans at said *Junta Suprema y Gubernativa* and the historic act at the Cathedral where the first Puerto Rican Bishop took off his pastoral ring and delivered it to the Representative in pledge of remembrance of his decision to support "the rights of our countrymen"; and the aforementioned *Junta Suprema* having been dissolved and substituted by the *Consejo de Regencia* of 1810, the latter reaffirmed, by official

decree, that Puerto Rico was an integral part of the Spanish Nation and that the Puerto Ricans were entitled to "the same rights and prerogatives as the Metropolis," which resulted in the second election of Power as a Deputy of the *Cortes;* and the preceding declaration of the *Consejo* being reaffirmed by the Decrees of the *Cortes* when Power was installed and seated in his first Vice-presidency, proclaiming the Spanish dominions in both hemispheres, as "a sole nation and a sole family," and the equal rights of the natives of Puerto Rico and of those of the peninsula; and since then and up to this day the Puerto Ricans have not ceased at any moment in their struggle to obtain more political liberties as a people.

Since then the earnest desire of the Puerto Ricans and their struggle for more political power has been, borrowing a verse from the late poet who sang to our countryside, *"un pecho que grita en verde; ¡ pero que siempre grita!"*

In the instructions given by the *Consejo* to our first deputy in the Spanish Parliament, a pledge of alliance was made to the Spanish nation, but in the political sphere they demanded immediate reforms in the name of "the law of humanity" (*la ley de la humanidad*). Among many other important demands, they requested social reforms for the improvement of "intellectual" conditions and a "university," because the education of the youth "is the fundamental basis of the State"; and they demanded free trade with foreign nations. These and other instructions indicate the orientation which the thought of the Puerto Ricans had at the beginning of the 19th Century concerning the political and socio-economic problems which are still present.

On July 14, 1812 the effectiveness, in Puerto Rico, of the Constitution of March 19 of that year was promulgated, recognizing equal rights to the Puerto Ricans as an integral part of the Spanish nation and their right to be represented in the Spanish Parliament by representatives elected by the

people. Locally, this Constitution created the Provincial Assembly, a basic organism for the internal development and growth of the country, the majority of its members being elected jointly with the Deputy to the *Cortes*.

The liberal regime under the Constitution of 1812 was substituted in 1814, when the Constitution was abolished, and until 1820, by the absolutism of Fernando VII; the Constitution was reestablished in 1820 until 1823 and deputies were elected, and the Puerto Ricans were again invested with all the rights of the Spanish citizenship as part of the nation.

As of 1823 the Constitution was substituted again by the absolutism of Fernando VII, and by Decree of May 28, 1825, which follows a former despotic one of September 4, 1810, the Governors were granted the contested and offensive full powers to govern the country in accordance with the *"Leyes de Indias."* However, by Royal Statute of 1834, under the regime of Isabel II and by an additional Decree, the right to have two representatives in the *Estamento de Procuradores* (Congress of Deputies) of the Spanish *Cortes* was acknowledged to the Puerto Ricans.

In 1823 an event occurred, considered by historian Cruz Monclova as the appearance of the autonomic political formula which then, in the second half of the century became rooted and, in fact, finally it became the predominant thought of the reformists and liberals of the country who, without rejecting completely the autonomic idea, had maintained a tendency towards assimilation.

The Deputy of Puerto Rico at that time, José María Quiñones, together with two Cuban deputies, presented a bill for the Economic and Political Government of the Overseas Provinces which, as has been said, represented a change from the assimilation system under the Constitution of 1812 to an autonomic system; a bill which (as Professor Cruz Monclova says), established "the difference" between Cuba and Puerto Rico in relation to the Metropolis and fixed the consequences

of said "difference." According to Cruz Monclova, the bill adopted in the intellectual order the idea of Montesquieu in the sense that "the laws should be adapted to the country where they shall govern and they should bear relation to the way of life of the inhabitants of the country," and the idea of the Constitution of Napoleon that "the colonies must be governed by special laws adequate to their particular conditions."

The *Cortes* approved the bill of José María Quiñones, although it was not promulgated immediately because of the reappearance of the absolutism of 1823.

In 1834 the two Puerto Rican representatives were elected to the *Estamento de Procuradores de las Cortes* (Congress of Deputies) of the Spanish *Cortes*, and in the instructions given by the City Council they claimed again, in addition to reformed political and social rights, free trade and education. On May 23, 1836, the *Estamentos* were dissolved.

On August 12, of that year, the Constitution of 1812 was reestablished bringing the assimilation of the Puerto Ricans to the Spanish nation with equal rights. Cruz Monclova comments that the liberals received joyfully the reestablishment of the Constitution of 1812, which meant assimilation, in spite of the autonomic idea of 1823, on the belief that by that same way they would arrive at that goal. Representatives to the *Cortes* were elected again and, in April 1837, the latter approved a resolution providing that the Overseas Possessions were to be governed by special laws, thus returning to the nonassimilatory thought of 1823. The *Cortes* ordered at the same time the exclusion of the Insular Deputies therefrom.

The resolution of the *Cortes* was perpetuated in the Constitution of 1837, Article 2 of its Additional Articles: "The Overseas Possessions shall be governed by special laws"; Art. 80 of the Constitution of 1845; Art. 86 of the Constitution of 1856. Those special laws, which never arrived, were

one of the greatest motives for the struggle of the Puerto Ricans for more political power during the rest of the century, and up to the autonomy statute of 1897 of minor duration.

Lidio Cruz Monclova states in his *Historia de Puerto Rico, Siglo XIX*, that "great was, on the other hand, the commotion experimented by the insular opinion when, on the following December 21, there appeared in the *Gaceta* a Royal Decree promulgated at the request of the Minister of Overseas Possessions, Don Antonio Cánovas del Castillo, on November 25 [1865] summoning to Madrid the representatives of Puerto Rico and Cuba to inform the Government about the '*social*, economic and political' problems in the islands and to propose the 'proper Special Laws to make them happy.'"

The Decree provided that the *Junta Informativa* would be composed of forty-four persons, twenty-two from the colonies and twenty-two designated by the Minister of Overseas Possessions, and in order to determine the facts, the *Junta* would hear orally or in writing the *Gobernadores Superiores*, Regents, and Intendants in Cuba and Puerto Rico and those who had occupied those positions before; the native Senators of those provinces, twenty-two commissioners from the islands elected by the Town Councils (*Ayuntamientos*) or corporations, and twenty-two other persons designated by the Minister of Overseas Possessions who had resided during 4 years in the Antilles and who had knowledge of the matters to be considered; and the overseas corporations or of the nation which the *Junta* thought it was profitable to hear.

On November 6, 1866, the *Junta* held its first meeting. In April 1867 the *Junta* received the first of 3 reports from the Puerto Ricans, from Ruiz Belvis, about the social problem. First recommendation:—the unconditional abolition of slavery, which was abolished six years later. Later on the economic report, which pleaded among many other things for free trade, and the political report, were presented. The

latter, in addition to claiming for the Puerto Ricans the same individual rights which were constitutionally enjoyed by the Spaniards of the nation, proposed an organic regime for the Government of Cuba and Puerto Rico. This was an autonomist organic system, and as Pilar Barbosa remarks, the political, economic, and social reforms supported by the Puerto Ricans in the *Junta Informativa* were the fundamental basis of the Liberal Reformist Political Party organized in 1870 when political parties first appeared in Puerto Rico as such. Although this party had a tendency towards assimilation when it was organized, later it evolved, to a great extent, into the Autonomist Party of 1887.

We cannot overlook the fact of the great similarity in the raison d'être, purposes, and mechanisms of the Informative Board (*Junta Informativa*) of 1866 and this other mechanism of the Status Commission and advisory groups or ad hoc committees, as they are better known, with the duty to "inform" about the political, social, and economic problems of the Puerto Ricans in order to find a solution.

The Government of the Revolution of 1868 announced an assimilatory government for the Puerto Ricans and, consequently, in 1869 the right to representation in the Spanish *Cortes*, which had been eliminated since 1837, was granted again. This time eleven deputies. However, the Constitution of 1869 was not extended to the Puerto Ricans, nor its Title I concerning the individual rights of the Spaniards, which provided in § 108 that the *Cortes* would reform the present system of government in the Overseas Provinces when the Deputies of Cuba and Puerto Rico would be seated to "extend to them, with the modifications deemed proper, the rights provided in the Constitution."

In August 1872 the Puerto Ricans elected fifteen Deputies to the *Cortes*, and in May 1873 they elected fifteen deputies to the National Assembly of the Republic. On August 6, 1873,

a law extending to Puerto Rico Title I of the Constitution of 1869—individual rights of the Spaniards—was promulgated, and later on the absolute powers of the Governors under the Decree of May 1825 were abolished. After the fall of the Republic in 1874, by proclamation of the Local Governor, said Title I was suspended in Puerto Rico.

The Constitution of 1876, after the restoration of the Monarchy of Alfonso XII, provided again in its § 89 that the Overseas Provinces would be governed by special laws, and that the Government was authorized to apply to those provinces, with the modifications deemed pertinent and giving notice thereof to the *Cortes*, the laws promulgated or to be promulgated for the Peninsula. Section 89 provided that Cuba and Puerto Rico would be represented in the *Cortes* as determined by a special law.

Finally, the political regime of the Charter of Autonomy of 1897, stems from the "special laws" offered since 1837 and the culmination of the persistent struggle of the Puerto Ricans for more self-government. Perhaps it should be stated that the representation of the Puerto Ricans in the Spanish *Cortes* was not nominal or restricted to local matters only. Its Deputies had the plenary governmental powers of all the other National Deputies, even in matters of such national interest as the election of a King, when some Puerto Rican Deputies voted in favor of Amadeo de Saboya, and Román Baldorioty de Castro cast a blank vote with his prophetic words: "Never, for nothing and for nobody, shall I betray my principles. That monarchy will bring the civil war and I do not want that the blood to be shed be sanctioned by my vote."[*]

---

[*] I am grateful for the data of this brief historic exposition mainly to Lidio Cruz Monclova in his *Historia de Puerto Rico, Siglo XIX*, 1958, and his work, *Baldorioty de Castro, Instituto de Cultura Puertorriqueña*, 1966; and to Doña Pilar Barbosa, V, VI *Obra de José Celso Barbosa, Historia del Autonomismo Puertorriqueño*, 1957. *Constituciones de España.*

## 20th CENTURY

With the change of sovereignty as the result of the war between the United States and Spain, the civil rights and the political status of the inhabitants of Puerto Rico were to be determined by the Congress of the United States, under Art. IX of the Treaty of Paris. The Puerto Ricans were deprived entirely of their political status attained under the Charter of Autonomy of 1897 and thereby they lost certain fundamental rights for their economic development for which they had been fervently struggling since the beginning of the 19th Century and which were finally attained. Those are the rights established by Arts. 37 and 38 of the Charter of Autonomy, which provided that all negotiation of the treaties of commerce affecting the Island of Puerto Rico, be they suggested by the Insular Government or by the home Government, should be made by the latter, with the cooperation, in both cases, of special delegates duly authorized by the Insular Government whose concurrence would be acknowledged upon submitting the treaties to the *Cortes* of the Kingdom, and if approved by the latter, they would govern in the insular territory; and Art. 38, to the effect that notice would be given to the insular government of any commercial treaties made without its participation as soon as said treaties would become laws of the Kingdom, to the end that, within a period of 3 months the Insular Government would declare its acceptance or nonacceptance of their stipulations. In case of acceptance, the treaty would be published by the Governor as a colonial statute.

Seventy-three (73) years later, this important political right already conquered by the Puerto Ricans for their economic development is now part of an *agenda* for the study by an ad hoc committee, the result of which cannot be anticipated.

As a political regime, the Charter of Autonomy of 1897 was substituted by the Organic Act of 1900 (Foraker Act). This statute declared the inhabitants of Puerto Rico citizens of Puerto Rico, and as such citizens of Puerto Rico, entitled to the protection of the United States and politically organized under the name of "The People of Puerto Rico." The Act of 1900 provided that its provisions would apply to the Island of Puerto Rico and to the adjacent islands and waters of the islands lying east of the seventy-fourth meridian of longitude west of Greenwich, which were ceded to the United States by virtue of the Treaty of Paris.

Different from the Organic Act of 1917, which superseded it, in the Foraker Act, Congress did not make any statement as to the political position of the Puerto Ricans in the realm of its federative system. Different from the Organic Act of 1917, the Foraker Act did not contain a Bill of Rights for the protection of the inhabitants of Puerto Rico. The Constitution of the United States, which contains a Bill of Rights, did not govern by itself, with respect to all its provisions in the island ceded, nor had it been extended to its inhabitants by action of Congress. However, by judicial interpretation the citizens of Puerto Rico had the protection of certain basic rights under the constitutional system of the United States. *Balzac* v. *Puerto Rico*, 258 U.S. 298, 312, and cases cited therein. At least they should have the protection of the due process clause of the Fifth Amendment by reason that since the Government under the Foraker Act was a local government by delegation of the Congress, Congress was bound by the Fifth Amendment.

The Organic Act of 1917, the next organic status of the Puerto Ricans, granted them the citizenship of the United States and created a Senate by election, but Congress localized the Puerto Ricans in the federal system with the expression that the island belonged to the United States. Said legislative expression was judicially reaffirmed, five years

later when the Supreme Court of the United States, in *Balzac*, ruled that Puerto Rico belonged to, but was not a part of the United States. That political concept, of positive law as well as of judicial interpretation, still hovers around at the present time without any modification, notwithstanding the political events which have occurred subsequently. The positive provision, as interpreted, is reproduced today as a positive provision of the Federal Relations Act in force, and up to now, the Supreme Court of the United States, final interpreter of these relations, has not decided otherwise.

During the 90 years of the 19th Century under the Spanish sovereignty and likewise under the sovereignty of the United States, the Puerto Ricans have not ceased to desire and struggle for greater political powers as a People. This struggle and vehement desire are explained because as organic regimes, the Foraker Act, as well as the Jones Act, were very restrictive in the recognition of political powers. Although the Jones Act improved the former Foraker Act, characterized by strong centralization in the administrative matters, and produced some decentralization in certain local functions of the government, creating a Senate elected by the people in substitution of the Executive Council appointed by the President, it should be noted that a period of 30 years elapsed under the Jones Act before the Puerto Ricans within the system of said territorial statute acquired the political right to elect their governor by popular vote, which was granted by Congress in 1947.

In the electoral campaign of 1948, the party in power struggled, as part of its political platform for that election, for the right of the Puerto Ricans to adopt their own Constitution. That party being victorious by a great majority, that desire and ideal were welcomed by Congress and that was the beginning of the development of the events which resulted in the proclamation, on July 25, 1952, of the Constitution of the *Estado Libre Asociado de Puerto Rico* by the Governor of

Puerto Rico. For the purpose of Congress, "The Commonwealth of Puerto Rico."

The basis for the creation of the Commonwealth of Puerto Rico was Public Law 600 of Congress approved on July 3, 1950. Perhaps, some comments are necessary in relation to this important statute which is not free in itself from the essence of certain intellectual and political contradiction, which probably have been, mainly, the cause of the discussion and discrepancy of ideas which aroused later as to what was the exact meaning of the political creation of the Commonwealth.

Upon approving Public Law 600, Congress sua sponte made the statement that fully recognizing the principle of government by consent, that Act is adopted in the nature of a compact so that the people of Puerto Rico could "organize a government" pursuant to the constitution of their own adoption. (L.P.R.A., Vol. 1—Historical Documents.)

If Public Law 600 was accepted by the qualified voters of Puerto Rico in a referendum, the Legislative Assembly would be authorized to call a constitutional convention to draft a constitution for the Island of Puerto Rico. The Constitution should create a republican form of *government* and it should include a Bill of Rights. If the Puerto Ricans accepted the law and adopted a Constitution, the President of the United States would be authorized to transmit it to Congress if he found that such constitution conformed with the applicable provisions of Public Law 600 and of the Constitution of the United States. In order to become effective, the Constitution had to be approved by Congress. When the Constitution would become effective, the former Organic Act, the Jones Act of 1917, continued in effect with the exception of a series of provisions mainly of administrative nature, which were repealed, and it was to be cited as the "Puerto Rican Federal Relations Act."

Law 600 having been accepted by the majority of the voters in Puerto Rico, the process of the Constitutional Convention continued and the Constitution of the Commonwealth was drafted and the same was proclaimed on July 25, 1952. According to its Preamble, the Commonwealth is created "within our union with the United States of America."

The "government" of the Commonwealth is vested in the legislative, executive, and judicial branches as established by the Constitution, equally subordinate to the sovereignty of the People of Puerto Rico. Article I, § 2. The relations of the inhabitants of Puerto Rico with the United States, however, are still governed by the provisions of the Foraker Act of 1900 and the Jones Act of 1917, which by virtue of Public Law 600 continued in effect, now cited as the Puerto Rican Federal Relations Act.

As to these relations, the Constitution of the Commonwealth does not have any political declaration outside of its Preamble, except Art. I, § 1 which, upon constituting the Commonwealth with political power which emanates from the people and shall be exercised in accordance with their will, provides that it is "within the terms of the compact agreed upon between the people of Puerto Rico and the United States of America"; and with the exception also of the provisions of Art. VI, § 16, to the effect that the public officials and employees of the Commonwealth shall take an oath to support "the Constitution of the United States of America" and the Constitution and the laws of the Commonwealth of Puerto Rico; and with the exception of Art. VII, § 3, to the effect that no amendment to the Constitution could alter the republican form of government or abolish its Bill of Rights, requisites of Public Law 600, and that any amendment should be consistent with the resolution enacted by the Congress of the United States approving the Constitution, with the applicable provisions of the Constitution of the United States, with Public Law 600, and with the Federal Relations Act; and finally,

with the exception of Art. IX, § 10, which requires the ratification of the Constitution by the Congress before it goes into effect.

Aside from these exceptions, the political expressions of the inhabitants of Puerto Rico in adopting the Constitution, appear in the Preamble and they are: the citizenship of the United States of America and the aspiration to enrich our democratic heritage in the individual and collective enjoyment of their rights and privileges, and the loyalty to the principles of the Federal Constitution.

The people of Puerto Rico voted for these two elements of federal relations, in addition to the enumerated exceptions. The other elements are expressions of Congress.

—0—0—

On July 10, 1962, the Governor of Puerto Rico, Luis Muñoz Marín, addressed President Kennedy and wrote to him in relation to the creation of the Commonwealth:

"We were aware then, and have become increasingly, and now acutely, aware that the arrangement was not perfect. The Constitutional Convention itself recognized from the beginning that there was room for growth and that this growth could and should be not towards independence or federal statehood, but within the genius of the creative Commonwealth idea itself.

"I believe that it is now time for that growth to occur. An undue delay in this cannot but be hurtful to Puerto Rico and to the significance of Puerto Rico as a showcase and example of the attitude of the United States in a world where colonialism is obsolete and extreme nationalism is obsolescent."

Muñoz Marín states then, upon pointing out certain views in relation to the growth of the Commonwealth, that he proposes:

"(1) The indispensable principle of the Commonwealth is self-government for Puerto Rico in permanent association with the United States on the basis of common loyalty, common

citizenship, mutual dedication to democracy, and mutual commitment to freedom.

"(2) The moral and juridical basis of the Commonwealth should be further clarified so as to eliminate any possible basis for the accusation, which is made by enemies and misguided friends of the United States and Puerto Rico, that the Commonwealth was not the free choice of the people of Puerto Rico acting in their sovereign capacity, but was merely a different kind of colonial arrangement to which they consented.

"(3) The governmental power and authority of the Commonwealth should be complete and any reservations or exceptions which are not an indispensable part of the arrangements for permanent association with the United States should be eliminated. Methods should be devised for forms of participation, appropriate to the Commonwealth concept, by the people of Puerto Rico on federal functions that affect them."

Following the preceding statements, Muñoz Marín told the President that it seems clear that the people of Puerto Rico should be consulted anew "on 'governmental' arrangements with the United States" and that the time had come when the people, on the basis of their own experience, should consider "how to perfect the Commonwealth concept within their permanent association with the Federal Union." That this represented his conviction on what should be done and that he believed it was that of the vast majority of Puerto Ricans.

In his answer to Governor Muñoz Marín, President Kennedy said he was aware that the Commonwealth relationship was not perfected and that it had not yet realized its full potential, and that he welcomed his statement that the people of Puerto Rico were about to begin the consideration of "this relation with the purpose of moving towards its maximum development." The President said that he was in full sympathy with this aspiration and that he saw no reason why the Commonwealth concept, if that was the desire of the people of Puerto Rico, could not be fully "developed," "as a

permanent institution in its association with the United States." That he agreed this was a proper time to recognize the need for growth "and that, both as a matter of fairness to all concerned and of establishing an unequivocal 'record,' to consult the people of Puerto Rico, as you propose to do, so that they may express any other preference, including independence, if that should be their wish."

What happened before Governor Muñoz Marín's letter of July 10, 1962 to President Kennedy, and why does the Governor refer to the clarification of the "moral and judicial basis" of the Commonwealth? Shortly after the proclamation of the Commonwealth there arose among the inhabitants of Puerto Rico a deep divergency of opinion as to what the Commonwealth was and what it was not, in relation to the political powers of the people of Puerto Rico and the relations of the Puerto Ricans with the United States. As to the administrative powers of the Commonwealth, there was no discussion. The detractors of the Commonwealth maintained that all that occurred with its creation was nothing but an administrative decentralization of the former territorial statute, the Jones Act, and that, politically, the Puerto Ricans continued under the same territorial status. The defenders of the Commonwealth maintained that the people of Puerto Rico had performed an act of free determination as to their organization as a body politic. The debate was not limited to the political sphere nor to the public opinion. It came to the judicial forum. In the light of specific legal controversies, some federal courts dignified the Commonwealth, situating it in a political status parallel or similar to that of a State of the Union. Other federal courts supported the view that it was still a mere territory, even after its creation.* One of the spheres of major

---

* *Mora* v. *Torres*, 113 F.Supp. 309 (Ortiz), *aff'd* in *Mora* v. *Mejías*, 206 F.2d 377 (1st Cir); *Mora* v. *Mejías*, 115 F.Supp. 610 (Ruiz Nazario); *Peñagarícano* v. *Allen Corporation*, 267 F.2d 550 (1st Cir.); *Americana of Puerto Rico, Inc.* v. *Kaplus*, 368 F.2d 431 (1st Cir.); *United States* v.

controversy was, and still is, the operation of the laws of Congress in the Commonwealth, specially those approved after its creation, without the intervention of the Puerto Ricans, as well as the scope of the "consent" to accept such operation in the Federal Relations Act; and if the "compact" established in Public Law 600 could or could not be unilaterally modified by Congress. Unfortunately for all, the Supreme Court of the United States, final interpreter as to what the Commonwealth is as a political system included in the federative system of the United States, did not render, nor has yet rendered, its opinion on the Federal Relations.

The concepts and clarifications expressed in Congress and in the Report of the House Committee on Public Lands as to the scope of Public Law 600 during the debate preceding its approval, when Representative Javits demanded more political power for the Puerto Ricans, as well as when they worried about the powers Congress might loose thereby, complicated even more the situation encouraging the ideological debate raised. Congressional Record—House, pp. 9584–9602, June 30, 1950; Congressional Record—Senate, pp. 8321–8324, June 8, 1950; Senate Report No. 1779, June 6, 1950; House Report No. 2275, June 19, 1950.

Irrespective of the arguments for or against the Commonwealth, a real situation may be created in a serene and objective approach to the problem free from intellectual or political heat or passion, result of what we previously expressed as to the fact that Public Law 600 contains the essence of a contradiction.

---

*Figueroa Ríos,* 140 F.Supp. 376 (Ruiz Nazario); *United States* v. *Mejías,* 131 F.Supp. 957 (Ruiz Nazario); *Lumus Company* v. *Commonwealth Oil Refining Co.,* 195 F.Supp. 47; *Mirabal Carrión et al.* v. *United States,* 225 F.2d 679 (1st Cir.). See 125 F.Supp. 819. *Cuebas Arbona* v. *United States of America,* 225 F.2d 679 (1st Cir.). See 126 F.Supp. 366. *Mitchell* v. *Rubio,* 139 F.Supp. 379; *Consentino, etc.* v. *International Longshoremen's Ass'n, etc.,* 126 F.Supp. 420. See: *Detrés v. Lions Building Corporation,* 136 F.Supp. 699 and its reversal in 234 F.2d 596 (7th Cir.).

Congress recognizes the principle of government by consent and approves Public Law 600 in the nature of a compact so that the people of Puerto Rico may "organize a government" pursuant to a constitution of their own adoption. There is no doubt that before the perpetuation of Public Law 600, in order that the desired fruits be derived therefrom, the Puerto Ricans, by a free and voluntary vote and by a vast majority, accepted the aforesaid law. In the more substantive aspect, however, it could not be said in a serene and dispassionate manner, that the Puerto Ricans at that time determined by themselves, true to the inmost wishes and aspirations of their very soul, the content and scope of the Federal Relations they wanted to establish with the United States, as if both, the people of the United States and the people of Puerto Rico, had seated themselves face to face at the bargaining table of the latin *"do ut des."* The term "determine" is used in opposition to the term "accept," since the concept of "free determination" in relation to the political system of a people is a concept which in public law has its own definite and unmistakable meaning. The only power of determination of the Puerto Ricans was on the "only alternative" to accept Public Law 600, as offered, or not to accept it, and to continue then, without a Constitution, and under the regime of the Jones Act; but it was not a determination concerning the substantive aspect of the compact.

The provisions of the Foraker Act and the Jones Act which continued in force to govern the Federal Relations of the inhabitants of Puerto Rico with the United States, even though the inhabitants of Puerto Rico accepted Public Law 600, were written and adopted only and solely by the Congress of the United States, many of them as far back as 1900 when Puerto Ricans did not even have a representative in said Congress, and the others, those of 1917, when they had a representative with the well-known limitations and restrictions in his office.

The concept of agreement or compact of Public Law 600 with the Puerto Ricans, in public law and for the political relations of Puerto Rico and the United States has its parallel in private law and the relations of individuals and individuals in the atypical "adhesion contract" in which one of the parties fixes the terms and conditions, substantive as well as adjective, without the intervention of the other party, and then the other party accepts them as they are fixed. This does not mean that an adhesion contract, because it has the aforesaid characteristics, is not binding. An adhesion contract in civil life is as binding for one party as for the other if there are no inherent reasons for its nullity. After the Puerto Ricans accepted Public Law 600, the compact or agreement inherent in it is absolutely binding for the Puerto Ricans and said Federal Relations bind them politically, legally, and morally. However, said obligatoriness does not necessarily describe the very concept of the political determination of a people in all its extent.

The problem might arise—the only thing that occurs in private relations when there is an adhesion contract—when the time for its interpretation arrives. In the private sphere it must be liberally interpreted in favor of the party who did not write the contract and restrictively interpreted against the party who wrote it. This is not the time to advance an opinion as to whether or not, in the event the interpretation of Public Law 600 is imperative, should the proper controversy arise, the most probable and proximate one, the application of the laws of Congress and the meaning of the general "consent," the courts would adhere, in public law, to rules of construction similar to those of the private law in such cases.

Aside from the ideological controversies which arose in relation to Public Law 600, the historical facts show that in the events that culminated in the proclamation of the Constitution of 1952, the Puerto Ricans did more than "organize a

government," as prescribed by Public Law 600, although they did not fail to organize one.

They created a State. It is conceivable that the terms government and State are not synonymous or the same thing. Under the Preamble, the political part of the Constitution and Art. I, § 1, they constituted a State whose political power emanated from the people, to be exercised within the compact of Public Law 600. Under Art. I, § 2, the Puerto Ricans proceeded then to "organize a government."

The Congress of the United States approved the Constitution without expressing any contrary view or any reserve as to what had been done by the people of Puerto Rico. A logical conclusion of the foregoing would be that the creation of a different State should be done through the constitutional channels recognized in public law when the change is not accomplished by the force of arms, but by the expression of the inhabitants. The Constitution of the Commonwealth itself creates the mechanism. Article VII, § 2.

As a result of the debate produced by the concept and political scope of the term Commonwealth, the Legislative Assembly approved, on March 19, 1959, Joint Resolution No. 2, "To propose to the Congress of the United States of America clarifications and modifications to the Puerto Rican Federal Relations Act." The last "Whereas" expresses the advisability of proposing to Congress certain changes in the Federal Relations Act in order to "clarify the nature of the Commonwealth," and to modify the relationship of the Commonwealth to the Federal Union, the Legislative Assembly expressly mentioning: (1) the adequate description in the Federal Relations Act of the term Commonwealth, so that it may not be classified as a "possession" or "territory"; (2) clarification as to the applicability in Puerto Rico of the federal laws; (3) the elimination of everything which in said statute may result confusing, obsolete, and inapplicable. Furthermore, the Legislative Assembly requested the Resident

Commissioner to propose to Congress five modifications to the Federal Relations Act.

As the result of Joint Resolution No. 2, the Resident Commissioner introduced in Congress on March 23, 1959, Bill No. H-5926. An identical bill was presented in the Senate by Senator Murray, No. S-2023. The Fernós-Murray Bill contained basic and substantial amendments to the "compact" between the Puerto Ricans and the United States. The bill arose marked disagreements in opinion in Congress as to the clarifications and modifications proposed to the Federal Relations, political and economic, which would have granted more political power to Puerto Rico, and finally, the bill was not approved. For whatever reasons there might be, Congress did not respond then to the demands of the island for more self-government.[1]

After the fate awarded to the Fernós-Murray Bill and after Joint Resolution No. 2 of March 19, 1959 was passed to clarify and modify the concept of the Commonwealth, there occurred the exchange of letters, in July 1962, between Governor Muñoz Marín and President Kennedy.

Both documents having been considered, it is evident that Governor Muñoz Marín, in his letter, conceived the development and growth of the Commonwealth only within a permanent union with the United States. He advocated more political powers within said system, and within said system and the permanent union he advocated changes in the federal relations. It is in that sense and for those purposes that

---

[1] An ample and detailed report on the Fernós-Murray Bill, of its provisions and the discussion thereof, may be obtained in a publication of the Committee on Interior and Insular Affairs of the House of Representatives entitled: "Puerto Rico. A Survey of Historical, Economic, and Political Affairs." Committee Print No. 15. November 1959. United States Government Printing Office, Washington, D.C., 1959. Consult: "The Puerto Rican Federal Relations Act and The Articles of Permanent Association of Puerto Rico with the United States—A Comparative Analysis Accompanied by Related Documents," publication of the Office of the Commonwealth of Puerto Rico in Washington, D.C., 1959.

Governor Muñoz Marín believed in the necessity of consulting the people again. In the mind of Muñoz Marín, in said letter, there was no idea of a consultation of the people to change the political system of the Commonwealth to another system. However, President Kennedy at the close of his reply, introduces the idea of a consultation which could lead to a change from the Commonwealth towards independence if that were the wish of the people.

In the following December, Joint Resolution No. 1 of 1962 was approved, this time to propose to Congress the procedure by which to establish "the final political status" of the people of Puerto Rico. In its provisions it resolves to propose to Congress "the prompt" settlement, in a democratic manner, of the political status of Puerto Rico; that, Congress having expressed the form which it would be willing "to agree that Commonwealth status may take in consonance with the principles contained in the fourth WHEREAS of this Resolution," the "three status formulas"—Commonwealth, Statehood, Independence—be submitted to the vote of the people on the basis of such expression by Congress, in accordance with the laws of Puerto Rico, "so that the winning formula remain established or be established pursuant to the will of the Puerto Rican people."

As a remark of historical nature, because as a matter of fact, the independence formula was defeated in the 1967 plebiscite, the question arises as to up to what point, there being a constitution in force as to which the people had directly expressed its desire to retain the citizenship of the United States of America, and its aspiration to enrich its democratic heritage in the individual and collective enjoyment of the rights and prerogatives of said citizenship, and had expressed its loyalty to the principles of the Constitution of the United States, as determining factors in their life, could Resolution No. 1 of 1962, perhaps following President Kennedy's suggestion, submit the independence formula which repre-

sented an abandonment of said factors, without having previously consulted the people through an amendment to the Constitution. In other words: was said part of Joint Resolution No. 1 compatible with the Constitution in force?

—0—0—0—

*Status Commission*

Pursuant to the Legislative expression of Joint Resolution No. 1 of December 1962, Representative Aspinall presented, on April 30, 1963, bill No. H-5945, "To establish a procedure for the prompt settlement, in a democratic manner, of the political status of Puerto Rico."

As originally presented, the Aspinall Bill stated that with due recognition of the inherent right and juridical capacity of the people of Puerto Rico for self-government and to establish those relations with the Government of the United States as freely agreed, Congress acknowledges Joint Resolution No. 1 of the Legislative Assembly of Puerto Rico, approved December 3, 1962, which proposes to Congress the prompt settlement in a democratic manner of the political status of Puerto Rico, and hereby creates the "United States-Puerto Rico Compact Commission."

The Commission would be composed of 12 members, four appointed by the President, four by the Governor, in addition to two Senators and two Representatives of Congress.

The Compact Commission was directed to do as follows:

"The Commission shall draft a proposed compact of permanent union between the Government of the United States and the people of Puerto Rico in the light of the principles expressed by the Legislative Assembly of Puerto Rico in said joint resolution numbered 1, namely: (a) 'the recognition and reassertion of the sovereignty of the people of Puerto Rico'; (b) 'the permanence and irrevocability of the union between the United States and Puerto Rico on the basis of common citizenship, common defense, common currency, free market, common

loyalty to the values of democracy, and of such other conditions as may be considered, in the compact, of mutual benefit to the United States and Puerto Rico'; (c) the specific definition of the powers of the United States with respect to Puerto Rico and the reservation of all other powers to the people of Puerto Rico; and (d) participation by the people of Puerto Rico in the powers exercised, under the compact, by the Government of the United States, in matters affecting Puerto Rico, in a measure proportional to the scope of such powers and the adoption of a formula under which the people of Puerto Rico will contribute, in a manner compatible with the stability and economic growth of Puerto Rico, to the general expenses of the United States Government."

The Commission would render its Report to the President, to Congress, to the Governor, and to the Legislature of Puerto Rico.

The House Committee on Interior and Insular Affairs, to which the Aspinall Bill was referred, in fact produced a substitute version. The original bill directed the Commission "to draft" a proposed compact or agreement covering the Federal Relations in Joint Resolution No. 1. See the debate—Congressional Record—House, October 23, 1963, pp. 20119 to 20130; Senate, 23785. The substitute version, which became Public Law 88–271 of February 20, 1964, established the United States-Puerto Rico Commission on the Status of Puerto Rico and directed this Commission to "study" all factors including, but not limited to the existing applicable laws, treaties, constitutions, and agreements, which may have a bearing on the present and future relationship between the United States and Puerto Rico. (Translation from L.P.R.A.) The commission should render a report to the President, Congress, to the Governor, and the Legislative Assembly. It seems as if time had retreated 100 years to the *Junta Informativa* of 1866. The resemblance even includes the "informative part." Different from the original Aspinall Bill, in which the Commission could establish the basis of a "compact" and other

federal relations, the substitute bill limited the power of the Commission to prepare a study and render a report.

The Commission, composed of 7 members appointed by the President and Congress, to which 6 more members by invitation of Congress, accepted by the Legislative Assembly and appointed by the Governor, were added, submitted its recommendations after many sessions of work and the recopilation of a great deal of information. It is of common knowledge that the Commission expressed itself on the "need in the immediate future for a method that provides for the consideration of proposals for improvement or growth of Commonwealth, or for change to Statehood or Independence," which method was later on suggested as a "plebiscite", and recommended that "procedures be devised which will permit the establishment of ad hoc joint advisory groups upon initiative of the President of the United States and the Governor of Puerto Rico acting jointly." In case preference for Statehood or Independence is indicated in the plebiscite, advisory groups would be constituted to consider "transition" measures. Should preference for the Commonwealth be indicated along the lines of Joint Resolution No. 1 of December 1962, advisory groups would examine these proposals.

The recommendation made by the Status Commission was accepted by the Legislative Assembly of Puerto Rico and gave rise to the Plebiscite Act of 1967 and to the subsequent plebiscitary consultation. The President of the United States impliedly accepted it in his letter of August 18, 1967 to the Governor of Puerto Rico, Roberto Sánchez Vilella. The Congress of the United States has not yet made any statement as to said recommendation. After one hundred sixty years of struggle for more political powers, the inhabitants of Puerto Rico are still at this stage.

It is impressing how the thoughts, approaches, conceptions, and attitudes of the different sectors of opinion of the Puerto Ricans as to their political status in the last Century,

particularly during the second half of the Century, as shown in the excellent exposition and analysis of the works of Lidio Cruz Monclova and Pilar Barbosa, compare with the thoughts, approaches, conceptions, and attitudes of the different sectors of opinion of the Puerto Ricans at this time, when the political debate is as hot as in the last Century. Hardly can one thoroughly understand the thoughts, conceptions, and attitudes of the different sectors of the Puerto Rican public opinion today, if one does not know perfectly our political struggle in our past history.

The present mechanism to obtain more political powers is useful and valuable and has been accepted. It is conceivable that it is not the only means, within the constitutional processes of law and order, and without it being unlawful, to which the creative imagination of the Puerto Ricans could resort in their struggle, which has lasted for over one and a half centuries, to settle their political status.

The debate on the political problem of Puerto Rico has always had in the past Century, as in the present, its natural forum of the public opinion and the ballot boxes. It must continue in that forum.

—O—

Opinion delivered by MR. JUSTICE BLANCO LUGO.

San Juan, Puerto Rico, February 2, 1970

I

*The Pleadings and the Issues*

Nine months after the plebiscite provided in Act No. 1 of December 23, 1966, 16 L.P.R.A. §§ 844–938 was held on May 2, 1969, the Popular Democratic Party, which pursuant to § 4(b), 16 L.P.R.A. § 847, had represented the winning Commonwealth status formula, filed a petition for mandamus

in this Court against Luis A. Ferré, who has held the office of Governor of Puerto Rico since January 2, 1969, requesting that the Governor be ordered "to perform the duties imposed on him by the Plebiscite Act of 1967." In order to give substance to this vague petition and to determine the claims made by petitioner, it will be necessary to examine the allegations of the petition.

After making reference to the holding of the plebiscite and to the results thereof, it was stated that the former Governor, Roberto Sánchez Vilella, had certified to the then President of the United States, Lyndon B. Johnson, the result of the plebiscitary consultation and had requested the joint constitution of the advisory groups recommended in the Report of the Status Commission and described in the Statement of Motives of the Plebiscite Act of 1967, *supra;*[1] that on January 24, 1969, the Popular Democratic Party had requested the Governor to designate the Puerto Rican members who were to belong to *the first advisory group* for the development of the Commonwealth, and *had proposed* to him the names of the persons who should be designated, *as well as an agenda of the topics* which, in its opinion, should be studied; that an identical petition was reiterated on February 24, 1969, without it having been answered or considered; that the Governor has the obligation to comply with the will of the people expressed in the plebiscitary consultation, taking the steps required in § 45 of the Act, by selecting the Puerto Rican members from among the persons proposed by the Popular Democratic Party and proposing to the President of the United States "the joint constitution of the advisory groups for their recommendation of the measures that they may deem necessary for the development of the Commonwealth, in accordance with its fundamental principles, to a

---

[1] The letter is dated August 17, 1967, and the reply of the President of the United States is *dated the following day.*

maximum of self-government compatible with such principles or, in the alternative, for their consideration of the subject matters proposed by the Popular Democratic Party."

It can be inferred, therefore, that the petition points to the existence of the following duties on the part of the Governor of Puerto Rico:

(i) the constitution of advisory groups for the development of the Commonwealth by means of the designation of the Puerto Rican members who shall compose same;

(ii) the designation of the members from among the persons suggested by the Popular Democratic Party;

(iii) the designation of advisory groups for the consideration of the measures which the committees themselves may deem necessary for the development of the Commonwealth, or in lieu thereof, of the topics proposed by the Popular Democratic Party.[2] *A contrario sensu*, the petitioner denies the

---

[2] In the letter sent to Governor Ferré by the Popular Democratic Party on January 24, 1969, the consideration of the following subject matters for the formulation of recommendations is proposed:

"a) The improvement of the legislation on coastwise shipping, in order that the ocean freight between United States and Puerto Rico may be lowered;

"b) The profit allocation of enterprises which do business in Puerto Rico and the United States and their tax responsibility in the United States and Puerto Rico;

"c) The enlargement of the participation of Puerto Rico in grant-in-aid programs and in the War against Poverty;

"d) The creation of a formula which will provide a larger contribution by the Commonwealth of Puerto Rico in the rendering of federal services here;

"e) The establishment of a formula whereby the level of minimum wages in Puerto Rico will reach the same level as those in the United States within the shortest possible time;

"f) The participation of Puerto Rico in treaties of a commercial, cultural, and educational nature;

"g) The application of the Federal Compulsory Military Service Act in order to determine which measures will make it more just and equitable for Puerto Ricans;

"h) The determination of protective measures for agricultural products of Puerto Rico against foreign competition;

"i) The clarification and the improvement of the principles which

authority of the respondent to participate in the selection of the matters to be considered by the advisory groups.[3]

On May 15, 1969, hardly a day before the ruling of this Court concerning the petition for mandamus, Governor Ferré answered the letters of the Popular Democratic Party. In its pertinent part he states:

". . . I will comply fully with the provisions of the Plebiscite Act and I will be guided in doing so by the majority opinion of the people of Puerto Rico. The responsibilities which the Governor may have and which flow from the Plebiscite Act and from our Constitution cannot and should not be shared by the Executive with other persons or entities in the absence of a clear legal provision. They are inherent to his office, for which reason any intent of extraneous intervention should be rejected in the execution thereof."

Pursuant to the provisions of Rule 55 of the Rules of Civil Procedure, we required respondent to file his answer to

govern the application of federal laws in Puerto Rico;

"j) To propose an agenda of other topics which may serve as a guide for the constitution of future advisory groups."

[3] At pages 30 and 31 of its brief, petitioner describes the relief it seeks thus:

". . . what is desired is an order instructing respondent:

"1. To designate in the shortest possible time the members of the advisory groups proposed, or to be proposed by the Popular Democratic Party; and

"2. (a) To propose to the President of the United States as the agenda for the first advisory group, the agenda offered by the Popular Democratic Party, which is, to make the recommendations which said group may deem to be of the most basic and urgent nature in order to comply with the plebiscitary mandate to develop the Commonwealth to a maximum of self-government compatible with a common defense, a common market, a common currency, and the indissoluble link of the citizenship of the United States—which entails the formulation on recommendations on all the principles specified in the Joint Resolution of December 1962—and to study, to that end, the other subjects enumerated in petitioner's letter to respondent, dated January 24, 1969; or in the alternative,

"(b) To propose to the President the constitution of an advisory group to study the entire development of the Commonwealth to a maximum of self-government compatible with a common defense, a common market, a common currency, and the indissoluble link of the citizenship of the United States of America."

the allegations of the petition.[4] He did so. In his answer, in essence, the Governor reaffirmed the position which he expressed in his letter of May 15, and he specifically stated that "he has not refused and does not refuse to comply with the obligations which the law may impose on him";[4.1] and that "The Governor has discretion to propose the topics to be studied by the advisory groups, and that in doing so he is bound to comply with the provisions of the Plebiscite Act and to be guided in their compliance by the majority opinion of the People of Puerto Rico"; and refusing, "because they constitute conclusions, interpretations, and opinions . . . having no legal basis" to be bound to designate persons proposed by the Popular Democratic Party to be members of the advisory groups. He also alleged seven special defenses.

The issue was thus joined.

## II

### Respondent's Obligations

The controversy having been properly diluted, it boils down to determining which are the functions which the Plebiscite Act imposes on the Governor and the scope of the intervention of the Popular Democratic Party, as representative of the winning Commonwealth status formula in the implementation of the plebiscitary mandate. More narrowly, the

---

[4] To this respect, in the corresponding order, I stated that "I would require the petitioner to inform whether the state of facts alleged in the petition exists to date."

[4.1] While this petition was still pending, respondent announced in a speech he delivered on the 4th of July ceremonies, that he had recommended to the President to join him in designating an advisory group to study the viability of Puerto Rico's participation in the selection of the Chief Executive of said Nation.

Only a few days ago, on January 27, 1970, the Press Office at La Fortaleza officially announced the "approval" by the President of the persons submitted by the Governor to become members of said advisory group.

question involved is the composition of the advisory groups and their agenda. That, in substance, involves the interpretation of § 45 of said Act, 16 L.P.R.A. § 888, in the light of the historical process which resulted in the holding of the plebiscitary consultation and of the provisions of the different laws, as a whole, which in one way or another have a bearing on this subject.

Section 45, *supra*, copied verbatim, reads:

"The General Supervisor of Elections shall certify to the Governor the result of the plebiscitary consultation. The Governor, in his turn, shall certify said result to the President and the Congress of the United States, to the Resident Commissioner, and to the Legislature of the Commonwealth of Puerto Rico.

"If one of the formulas wins, as provided in section 2 of this act, the Governor shall, in his certification to the President, ask for the joint constitution of the advisory groups recommended in the report of the Status Commission and described in the statement of motives of this act.

"According to that report, the joint advisory groups shall consider the necessary transition measures toward statehood or toward independence, in the event one of these formulas wins. In such case the members of the advisory groups that must be appointed by the Governor of Puerto Rico shall be designated on proposal of the party or the Directing Committee that has represented the winning formula in the plebiscitary process. If the representation of the formula in the plebiscitary process has been dual, the party and the Directing Committee shall be entitled to propose an equal number of members.

"In the event that Commonwealth be the winning formula, the Governor shall propose to the President the joint constitution of the advisory groups in conformity with the findings that from time to time may be made on the measures of development of the Commonwealth, to be considered on the basis of the authorization granted at the plebiscite.

"A majority vote in favor of any of the status formulas constitutes a mandate of the People of Puerto Rico to the Resident Commissioner, as their representative in the federal sphere, to

act in the discharge of his official duties in accordance with the will of the people expressed through the said vote."

—A—

### Composition of the Advisory Groups

A strictly literal interpretation of the above-copied provisions would inflexibly lead to acknowledging that an unlimited discretion has been granted to the Governor for the implementation of the plebiscitary mandate. Such interpretation is the most simplistic solution and the one which does not require further elaboration. But its adoption would tend, as we shall see, to thwart to a certain extent the result of the plebiscite or at least would denaturalize it. In the fulfillment of our duty to expound the law we cannot be shy, oblivious to the consequences that might ensue therefrom. Therefore, we disapprove of such interpretation.

The authority of the Governor of Puerto Rico to designate the advisory groups is not questioned. Thus far, the issue is a simple one. The problem becomes thorny when we are faced with the measures provided by the Act for the composition of such groups. On the one hand, assuming that the winning formula had been Statehood or Independence, the Act recognizes a direct intervention to the political parties or Directing Committees which had represented such formulas—"In such case the members of the advisory groups that must be appointed by the Governor of Puerto Rico shall be designated on proposal of the party or the Directing Committee that has represented the winning formula in the plebiscitary process"—; on the other hand, insofar as the Commonwealth status formula is concerned, no mention is made of the intervention of parties or committees—". . . the Governor shall propose to the President the joint constitution of the advisory groups in conformity with the findings that from time to time

may be made on the measures of development of the Common-
wealth. . . ."

It is not easy to accept that we are dealing here with a
mere legislative oversight which might justify our remedying
it. This is no ordinary and common legislative measure before
the Legislative Assembly. The importance of the matter object
of legislation was obvious. It was given careful consideration
in a Special Session of the Legislative Assembly and gave rise
to active negotiations between the proponents of the different
formulas for the solution of the political status. The exclusion
of the party which represented the Commonwealth formula
from participation in the selection of the advisory groups was
deliberate, in the sense that because of the then prevailing
political power situation, it was deemed unnecessary. We can-
not grant the remedy which is now sought to correct this lack
of foresight.

At the time when the need for this legislation, which had
been recommended by the Status Commission for the people
to express their preference was under consideration, the
Popular Democratic Party, supporter of the Commonwealth
status formula, had elected the person who held the office of
Governor and decisively controlled both Houses of the Legis-
lative Assembly. It was not to be expected that the man who
then held the office of Governor would fail to pay heed to the
recommendations of his party in a matter so vital within the
political development; the opposite was true, it could be antic-
ipated that he would designate supporters of the Common-
wealth formula, to become members of the advisory groups,
at the suggestion of such party. But that was not the case
with the supporters of the other formulas whose participa-
tion in the plebiscite was strongly and intensely desired, in
order that the result of the consultation would be clothed with
the greatest possible legitimacy, both internally and external-
ly. In order to guarantee such participation, whether by the
legally existing parties or through the mechanism of the

Directing Committees which were devised in substitution thereof, and in order that their efforts might not be frustrated in case the will of the people would favor Statehood or Independence, it was imperative that the representatives proposed by them be the ones to consider the necessary transition measures conducive to any of the aforementioned formulas. Thus, the need for express provisions in that sense.

It is also undeniable that the organized political parties which defended Statehood and Independence had made statements about the unacceptability of the plebiscitary consultation. There was keen interest that they should participate in the voting, inasmuch as their nonparticipation could tarnish the result and affect its reliability. The intervention in the implementation of the respective formulas may have constituted an incentive to produce such participation.

On the other hand, the holding of the plebiscitary consultation on July 23, 1967, afforded sufficient time so that the result could be implemented before the next general election in November 1968. Precisely, one of the objectives of all this process was to detach the expression of the people's will from any other electoral issue. In the Statement of Motives of the Act it is clearly expressed that "These joint advisory groups could *immediately* begin to consider proposals for the development of the Commonwealth. . . ." The affinity of the Governor, who had been elected to serve until January 2, 1969 with the Commonwealth formula, was relied on.

It seems strange that petitioner's prayer should be based on the application of the constitutional guarantee on equal protection of the laws, especially considering that it was the lawmakers affiliated to said party who devised the method for the selection of the advisory groups, which they now repudiate. Neither its historical genesis nor its subsequent development justify the alleged application in this case. Gray, *Developments in the Law—Equal Protection,* 82 Harv. L.

Rev. 1065 (1969). Originally, the equal protection guarantee was aimed at achieving the political and civil equality of a large group of the American people. Frank & Munro, *The Original Understanding of "Equal Protection of the Laws,"* 50 Colum. L. Rev. 131 (1950); contemporaneously this guarantee has served to achieve changes in the social structure of the country and to facilitate an economic revolution by means of (i) the limitation upon permissible legislative classifications; (ii) opposing discriminatory legislation, and (iii) imposing substantive limits upon the exercise of the police power. Tussman & tenBroek, *The Equal Protection of the Laws,* 37 Calif. L. Rev. 341 (1949); Antieau, *Equal Protection Outside the Clause,* 40 Calif. L. Rev. 362 (1952). We find nothing in § 45 which imposes an onerous burden or discriminatory penalty in connection with the composition of the advisory groups for the development of the Commonwealth. If it should become necessary, as we have previously stated, there are reasons contemporaneous with the approval of the Act which explain the difference prescribed in said section with regard to the selection of the representatives. That is all that is required.[5] Unless it is alleged that all this merely amounts to an exercise in abstract symmetry. In the situation under consideration, you cannot rigorously speak of the infringement of such constitutional guarantee, which in *practice* presupposes the real and effective existence of at least two different rules which are being applied to control persons or entities placed in the same position.

---

[5] The rules for determining whether there has been a denial of the equal protection of the laws were set down by Mr. Justice Van Devanter, in *Lindsley* v. *Natural Carbonic Gas Co.,* 220 U.S. 61 (1911), as follows:

(1) The equal-protection clause of the 14th Amendment does not take from the state the power to classify in the adoption of police laws, but admits of the exercise of a wide scope of discretion in that regard, and avoids what is done only when it is without any reasonable basis, and therefore is purely arbitrary.

(2) A classification having some reasonable basis does not offend

We conclude, therefore, that the Governor is not bound *by law* to select the Puerto Rican members of the advisory groups from among the persons suggested by the Popular Democratic Party. Nevertheless, this does not mean that he has been given an absolute discretion for such designation, inasmuch as, in our opinion, from the examination and study of the provisions of the law as a whole it appears that the Commonwealth formula having won, the Puerto Rican members must be supporters of that formula.[5.1] Otherwise, the results of the consultation would be impaired because the implementation of the winning formula might be entrusted to persons who do not sincerely believe in its virtuality and efficacy, and such a result would offend a just conscience. The entire framework of the Plebiscite Act shows that everything concerned with each one of the formulas should at all times be entrusted to those who believe in it and defend it, in order to avoid any possible adulteration of concepts and of their objectives. Thus, in § 4(a), 16 L.P.R.A. § 847, in dealing with the appointment of additional members to the Commonwealth Board of Elections, when faced with the possibility that the political party defending a particular formula would not make the corresponding petition to the Governor, it is provided that "the aforesaid additional members shall be

against that clause merely because it is not made with mathematical nicety, or because in practice it results in some inequality.

(3) When the classification in such a law is called in question, if any state of facts reasonably can be conceived that would sustain it, the existence of that state of facts at the time the law was enacted must be assumed.

(4) One who assails the classification in such a law must carry the burden of showing that it does not rest upon any reasonable basis, but is essentially arbitrary.

[5.1] It should be made clear that the difference between the construction suggested by Mr. Justice Rigau—the obligation to designate the members of the advisory groups on proposal of the Popular Democratic Party, which presupposes that they would be persons who support in good faith the Commonwealth formula—and ours, is limited in essence to a difference in the method of selection.

appointed by the Governor *and shall be persons with an acknowledged record as defenders of the corresponding status formula.*" And in subsection (c) (2) of the same section, in providing for the organization and recognition of the groups or entities which on account of the abstention of the political parties would assume the representation of a given formula, it was provided that ". . . said group, organization or entity existed and had *a public and acknowledged record as a defender of such status formula;* or that, not having been in existence as such on that date, was, on the date of the approval of this act, composed in part, *of persons who had been affiliated with a group, organization or entity which, on August 5, 1966,* existed and had *a public and acknowledged record as a defender of the status formula* supported by said group, organization or entity, or that, not having been in existence on the date this act took effect, a substantial part of its members had, on August 5, 1966, because *of their affiliation with any party,* a *public and acknowledged record as defenders of the status formula* that it intends to represent." And in indicating in subsection (4) the minimum requirement of necessary signatures, there is required a number equivalent to not less than 1% of the electors "who voted in the preceding general election in favor of the political party *which supported the status formula favored by the group, organization or entity that wishes to participate.*"

This legislative concern that the different formulas should be represented by persons who are acknowledged supporters of each such formula has been constant. Thus, in Act No. 9 of April 13, 1964 (Sess. Laws, p. 40), concerning the appointment of Puerto Rican members to the United States-Puerto Rico Commission on the Status of Puerto Rico, created by Public Law No. 88–271 of February 20, 1964, 78 Stat. 17, 48 U.S.C. § 731 note, it is provided that in the event that any one of the political parties would fail to propose the

names of the members who are to serve on the Commission, or to fill any vacancy which might arise, "the Governor shall designate as member or members of the Commission persons publicly known as followers of the political formula postulated by the party which so failed to certify names to the Governor."

In connection with this aspect of the issue, we conclude, in synthesis, that pursuant to the Act, (a) the Governor is bound to designate the members of the advisory groups for the consideration of measures for the development of the Commonwealth and, (b) that he must designate as Puerto Rican members persons who have "a public and acknowledged record as defenders" of such formula.

—B—

*Measures To Be Considered by the Advisory Groups*

In the plebiscite held on July 23, 1967, the people expressed their preference with regard to the status of the country: the Commonwealth status with capacity for growth and development.[6] To structure the growth of the Commonwealth is the task corresponding to the advisory groups in order to implement the result of the plebiscitary consultation. In this respect, the Popular Democratic Party claims the authority to determine the measures or the topics which are to be considered by such advisory groups.

Subsection 4 of § 45, *supra*, merely provides that:

"In the event that Commonwealth be the winning formula, the Governor shall propose to the President the joint constitution of the advisory groups in conformity with the findings that from time to time may be made on the measures of development of the Commonwealth, to be considered *on the basis of the authorization granted at the plebiscite.*"

---

[6] Of a total of 707,293 votes cast, the Commonwealth received 60.41%, Statehood 38.98%, and Independence 0.60%.

What is the authorization granted by the people for the development of the Commonwealth? The Plebiscite Act itself in its § 1, 16 L.P.R.A. § 844, provides the necessary guideline for setting the *general boundaries* of the task in pursuit of the growth of the Commonwealth,[7] in stating that

"A vote in favor of Commonwealth shall mean:

"(1) The reaffirmation of the Commonwealth established by mutual agreement under the terms of Act 600 of 1950 and Joint Resolution 447 of 1952 of the Congress of the United States as an autonomous community permanently associated with the United States of America;

"(2) The inviolability of common citizenship as the primary and indispensable basis of the permanent union between Puerto Rico and the United States;

"(3) The authorization to develop Commonwealth in accordance with its fundamental principles to a maximum of self-government compatible with a common defense, a common market, a common currency and the indissoluble link of the citizenship of the United States;

"(4) That no change in the relations between the United States and Puerto Rico shall take place unless previously approved by a majority of the electors voting in a referendum held to that effect."

And the Statement of Motives, upon adopting by reference certain expressions made by the Status Commission, defined more accurately the proper measures for the consideration of the advisory groups, pointing to the maximum growth of the Commonwealth, "along the lines of the Commonwealth Legislative Assembly's Resolution No. 1 of December 3, 1962,"[8] to wit:

---

[7] In the printed ballots used in the holding of the plebiscite, pursuant to § 19, 16 L.P.R.A. § 862, an identical text was inserted on the bottom of the same.

[8] The Joint Report issued by the Special Committees of the Senate and the House of Representatives on the Plebiscitary Consultation, 16 Journal of Proceedings 105, 106 (1962), states as follows:

"It is also provided that Congress, once having expressed the form

"1. The recognition and reassertion of the sovereignty of the People of Puerto Rico, so that no doubt may remain of their capacity to enter into a compact under conditions of juridical equality.

"2. The assurance of the permanence and irrevocability of the union between the United States and Puerto Rico on the basis of common citizenship, common defense, common currency, free market, common loyalty to the values of democracy and of such other conditions as may be considered, in the compact, of mutual benefit between the United States and Puerto Rico.

"3. The specific definition of the powers of the United States with respect to Puerto Rico, which shall exclusively be those essential to the union.

"4. All other powers shall be exercised by the constitutional organisms of the people of Puerto Rico.

"5. Participation by the people of Puerto Rico in the powers exercised, under the compact, by the government of the United States, in matters affecting Puerto Rico, in a measure proportional to the scope of such powers. This may include, among other ways of implementing such participation, the right to vote for the President and Vice-President of the United States.

"6. The adoption of a formula under which the people of Puerto Rico will contribute to defray the general expenses of the United States Government, in a manner compatible with the stability and economic growth of Puerto Rico."

Finally, it added, "or through other measures that may be conducive to Commonwealth growth."

Furthermore, the entire evolution of the Commonwealth since its adoption in 1952, until the approval of the above-copied Resolution of December 3, 1962, unequivocally points to the nature and configuration of the measures which may be considered for the development of such formula.[9]

---

in which it is willing to agree to Commonwealth status in accordance with the principles . . . [which] have also been set down in the fourth Whereas of this Resolution . . . ."

   [9] With regard to the local application of federal laws with the express consent of the Legislative Assembly of Puerto Rico, see, Joint Resolution No. 97 of June 22, 1956 (J.R. 1956, p. 244) concerning the processing tax on refined sugar; Joint Resolution No. 1 of July 25, 1956 (J.R. 1956,

There is no express requirement in the Act that the agenda of the advisory groups be submitted by the party which represented the winning status formula. In a strict hermeneutical process, it might be deemed justified, in absence of clear and precise guidelines concerning the mean-

p. 334) concerning the Federal Drugs and Narcotics Act and § 63 of the Narcotics Act of Puerto Rico, No. 48 of June 18, 1959, 24 L.P.R.A. § 976m; Act No. 3 of May 6, 1959 (Sess. Laws, p. 13) concerning distilled spirits. See, also, Leibowitz, *The Applicability of Federal Law to the Commonwealth of Puerto Rico*, 37 *Rev. Jur. U.P.R.* 615 (1968).

The Constitutional Convention itself expressly acknowledged, by means of Resolution No. 23, Journal of Proceedings of the Constitutional Convention 2410, that "The People of Puerto Rico reserve the right to propose and accept modifications in the terms of its relations with the United States of America, in order that these relations may at all times be the expression of an agreement freely entered into between the people of Puerto Rico and the United States of America." In accordance with these expressions, the Legislative Assembly adopted Joint Resolution No. 2 of March 19, 1959, instructing the Resident Commissioner of Puerto Rico to propose to the Congress of the United States the following clarifications:

(1) The Commonwealth of Puerto Rico should be adequately described in the Federal Relations Act, so that it may in no way be classified as a "possession" or "territory";

(2) Consistent with the fundamental principle of full local self-government for the people of Puerto Rico, it should be made clear that the federal laws applicable in Puerto Rico shall apply in the same way as they may be made applicable in the several States;

(3) The Federal Relations Act should be cleared of all language which may result confusing, inadequate, obsolete or inapplicable;
and likewise to propose the following modifications:

"(1) All excise taxes collected in Puerto Rico on articles produced for export to the United States should be imposed by the Commonwealth of Puerto Rico; provided, that if such excises were lower than those imposed by the federal internal revenue laws on similar articles, the Federal Treasury shall collect the difference at the port of entry, so preserving a competitive equality between such products.

"(2) A means should be provided by which the Commonwealth of Puerto Rico may, at its request, be included or excluded from United States commercial treaties.

"(3) An adequate formula should be devised by which the Commonwealth of Puerto Rico may gradually assume, as its resources may warrant, such federal responsibilities as are compatible with the principle of permanent association.

"(4) Judgments of the Supreme Court of Puerto Rico should be reviewed by the Supreme Court of the United States in the same manner

ing and content of "the development of the Commonwealth." But as we have shown this concept has—as a result of the Acts of the Legislative Assembly itself and of the supporters of the formula—a meaning, content, and scope which are easily discernible. In the performance of the duties which

as are the judgments of the state supreme courts.

"(5) The debt margin provision, as proposed to the Congress of the United States of America in Joint Resolution No. 1, approved by the Governor of the Commonwealth of Puerto Rico on June 23, 1958, should be removed from the Federal Relations Act."

In compliance with this legislative mandate, in 1959 Senate Bill No. 2023 and House Bill No. 5926 were introduced during the 86th Congress, providing that federal laws be applied in Puerto Rico (a) in the same manner in which they might be applied if Puerto Rico were a State, (b) insofar as they may be compatible with the compact, and (c) they should expressly mention the Commonwealth. Subsequently, the requirement about compatibility with the compact was varied somewhat and all matters concerning internal revenue and tariff acts were excluded from the scope of the federal legislative authority. A distinction was also made between legislative measures approved pursuant to federal power relative to the States, and legislative measures adopted under "other powers," to wit, the territorial clause, in which case the express consent of Puerto Rico would be required before the measures go into effect. This measure known as the Fernós-Murray bill, House Bill No. 9234, was not reported by the corresponding committees, despite the fact that hearings were held both in Puerto Rico and in the United States. See, Hernández Colón, *The Commonwealth of Puerto Rico: Territory or State*, 19 *Rev. Col. Abo. P.R.* 207, 255 *et seq.* (1959).

Of all the measures proposed the only ones that were approved by Congress were those relative to: (a) the direct review by the Supreme Court of the United States of the judgments rendered by the Supreme Court of Puerto Rico, P.L. 87–189 (1961), 28 U.S.C. § 1258, and (b) the lifting of restrictions concerning the borrowing power of Puerto Rico imposed by the Federal Relations Act, P.L. 87–121 (1961), see Act No. 1 of September 29, 1961 (Sp. Sess. Laws, p. 401).

In another related aspect, see P.L. 808, 70 Stat. 658, which amends the United States Judicial Code to expressly provide that for the purposes of diversity of citizenship in connection with the jurisdiction of the federal courts, the word "states" includes "the territories, the District of Columbia, and the Commonwealth of Puerto Rico." Beresford, *Commonwealth Status and the Federal District Court of Puerto Rico*, 19 *Rev. Col. Abo. P.R.* 19 (1958); Casellas, *The Admiralty Jurisdiction in the Commonwealth of Puerto Rico*, 22 *Rev. Col. Abo. P.R.* 165 (1961). It is interesting to note that the practice of designating justices of the Supreme Court of Puerto Rico as temporary substitutes for the judges of the United States District

the law imposes on the Governor to implement the development of the Commonwealth, he is limited by this meaning, content, and scope.[10] Not to pay heed to them would be to disregard the mandate of the plebiscitary consultation, which presupposes an effective implementation of its result. It is convenient to add that this implementation of the result of the plebiscite requires a full and complete, not a piecemeal and haphazard development of the winning formula. The areas in which the implementation can be made effective *immediately* are well known. Paraphrasing *Brown* v. *Board of Education*, 347 U.S. 483 (1954), it is to be expected that executive action to that effect will be made "with all deliberate speed."

## III

### *Disposition of the Petition*

The foregoing conclusions relieve us from the need to discuss the special defenses raised by the respondent. The plebiscitary consultation was held during the middle of 1967. It is now time, two and a half years later, to begin implementing the result thereof in an effective and objective manner. For this reason it seems more reasonable to heed promptly our construction of the duties corresponding to the Governor, and the intervention of the political party which represented the winning formula in the implementation of said result. The construction of laws is the sole and limited role reserved

---

Court for the District of Puerto Rico, as authorized by § 41 of the Federal Relations Act, has fallen into disuse. *Moreno-Ríos* v. *United States*, 256 F.2d 68 (1st Cir. 1958).

For the historical background prior to 1952, see the ample recital in the opinion of Mr. Justice Rigau.

[10] As we indicated in footnote 4.1, the President of the United States has announced the "approval" of the persons designated by the Governor to become members of the first advisory group, which will consider the right to vote for the President and Vice-President of the United States, which is one of the ways in which the Commonwealth may be developed according to J.R. No. 1 of December 3, 1962.

to us by the Constitution in this process of the political development of our country. The sooner we fulfill this function, the better we shall have served the whole community.

In view of the foregoing conclusions, it would be proper to issue an order requiring the respondent to comply with the duties imposed on him by the Plebiscite Act, as construed by us in this opinion. But in view of his answer, wherein he states that he is willing to proceed to appoint the advisory groups, and in view of his official acts during the pendency of this petition, and taking into consideration that we have not admitted petitioner's principal prayer—that the members of the advisory groups be designated upon its proposal and that the matters to be considered be likewise selected upon its proposal—the issuance of a writ of mandamus does not lie.

—O—

Separate opinion of MR. JUSTICE PÉREZ PIMENTEL.

San Juan, Puerto Rico, February 2, 1970

I agree with the opinion rendered by Mr. Justice Blanco Lugo. With regard to my concurrence in the disposal of the petition, I have taken into consideration (1) the short period of time that elapsed from the time when respondent took office to the date on which the petitioner requested him to comply with the duties imposed by the Plebiscite Act, (2) the need for a judicial interpretation of said Plebiscite Act, especially of its § 45, with regard to the manner in which the Puerto Rican members of the joint advisory groups should be designated and the political ideology of those members, and (3) the manifested willingness of the respondent Governor to comply fully with the provisions of the Plebiscite Act.

Since a majority of this Court has construed said Plebiscite Act in the sense that the designation of the Puerto Rican

members of the advisory groups should at least devolve upon persons with a public and acknowledged record as defenders of the Commonwealth of Puerto Rico, respondent is now in a better position to proceed with the greatest promptness to designate said advisory groups in accordance with the majority opinion of this Court.

—O—

Separate opinion of MR. JUSTICE DÁVILA.

San Juan, Puerto Rico, February 2, 1970

I concur with the opinion rendered by Mr. Justice Blanco Lugo and with his decision to deny the writ of mandamus, in view of the position taken by respondent to the effect that he will "comply fully with the provisions of the Plebiscite Act," and because I understand that the judgment has been rendered without prejudice that petitioner may resort to this Court if respondent should fail to comply, within a reasonable time, with the duties imposed on him by § 45 of the Plebiscite Act, as such duties have been construed in the opinion of Mr. Justice Blanco Lugo, in the sense that (a) the members of the ad hoc committees to be designated by the Governor must be persons "of the highest acknowledged ability and the highest prestige," and with "a public and acknowledged record as defenders" of the Commonwealth, and that (b) the implementation of the result of the plebiscite requires a full and complete development, and not a fractional and groping one, of the Commonwealth formula, in accordance with the content and scope of this concept, as delimited in the opinion.

—O—

Opinion of MR. JUSTICE RIGAU, in which MR. JUSTICE RAMÍREZ BAGES and MR. JUSTICE TORRES RIGUAL, concur.

San Juan, Puerto Ricó, February 2, 1970

Since this case is closely connected with an important step in the constitutional development of Puerto Rico, a development which, because of its nature is unavoidably a long process, not to be measured in years but in decades, it is advisable to take a look at its historical background in order to place this case in its correct perspective.

More than advisable it is necessary to do so. It is universally acknowledged that to know the origin and historical evolution of a juridical institution is essential for its better understanding and very useful for the correct application of the law to specific or concrete cases. It is much more so when we are dealing with constitutional law, which is to a large extent the history of a country. Undoubtedly, that is the reason why Mr. Justice Holmes said that the law might be regarded as a great anthropological document.[1] "A historical product," Castán[2] called it.

This close connection between the product—the law—and the history of the country from which it springs should be evident. It operates in all legal systems.[3] The rational study of law, Holmes wrote, is still to a large extent the study of history.[4] In the first page of his classical book, The Common Law, his famous aphorism appears: "The life of the law has not been logic: it has been experience," that is, history. And

---

[1] Collected Legal Papers 298 (1920).

[2] *Teoría de la Aplicación e Investigación del Derecho* 105 (1947).

[3] Friedmann, W., Legal Theory, Chapter 3, 4th ed. (1960); Chapter 5, 5th ed. (1967).

[4] *The Path of the Law*, 10 Harv. L. Rev. 457; Collected Legal Papers 186 (1920); The Life of the Law 3, Honnold ed. (1964).

almost immediately, he adds: "The law embodies the story of a nation's development through many centuries." This is particularly true of constitutional law. Let us then look at the historical background and the roots of the situation with which we are now faced.

At the time Puerto Rico was invaded by American troops in 1898, Puerto Rico, after four centuries of Spanish rule, had just obtained the Charter of Autonomy of 1897, which virtually granted it self-government.

This first great political conquest by Puerto Rico, represented by the Charter of Autonomy, was, of course, an achievement of Puerto Rican autonomism. By initiative of Luis Muñoz Rivera, the Puerto Rican Autonomous Party, which had been founded in Ponce in 1887, entered in 1896, after long conferences and polemics with Spanish political leaders, into a compact with the Spanish Liberal Party which at that time was led by Práxedes Mateo Sagasta, by which both parties agreed to support each other, with the understanding that Sagasta would back the autonomy of Puerto Rico before the Spanish Crown. The following year Sagasta assumed the office of Prime Minister of Spain and made good his promise to the Puerto Rican people, obtaining from the Queen Regent María Cristina the granting of the Charter of Autonomy.

The Charter of Autonomy established, to a great measure, a parliamentary type of government for Puerto Rico. For its time it was a progressive document. The orders of the Governor-General could not take effect unless countersigned by our Cabinet. The Insular Parliament had power to frame tariffs and fix import and export duties. As to international commerce, it established that notice should be given to the insular government of any commercial treaties made without its participation to the end that within a period of three months it might declare its acceptance or nonacceptance of their stipulations. The Insular Government was also granted

the initiative to negotiate commercial treaties, even though they would be carried out by the home government, but the latter aided by special delegates authorized by the Insular Government. Also, these and many other liberties conquered upon the granting of the Charter of Autonomy were made irrevocable, in the absence of the express consent of the Insular Parliament.

Formerly, under the Spanish Constitution of 1812, the Island had already been granted representation, with full rights, in the Spanish Parliament (the *Cortes*). Ramón Power Giral was the first Puerto Rican deputy. At the time of the American occupancy of the Island, our representation in the Spanish Parliament consisted of 16 delegates and 5 senators.[5]

It is not necessary to itemize the political vicissitudes of Puerto Rico under the Spanish government, which were in part consequences of those of Spain itself, but it is necessary to recall that in the 19th Century, Puerto Rico acquired conscience of being a people, politically speaking. In that century the insurrection known as the *Grito de Lares* took place on September 23, 1868; a liberal movement arose for the purpose of promoting the social, political, and economic development of the Island;[6] the first political parties were founded, and during the last 25 years of that century a strong autonomic movement, which has lasted for almost a century in Puerto Rican political thought, was initiated.[7]

---

[5] I Pagán, Bolívar, *Historia de los Partidos Políticos Puertorriqueños* 19 (1959).

[6] Among many others, worth remembering, are such illustrious names as Ramón Power Giral, Román Baldorioty de Castro, Ramón Emeterio Betances, Segundo Ruiz Belvis, Eugenio María de Hostos, Julián E. Blanco Sosa, Ramón Marín, José Julián Acosta, Julio L. Vizcarrondo, Manuel Elzaburu, José Pablo Morales, José Gautier Benítez, Luis Muñoz Rivera, José de Diego, and José Celso Barbosa.

[7] Blanco, Tomás, *Prontuario Histórico de Puerto Rico* 53–145, 2d ed. (1943); Cruz-Monclova and Colorado, *Noticia y Pulso del Movimiento Polí-*

424

Besides other achievements of the liberal Puerto Rican movement of the 19th Century—such as the peaceful abolition of slavery in 1873—the attainment of the aforesaid Charter of Autonomy represents its greatest accomplishment. Thus, in 1897, the Puerto Rican ship of state is steered by Puerto Rican hand and is headed towards its natural historical destiny, when the storm of the Spanish-American War broke loose and the country was occupied by American troops.[8] As it is known, as a result of said war Puerto Rico became a territory under the domination of the United States. Thus, the war and its outcome truncated the hopeful seedling of self-government which had just sprouted in Puerto Rico.

After two years of military government, in 1900, the Congress of the United States passed the Foraker Act, through which it established a colonial type of civil government for Puerto Rico.[9] The Governor, the heads of the executive departments, the Upper House of the Legislative Assembly (named at that time the Executive Council), and the Justices of the Supreme Court, were appointed by the President of the United States. It contained no Bill of Rights. Under said Act, the Puerto Rican people elected the Lower House (named House of Delegates), the municipal officers, and a Commissioner to the United States, with voice but without vote in the House of Representatives of the Congress.

It is of common knowledge that the Foraker Act, although it contained economic provisions favorable to the Island, dis-

tico Puertorriqueño 11–64 (1955); Pedreira, Insularismo 89–95 (1957 ed.); Morales-Carrión, Ojeada al Proceso Histórico de Puerto Rico 8–17 (1950); Cruz-Monclova, Historia del Año 1887 (1966).

[8] The action was very rapid. On February 9, 1898, the autonomous life of the Island started. On the night of the 15th of that same month, the North American battleship "Maine" blew up in the harbor of Havana. On March 4, President McKinley was sworn President of the United States. On April 25, the Congress of that country declared war to Spain. On the dawn of May 12, the American fleet bombarded San Juan. On July 25, the first occupation forces landed in Guánica.

[9] 31 Stat. 77 (1900).

appointed the Puerto Rican people in their hope to continue and increase their self-government. The Foraker Act proved very unpopular in practically all sectors of opinion in Puerto Rico and petitions for its amendment started soon.[10]

A new Organic Act, the Jones Act of 1917 of the Congress of the United States,[11] introduced important reforms. It granted United States citizenship to the Puerto Ricans; both legislative houses from then on would be elective; and a Bill of Rights, which contained the best of the Anglo-Saxon thought in the area of individual liberties, was decreed.

At first the Jones Act was received in Puerto Rico with applause as a great step towards self-government. However, despite the important reforms it brought about, its colonial onus soon also rendered it unacceptable for the Puerto Rican people. The Governor, the Attorney General, the Commissioner of Education, the Auditor, and the Justices of the Supreme Court, still were presidential appointees.[12]

Those and other important details (possible veto, though never exercised, of Puerto Rican legislation by the Congress, etc.), together with the fundamental flaw that an Organic Act decreed unilaterally by Congress, no matter how good it was, did not solve the latent moral problem in that relationship, rendered, as we said, the Jones Act unsatisfactory, in view of the political aspirations and the moral conscience of

---

[10] I Pagán, Bolívar, *Historia de los Partidos Políticos Puertorriqueños* 66–66, 81 (1959); Cruz-Monclova and Colorado, *op. cit.* at 71; Morales-Carrión, *op. cit.* at 21–22. See, for example, the letter of Luis Muñoz Rivera to President McKinley, published in the Puerto Rico Herald on July 13, 1901, in which he stated: "The Foraker Act, Mr. President, good in the economic, should have never left the Capitol of Washington; it is a law unworthy of the United States that imposes it and of Puerto Rico, which bears it. There does not exist in it the slightest shadow of a democratic thought." This letter is published in full in the cited work of Bolívar Pagán, Vol. I, p. 81.

[11] 39 Stat. 951 (1917).

[12] Thirty years later the Jones Act was amended to allow the Puerto Ricans to elect their own Governor. 61 Stat. 770 (1947).

the people of Puerto Rico.[13] The system could be benevolent, but it failed to honor the basic principle of government by consent which is essential in a democracy and among free people.

Neither did it satisfy some members of Congress. See the following statements:

Congressman Huddleston: "I assert that the whole proceeding is undemocratic. . . . Practically none of us have any knowledge of the conditions that exist in that island. . . . In the state of every gentleman here, the people would resent bitterly any attempt on the part of the Congress to prescribe the qualification of votes. [T]o the people of Puerto Rico should be left the question as to who shall enjoy the right of franchise."[14]

Senator Fall: "I am frank to say that I think very few Members of the Senate understand what they are attempting to legislate about at all."[15]

As was to be expected, the efforts to substitute the Jones Act continued. On February 10, 1943, the Legislative Assembly of Puerto Rico unanimously approved Concurrent Resolution No. 1.

"To lay before the President and the Congress of the United States of America, the right of the people of Puerto Rico that the colonial system of government be ended and to decide democratically the permanent political status of Puerto Rico, as expeditely as possible, immediately if feasible."

In said resolution it was stated that the issue of the status should be decided "by the free vote of the people of Puerto Rico." It was requested that said vote be expressed

---

[13] I Pagán, Bolívar, *op. cit.* at pp. 179–181; Muñoz-Amato, Pedro, *Mayor Trends in the Constitutional History of Puerto Rico*, 12 *Revista de Derecho, Legislación y Jurisprudencia del Colegio de Abogados de Puerto Rico* 242–284 (1949) ; Cruz-Monclova and Colorado, *op. cit.* at p. 75.

[14] 53 Congressional Record, 8470, March 22, 1916, 64th Congress, First Session.

[15] 54 Congressional Record, 3470, February 17, 1917, 64th Congress, Second Session.

"in special elections." In effect, a plebiscite on the matter of the status was requested. Sess. Laws, p. 1084 (1943).[16] At that time the United States was involved in World War II and the matter did not prosper.

On February 20, 1945, the Legislative Assembly approved, unanimously also, Joint Resolution No. 1 of that year. All the political parties then extant in the Island, to wit, the Popular Democratic Party, the Republican Union, the Liberal Party, and the Socialist Party, concurred in its approval. Through said resolution, the Congress of the United States was requested to submit "the problem of the final political status to the votes of the people of Puerto Rico." Puerto Rico would express its wish at a "plebiscite or referendum completely separate from the general elections." To request from Congress the approval of the Plebiscite Act, the Legislative Assembly created that year a Legislative Commission on the Political Status of Puerto Rico.

The Legislative Commission, presided by the then parliamentary majority leader and President of the Senate, Luis Muñoz Marín, left for Washington. For the transcript of the debate which took place before the Senate Committee, see the San Juan newspaper *El Mundo* of May 15, 1945. The next day said newspaper published an editorial entitled: *El Turno del Congreso* (Congress' Turn) in which it stated in part:

"Puerto Rico has reasons to feel satisfied with the exposition of its fundamental problem made before the Committee of Territories and Possessions of the Senate of the United States. It is a satisfaction which belongs to all the people, as such, without partisan limitations and without importunate passion.

---

[16] In these days of student activism the following note is rather interesting. On that date the student body of the University, Río Piedras campus, in a General Assembly of Students, approved a resolution requesting the plebiscite. The resolution was delivered to the Legislative Assembly by the then university student and Chairman of the Student Council of the University of Puerto Rico, Santiago Polanco Abréu, who was later Speaker of the House of Representatives of Puerto Rico and Resident Commissioner in Washington. Minutes of the House of Representatives at p. 27 (1943).

"That exposition had a noble concretion in the testimony delivered before that organism by the President of the Senate of Puerto Rico. . . ."

Apparently in the years from 1946 to 1948 the leaders of the majority party arrived at the solution which would constitute the position the party would assume in the 1948 election—self-government compatible with association with the United States—a position which upon receiving the electoral backing in Puerto Rico and the approval of the Congress of the United States, became, after being approved in the special elections of June 4, 1951 and March 3, 1952, the Commonwealth of Puerto Rico.[17]

Since the constitutional developments of 1950 thru 1952 are more recent than the ones previously mentioned, there is, presumably, a clearer remembrance of them than of the previous ones. But this summarized description of the constitutional process of Puerto Rico would be unexplainably incomplete if said developments are not mentioned here. For that reason, we must mention them.

On Puerto Rican initiative, in March 1950 the Bill that later became Public Law 600,[18] was introduced in the Congress of the United States. It was thereby expressed by Congress that "fully recognizing the principle of government

---

[17] On the development of the thought that materialized in the formula of the Commonwealth, see the following: Two articles on the Political Status of Puerto Rico, by Luis Muñoz Marín, published by *El Mundo* on June 28 and 29, 1946, and his speech of the 4th of July 1948; the statements of Dr. Antonio Fernós Isern, published in *El Mundo* of July 4, 1946, and his speech of February 26, 1947, delivered at Rollins College, in Winter Park, Florida. All these works appear in Fernós-Isern, Antonio, *Puerto Rico Libre y Federado* (1951).

On the political-constitutional process from the Jones Act (1917) to the commencement of the process by means of which the Commonwealth was organized (1950), we have given some highlights only. For a more complete report on said developments, see Cruz Monclova and Colorado, *Noticia y Pulso del Movimiento Político Puertorriqueño* 91–109 (1955); and Fernós-Isern, Antonio, *op. cit.*

[18] Approved on July 3, 1950, 64 Stat. 319; L.P.R.A., Vol. 1 at p. 136 (1965 ed.). See Fernós-Isern, *op. cit.* at p. 13.

by consent, this Act is now adopted in the nature of a compact, so that the People of Puerto Rico may organize a government pursuant to a constitution of their own adoption." By its own terms, in order that said Act could become operative, it would have to be accepted by the voters of Puerto Rico through an island-wide referendum.

As has been said, Act 600 of the Congress was submitted for acceptance or rejection to the voters of Puerto Rico in a referendum held on June 4, 1951. The votes in favor of the acceptance of the Act were 76.5% of the total votes cast and Act 600 was accepted. The then extant political parties, to wit: the Popular Democratic Party, the Statehood Party, the Socialist Party, and the Independence Party, were represented at the polls.

On August 27, 1951 an election was held to elect the members of the Constitutional Convention which would draft the Constitution of Puerto Rico. The Convention consisted of 92 delegates. The convention worked from September 17, 1951 to February 6, 1952, on which date it approved the Constitution with 88 votes in its favor, 3 against, and one delegate absent.[19]

On March 3, 1952 the Constitution which had been drafted by the Constitutional Convention, was submitted to the Puerto Rican electorate for its approval or rejection. The Constitution was approved by 81% of the votes cast.[20]

On July 3, 1952, Public Law 447 of the Congress was approved, by which, pursuant to the provisions of the aforementioned Act 600—which had been approved by the Congress and by the Puerto Rican electorate—Congress, on its

[19] On the Constitution see Gutiérrez-Franqui and Wells, *The Commonwealth Constitution*, 285 The Annals of the American Academy of Political and Social Science 33, January 1953.

[20] For a more detailed exposition of the above related facts, see Notes and Comments on the Constitution of the Commonwealth of Puerto Rico 14–30 (1952).

part, approved the Constitution of Puerto Rico.[21] By means of said Act, Congress proposed three amendments to the Constitution, which were expressly accepted by the electorate of Puerto Rico in the election of November 1952.

Said amendments consisted of the following: (1) The Constitution originally provided (Art. II, § 5), insofar as pertinent, that "There shall be a system of free and wholly nonsectarian public education." It also provided that the elementary public school would be compulsory. Congress proposed a language which specified that compulsory attendance at elementary public schools would not be construed as applicable to those receiving elementary education in private schools.

(2) The Constitution originally provided (Art. VII, § 3), that no amendment to the same could alter the republican form of government or abolish its Bill of Rights. Congress proposed that a second sentence be added to that section, in order to establish that any amendment to the Constitution shall be consistent with the aforementioned Law 447, with the applicable provisions of the Constitution of the United States, with the Federal Relations Act, and with Public Law 600.

(3) That § 20 of Art. II be eliminated. This § 20 of the Bill of Rights of the Constitution did not confer any rights juridically executory, but only recognized certain goals of social justice, such as the right to obtain work, the right to an adequate standard of living, and to receive social protection in the event of unemployment, old age, or disability.

The aforementioned Law 447 of Congress of 1952, states that Act 600, approved on July 3, 1950, "was adopted by the Congress as a compact with the people of Puerto Rico to become operative upon its approval by the people of Puerto Rico."

---

[21] Public Law 447, 66 Stat. 327; L.P.R.A., Vol. 1 at p. 144 (1965 ed.).

The Constitution having been approved by the electorate of Puerto Rico and by the Congress of the United States, the establishment of the Commonwealth of Puerto Rico was officially proclaimed by the Governor of Puerto Rico on July 25, 1952.[22]

The evolution we have thus far sketched of a people which has progressed from its status of possession or booty of war (year 1898), to association by compact (years 1950–1952), recalls the well-known expression of the great English jurist, Sir Henry Maine, in the sense that "we may say that the movement of the progressive societies has hitherto been a movement from status to contract."[23]

On November 27, 1953, the General Assembly of the United Nations approved a resolution recognizing that Puerto Rico had ceased to be a "non-self-governing territory" and that the United States should no longer transmit to the United Nations information about Puerto Rico under Art. 73(e) of the Charter of the United Nations.[24]

The events which lead to the holding of the plebiscite in 1967 have their immediate beginning in certain correspondence exchanged in the year 1962, between the Governor of

[22] Wells, Henry, The Modernization of Puerto Rico 220–241 (1969); Friedrich, Carl, Puerto Rico: Middle Road to Freedom (1959); Wells, "Constitutional Development in Puerto Rico" in Development Towards Self-Government in the Caribbean 73 (Symposium), The Hague (1955); Magruder, Calvert, *The Commonwealth Status of Puerto Rico*, 15 U. Pitt. L. Rev. 1 (1953); Muñoz-Amato, Pedro, Congressional Conservatism and Puerto Rican Democracy in the Commonwealth Relationship, 21 *Rev. Jur. U.P.R.* 321 (1952).

[23] Ancient Law 165 (1861), Beacon Press ed., Boston (1963).

[24] Resolution 151 of the General Assembly of the United Nations of November 27, 1953. For the correspondence between the Governor of Puerto Rico and the President of the United States and for the message of the Government of the United States to the United Nations, see 28 Department of State Bulletin 584 (1953).

Said Art. 73(e) imposes the obligation on governments, Members of the United Nations which have responsibilities for the administration of territories whose peoples have not yet attained self-government, to transmit reports to the Secretary-General of the United Nations.

Puerto Rico, Luis Muñoz Marín, and the President of the United States, John F. Kennedy. We say immediate beginning because the idea that the problem of the political status of Puerto Rico be solved through a plebiscite has older antecedents.

Already in the year 1898, immediately after the change of sovereignty, Eugenio María de Hostos proposed a plebiscite. In 1914 a group of leaders of the Puerto Rican Union Party, approached the leadership of the (Puerto Rican) Republican Party, inviting them to participate in a plebiscite to decide between statehood or independence. The idea did not prosper, since the Republican Party did not accept.[25] Throughout the years, the political parties which have defended the idea of autonomy, or their leaders, have proposed the holding of a plebiscite. Thus, it occurred in 1914, in 1919, in 1923, in 1939, and in the year 1943, in which, as we already said, the Legislative Assembly approved, with the adhesion of all the political parties represented therein, a concurrent resolution proposing to Congress the holding of a plebiscite.

As of 1956, the debate about the plebiscite was renewed. Despite the constitutional process of the years 1950 to 1952, which we have previously recited, some leaders of the opposition insisted that a plebiscite on the political status be held in a special voting for that specific purpose. For that purpose the Legislative Assembly approved Act No. 95 of June 21, 1960,[26] authorizing the holding of a plebiscite after a party or political group had filed petitions with the Secretary of State of Puerto Rico, equivalent to ten percent of the number of electors who had voted in the immediately preceding elec-

---

[25] See De Diego, José, *El Plebiscito* (1916). There is a 1966 edition of Editorial Cordillera. It also appears in II *Obras Completas de José de Diego* 475, Institute of Puerto Rican Culture ed. (1966).

[26] 16 L.P.R.A. § 701 *et seq.*. Said Act was repealed by Act. No. 1 of December 23, 1966, which provided for the holding of the plebiscite of 1967, 16 L.P.R.A. § 844 *et seq.*

tion. During the six years that said Act was in force, no party or group invoked its provisions to request the holding of a plebiscite.

Ten years after the founding of the Commonwealth, on July 10, 1962, Governor Luis Muñoz Marín wrote to President Kennedy, and after referring to the establishment of the Commonwealth, he said in his letter:

"We were aware then, and have become increasingly, and now acutely, aware that the arrangement was not perfect. The Constitutional Convention itself recognized from the beginning that there was room for growth and that this growth could and should be not towards independence or federal statehood, but within the genius of the creative Commonwealth idea itself.

"I believe that it is now time for that growth to occur. An undue delay in this cannot but be hurtful to Puerto Rico and to the significance of Puerto Rico as a showcase and example of the attitude of the United States in a world where colonialism is obsolete and extreme nationalism is obsolescent."

In his letter to the President, the Governor stated the principles that, in his judgment, should guide the proposed growth:

"(1) The indispensable principle of the Commonwealth is self-government for Puerto Rico in permanent association with the United States on the basis of common loyalty, common citizenship, mutual dedication to democracy and mutual commitment to freedom.

"(2) The moral and juridical basis of the Commonwealth should be further clarified so as to eliminate any possible basis for the accusation, which is made by enemies and misguided friends of the United States and Puerto Rico, that the Commonwealth was not the free choice of the people of Puerto Rico, acting in their sovereign capacity, but was merely a different kind of colonial arrangement to which they consented.

"(3) The governmental power and authority of the Commonwealth should be complete and any reservations or exceptions which are not an indispensable part of the arrangements for permanent association with the United States should be

eliminated. Methods should be devised for forms of participation, appropriate to the Commonwealth concept, by the people of Puerto Rico on federal functions that affect them."

In his letter to the President, the Governor added:

"Accordingly, it seems clear that the people of Puerto Rico should be consulted anew on governmental arrangements. The time has now come when the people, on the basis of their own experience, should consider how to perfect the Commonwealth concept within their permanent association with the Federal Union. This represents my conviction, and I believe that of the vast majority of Puerto Ricans, on what should be done."

President Kennedy answered to the Governor on July 24, 1962:

"I am aware, however, as you point out, that the Commonwealth relationship is not perfected and that it has not yet realized its full potential, and I welcome your statement that the people of Puerto Rico are about to begin the consideration of this with the purpose of moving towards its maximum development. I am in full sympathy with this aspiration. I see no reason why the Commonwealth concept, if that is the desire of the people of Puerto Rico, should not be fully developed as a permanent institution in its association with the United States. I agree that this is a proper time to recognize the need for growth and, both as a matter of fairness to all concerned and of establishing an unequivocal record, to consult the people of Puerto Rico, as you propose to do, so that they may express any other preference, including independence, if that should be their wish."[26-a]

The immediate result of this exchange of letters between the Governor of Puerto Rico and the President of the United States was the approval by the Legislative Assembly of Puerto Rico of its Joint Resolution No. 1 of December 3, 1962, L.P.R.A., Vol. 1 at p. 151 (1965 ed.), whereby the holding of a plebiscite in Puerto Rico was formally proposed to the Congress of the United States. In the plebiscite the

---

[26-a] *El Mundo* at p. 16, July 25, 1962, final ed.

voter would express his preference as to one of the three formulas: (1) The Commonwealth, based on common citizenship with the United States and developed to the maximum consistent with the association, (2) federated statehood and (3) independence.

As a result of the aforesaid Joint Resolution of 1962 of the Legislative Assembly of Puerto Rico, Congress approved Public Law 88-271 of February 20, 1964,[27] whereby a joint commission was created, known as the Status Commission, to be composed of seven members representing the United States and six representing Puerto Rico, to study thoroughly the factors having a bearing on the present and future relationship between both countries.

In § 2(c) of said Public Law 88-271, Congress stated the following:

"The Congress hereby invites the Commonwealth of Puerto Rico to provide for participation of the Commonwealth and its people in the work of the Commission by enactment of a law providing for the appointment of an additional six members of the Commission."

Through Act No. 9 of April 13, 1964, L.P.R.A., Vol. 1 at p. 156 (1965 ed.), the Legislative Assembly of Puerto Rico accepted the invitation of the Congress to participate in the Status Commission and provided for the appointment of the six Puerto Rican members to said Commission.

The Commission held public hearings in San Juan, worked for two years and submitted its report in August 1966. In its report the Commission reached certain conclusions and made some recommendations to the President and to the Congress of the United States, and to the Governor and to the Legislative Assembly of Puerto Rico. In its conclusions, the Commission stated that "Both Puerto Rico and the United States share a common commitment to individual freedom, to funda-

---

[27] 78 Stat. 17; L.P.R.A., Vol. 1 at p. 154 (1965 ed.).

mental human rights, and to the traditions of democratic, representative government." It also stated in its report that:

"The Commission's major conclusion is that all three forms of political status—the Commonwealth, Statehood, and Independence—are valid and confer upon the people of Puerto Rico equal dignity with equality of status and of national citizenship."

The Commission also concluded that any choice among said forms of status was to be made by the people of Puerto Rico; that such an expression should precede any change in status; and that the first step toward any change in political status should be taken by Puerto Rico. It concluded furthermore that:

"An expression of the will of the citizens of Puerto Rico by popular vote on the question of whether they wish to continue Commonwealth status capable of growth and development, or to change to either statehood or independence, would be helpful to all concerned."

The Status Commission recommended that if a plebiscite should take place and in order to organize the form of status chosen therein, a joint advisory group or groups should be convened.[28]

In the light of the conclusions and recommendations of the Status Commission, the Legislative Assembly of Puerto Rico approved Act No. 1 of December 23, 1966, 16 L.P.R.A. § 844 *et seq.*, which provided for the holding of a plebiscite. After the consequent public debates by means of public meetings, the press, radio, and television, the plebiscite was held on July 23, 1967. A total of 707,293 electors cast their votes and the result was as follows: 60.41% for the Commonwealth; 38.98% for Statehood, and .60% for independence.[29]

[28] Report of the United States-Puerto Rico Commission on the Status of Puerto Rico at pp. 5-9 (1966).

[29] Commonwealth Board of Elections, Official Report on the Plebiscite of 1967 on the Political Status of Puerto Rico (English and Spanish), at p. 6.

It is of general knowledge that the Popular Democratic Party supported and defended at the plebiscite the Commonwealth status, developed to the maximum consistent with association with the United States, and that the respondent was the principal leader of those favoring statehood.

As required by the Plebiscite Act, on August 17, 1967, the Governor of Puerto Rico, Roberto Sánchez Vilella, certified to the President of the United States, Lyndon B. Johnson, the results of the plebiscite. The President replied next day by means of a letter stating his satisfaction that the will of the Puerto Rican people regarding the political status had been democratically ascertained by means of the plebiscite, and added that he was ready to appoint the United States members of the joint advisory groups as soon as the Commonwealth appointed its representatives in said groups.

The term for which Governor Sánchez Vilella was elected expired on January 2, 1969 and in November 1968 a general election was held in the Island to elect the Governor, the Resident Commissioner in Washington, and the members of the Legislative Assembly. The result of the election was as follows: New Progressive Party 390,922 votes; Popular Democratic Party 367,901 votes; People's Party 87,832 votes; Puerto Rican Independence Party 24,729 votes; Statehood Republican Party 4,057 votes.[29-a]

As a result of said election, the respondent Luis A. Ferré, candidate of the New Progressive Party, became governor. He took office on January 2, 1969. The party of the new governor elected the Resident Commissioner, Jorge Luis Córdova Díaz, and obtained control of the House of Representatives. The Popular Party retained control of the Senate.

On May 2, 1969, the Popular Democratic Party (P.D.P.) filed a petition for mandamus in this Court requesting us to

---

[29-a] Commonwealth Board of Elections, Report on the General Elections Held on November 5, 1968, at p. 1.

order the Governor to perform the duties imposed on him by the Plebiscite Act.

In its petition the petitioner alleges, in essence, that the Plebiscite Act imposes on the Governor the duty to appoint, on proposal of the Popular Democratic Party, the Puerto Rican members of the advisory groups and that he has refused to do so despite the fact that on two occasions he has been formally requested to do so by the petitioner. The petitioner relies on the text of said Act and on the fact that the Popular Democratic Party was the one which defended the Commonwealth status formula in the plebiscite, which formula was the winning one in said voting.

After requesting and obtaining an extension from this Court, respondent filed his answer on June 9, 1969. He accepted some of the allegations made by the petitioner, denied others, and assumed the position that the requested mandamus did not lie, neither on the merits of the question, nor because of a series of affirmative defenses raised by him. We shall discuss said defenses, some briefly and some to a larger extent, according to their respective importance and afterwards we shall discuss the case on the merits.

## Standing to Sue

Respondent's first affirmative defense consists in sustaining that the petitioner has no standing to file this action. This defense lacks merit. A mere reading of § 45 of the Plebiscite Act shows that the responsibility assumed by the political parties and organizations, representing the three forms of status voted upon at the plebiscite, does not cease with the holding of the plebiscite. See, for example, the following excerpts from said § 45:

"If one of the formulas wins, as provided in section 2 of this Act, the Governor shall, in his certification to the President, ask for the joint constitution of the advisory groups recommended

in the report of the Status Commission and described in the statement of motives of this Act.

"In such case the members of the advisory groups that must be appointed by the Governor of Puerto Rico shall be designated on proposal of the party or the Directing Committee that has represented the winning formula in the plebiscitary process."

If the political party which promoted and defended the winning formula at the plebiscite would not have standing to request the courts to enforce the Plebiscite Act and to order that the plebiscitary mandate be complied with, who, then, would have it? It is clear that the party or organization which promoted the winning formula has standing to resort to the courts in the aforesaid sense. That is the manifest legislative intent. The Joint Report of December 17, 1966 of the Special Commissions, created to study the Plebiscite bill, partly states as follows:

"The decisions which are being taken by the Legislative Assembly demand that there be adequate guaranties for the acceptance of the democratic will of the People as expressed at the plebiscite." 20 Journal of Proceedings 503 (1966 Special Session).

The plebiscite was not a mere academic exercise, but a practical step taken by this country in its painful search for itself. It was also a political and legal step in the long path of its constitutional development. The Plebiscite Act, and particularly its § 45, invested the political parties and organizations which participated in the plebiscite with standing to resort to the courts in defense of the rights vested on them by the Act and to petition and obtain that all concerned public officers abide by the law. See, Thio, Locus Standi in Relation to Mandamus, Public Law 133, 147 (1966).

In *Teachers' Association v. Pérez, Actg. Governor,* 67 P.R.R. 795 (1947), we held that the enforcement of laws is a matter of public interest. A petition for mandamus was also involved there and the standing of the petitioner, the Teach-

ers' Association of Puerto Rico, was questioned. To that effect we said at page 797:

"Defendants argue that the Teachers' Association has no special interest in the matter; that perhaps the teachers individually have that interest because they are the ones called upon to teach in whatever language may be adopted, but that the petitioner is a juridical entity different from the members composing it and, consequently, it cannot even assume the representation of the teachers in this matter.

"We would agree with the defendants if the question involved were one of private interest. There is no doubt, however, that the selection of the language, which is to be used as the vehicle for teaching in the public schools, is a question of public interest. And so are the acts which may be enforced. The majority of cases which construe statutes similar to the one herein involved maintain that where the question is one of public concern and the object of the mandamus is to enforce the performance of a public duty, the people is considered as the beneficially interested party and the petitioner need not show that he has a special interest in the result of the case. It is sufficient that he is a citizen and as such interested in the performance and protection of the public duty."[29-b]

---

[29-b] This, of course, refers to exceptional situations as the one raised in the case of the Teachers' Association, and in the instant case, but the rule established by the Law of Mandamus is to the effect that only the persons beneficially interested can successfully invoke the writ. 32 L.P.R.A. § 3423; *Prensa Insular de P.R.* v. *Cordero, Auditor*, 67 P.R.R. 83, 96 (1947). For the purposes of this case, it is not necessary to consider or discuss who is a beneficially interested person, whether one who is protected by the statute with respect to a specific right, or one who in fact has been adversely affected. This complex and technical matter has been the object of discussion by well-known writers in the field of administrative law. 3 Davis, Administrative Law Treatise, Chapter 22; Jaffe, *Standing to Secure Judicial Review: Public Actions*, 74 Harv. L. Rev. 1265 (1961); Jaffe, *Standing to Secure Judicial Review: Private Actions*, 75 Harv. L. Rev. 255 (1961).

The federal case law is not uniform on this matter. However, the modern trend is that of abolishing the technical complexities of the lack of standing doctrine and to open the doors of the courts to all who think they have a valid claim. *Flast* v. *Cohen*, 392 U.S. 83 (1968); *Curran* v. *Clifford*, 37 U.S.L.W. 2390 (Dec. 1968, D.C. Cir.).

### The Petition Is Not Premature
### and There Are No Laches

The defenses raised by the respondent that the petition is premature and that the petitioner incurred in delay or laches are self-contradictory and lack merit. It would be useless to discuss them.

### Res Judicata

Another affirmative defense raised by respondent is that of res judicata. He alleges that this controversy was already adjudicated in the Superior Court of San Juan, in the case CS-69-243, entitled *Enrique Bird Piñero* v. *Luis A. Ferré and Popular Democratic Party*. We do not agree. We could enter into a detailed discussion of the aforesaid *Bird Piñero* case and distinguish it from the present case, but it is not necessary to do so on account of the reasoning that follows.

As it is known, the res judicata doctrine is of a technical nature and it has well-acknowledged exceptions and limitations. Not long ago we discussed and examined it in *Pérez* v. *Bauzá*, 83 P.R.R. 213 (1961) and in *Millán* v. *Caribe Motors*, 83 P.R.R. 474 (1961). In *Pérez, supra,* we said at p. 217:

"In general terms, it may be affirmed that the rule of res judicata is based on considerations of public policy and necessity: on the one hand, the interest of the State in terminating litigations . . . and, on the other hand, the desirability of not submitting a citizen twice to the inconveniences which the litigation on the same cause entails."

And at p. 218 of the same case:

"However, the courts have refused to apply rigidly the defense of res judicata if in so doing it defeats the ends of justice, especially if reasons of public policy are involved. . . . As already stated, the doctrine rests upon the basic principle that there should be an end to litigation, but if the rigid application thereof would in practice defeat a right permeated in some way with public interest, the courts are inclined to a solution which would guarantee proper justice instead of rigidly applying a

fiction of law which rests fundamentally upon a principle of convenience and procedural order. . . . In other words, the rule is not absolute and should always be weighed with the equally salutary principle that justice should be done in every case."

In *Millán* v. *Caribe Motors, supra,* we refused to apply the res judicata doctrine in a situation where, if we had applied it, an injustice would have been produced. There we said, 83 P.R.R. 488:

"It is proper to point out that we are conscious of the usefulness and importance of the rule of res judicata and of the doctrine of collateral estoppel by judgment. Certainly, there is an interest, individual as well as social, in putting an end to litigation. Yet, we cannot defeat justice in the name of rules which were adopted for the purpose of facilitating its administration. We must reconcile the general maxims with the facts of the case."[30]

In the same sense, see *Feliciano Ruiz* v. *Alfonso Development Corp.,* 96 P.R.R. 105, 111 (1968), and *Monagas* v. *Vidal,* 170 F.2d 99, 106.

Our position with respect to the application of the doctrine of res judicata is consistent with the best trends of thoughts on the subject. In *United States* v. *Silliman,* 167 F.2d 607, 614 (1948), it was stated:

"Such a rule of public policy [res judicata] must be watched in its application lest a blind adherence to it tend to defeat the even firmer established policy of giving every litigant a full and fair day in court."

In *Developments in the Law: Res Judicata,* 65 Harv. L. Rev. 818 (1952), after mentioning the reasons which justify the doctrine and its exceptions, it is said: "Both judicial formulation and scholarly examination of the rule of res judicata should balance these opposing considerations."[31]

---

[30] Castán, *Teoría de la Aplicación e Investigación del Derecho* 253–258 (1947).

[31] *Selected Essays on Civil Procedure,* ed. by the Harvard Law Review Association (1965).

Because we do not believe in applying juridical maxims and doctrines "if, in so doing it defeats the ends of justice, especially if reasons of public policy are involved," *Pérez* v. *Bauzá, supra;* because it is undeniable that this litigation involves reasons of public policy of the highest order; because this litigation partakes of the nature of a class suit (425,000 electors voted for the Commonwealth status at the Plebiscite) ; and because this Court is the most adequate forum to discuss the important subjects raised in this case, we are of the opinion that the res judicata doctrine is not applicable.

Of the affirmative defenses raised by the respondent, we have left three to be discussed jointly, because of their close relation with one another. Said defenses are: that this mandamus does not lie because it would violate the principle of separation of powers; that this is a nonjusticiable political question; and that the remedy requested does not lie because it is directed to a discretional function of respondent. In discussing these defenses we are getting to the merits of the controversy. After we have discussed them we shall come to the gist of the case: Whether or not respondent should appoint the advisory groups on proposal of petitioner.

### Separation of Powers

The contention that the principle of separation of powers would be violated if this Court should order respondent to comply with certain provisions of law is not new, but we shall discuss it because it reaches the heart of the concept of the government by law. Said concept or principle of government, known also as the supremacy of the law, and more appropriately known in Anglo-Saxon legal literature as "the rule of law," represents, of course, a basic and indispensable condition of the constitutional-democratic system of government. We use the word indispensable advisedly.

This matter is very interesting and its literature quite

rich, but due to space limitations, we shall refrain from treating it to the extent that it deserves. Nevertheless, we think it is advisable to enter somewhat into it.

First, let us bear in mind that this principle of constitutional law—that of separation of powers—as so many others, represents the legal concretization of a political theory. This theory of "divided" or "mixed" government, as it is also known, is a valuable defense against tyranny and it is older than the Constitution of the United States and than the writings of the political theorists of the 17th and 18th centuries that were so well known by the framers of the American Constitution.

The constitution of republican Rome offers a notable example of a careful separation of powers. Discussions of the matter are found in Aristotle (*Politics*), in Plato (*Laws*), and in Polybius (*Histories*, Book VI). Polybius' analysis has influenced modern thought.[32] In England, Sir Thomas Smith (*De Republica Anglorum*)[33] discussed it in 1583, in connection with English constitutional law, and the republican Harrington, in his *Oceana* (1656), a book directed to the attention of Cromwell, treated it extensively.

The immediate sources, which inspired the Fathers of the American Constitution on this subject, were Locke, Second Treatise of Government (1690), and especially Montesquieu, The Spirit of Laws, Book XI (1748), who was called by Madison the "oracle who is always consulted and cited on this subject," The Federalist No. 47 (1788). The American formulation of the principle of separation of powers was also influenced by Blackstone, Commentaries on the Laws of England (1765 and following editions), as a result of his great

---

[32] It influenced Cicero and the philosophers of the middle ages as Marsilio de Padua and St. Thomas Aquinas and Locke and Montesquieu, amongst the modern.

[33] Allen, A History of Political Thought in the Sixteenth Century 262 (1928).

influence upon the American legal profession during its first century. Pound, The Formative Era of American Law (1938). For excellent discussions of this principle see the chapter *"The Separation of Powers: False and True"* in Finer, The Theory and Practice of Modern Government 94, rev. ed. (1960); Friedrich, Constitutional Government and Democracy 173, rev. ed. (1950), and Sharp, *The Classical American Doctrine of the Separation of Powers*, 2 U. Chi. L. Rev. 385 (1935).

Today it is universally acknowledged by the courts and by the authors that the separation of powers is neither complete nor absolute.[34] It might be said that no one pretended it to be so. The practical impossibility of a contrary view was recognized by its principal exponents and by the very fathers of the Constitution of the United States. Madison, The Federalist, No. 47.

As to Puerto Rican constitutional law, it is true that our Constitution organized a government in which the Legislative, Executive, and Judicial powers are separate and are exercised by three distinct departments or branches of government, but this separation, which is true in general terms, is not absolute in our Constitution either. By constitutional and statutory provisions there are government functions which go across boundary lines and are exercised by a branch of government whose nature is different from said functions. Some examples of these are the following:

The Governor, head of the executive branch, partakes of the legislative function (a) upon submitting annually to the

[34] *Banco Popular de Puerto Rico* v. *District Court*, 63 P.R.R. 63, 67 (1944); *Miffitt* v. *Statler Hilton, Inc.*, 248 A.2d 581, 583 (1968); *Hobson* v. *Hansen*, 265 F.Supp. 902, 915 (1967); *Hill* v. *Relyea*, 216 N.E.2d 795, 798 (1966); *David* v. *Vesta Co.*, 212 A.2d 345, 357 (1965); *United States* v. *Solomon*, 216 F.Supp. 835, 840 (1963); *Dickson* v. *Saiz*, 308 P.2d 205, 211 (1957); *In re Opinion of the Justices*, 64 A.2d 169, 172 (1949); *Parker* v. *Riley*, 113 P.2d 873, 877 (1941); 1 Davis, Administrative Law Treatise, § 1.09; Jaffe, Judicial Control of Administrative Action 29 (1965); Sharp, *op. cit.* 2 U. Chi. L. Rev. 385 (1935).

Legislative Assembly, the tentative budget and a report which, by constitutional mandate, "shall contain the information necessary for the formulation of a program of legislation." Also, (b) he may call the Legislative Assembly or the Senate into special session when in his judgment the public interest so requires. And (c) he approves or disapproves the bills passed by the Legislative Assembly. He participates in judicial functions when he suspends the execution of sentences in criminal cases, when he grants pardons, commutations of punishment and remission of fines.

The Senate, the upper house of the legislative branch, partakes of the executive function when it confirms or rejects appointments made by the Governor. The Supreme Court, the highest organ of the judicial branch, partakes of the legislative function when it adopts rules' of evidence and rules of civil and criminal procedure. The Chief Justice, the highest judicial officer, partakes of the executive function because of the fact that he is in charge of one of the major administrative responsibilities of the government: he directs the administration of the courts. Constitution of Puerto Rico, Art. IV, § 4; Art. V, § 7. Besides, the autonomous Boards and Commissions created by law exercise legislative functions in their rule-making power, judicial functions when they hold hearings, decide cases and impose penalties, and executive functions, upon supervising the enforcement of their respective laws.

The contention that the issuing of the writ of mandamus requested in this case violates the separation of powers has been adversely decided for the respondent ever since the beginning of the case law of the United States and of our own case law. In the famous case of *Marbury* v. *Madison*, 5 U.S. (1 Cranch) 137 (1803); also a case of mandamus, after discussing that contention the Court said that "It is not by the office of the person to whom the writ is directed, but the

nature of the thing to be done, that the propriety or impropriety of issuing a mandamus is to be determined." 2 L.Ed. 71.

In Puerto Rico, our courts have consistently upheld the rule of law through the judicial review of the powers of the Governor, and specifically we have repeatedly decided that the courts may compel the governors to comply with the ministerial duties imposed on them by the Constitution and the laws. It has been likewise decided in California, Colorado, Kansas, Kentucky, Maryland, Montana, Nebraska, Nevada, North Carolina, Wyoming, and Minnesota.[35]

The question as to whether the courts of Puerto Rico have jurisdiction to issue a writ of mandamus to the governor to compel him to comply with a ministerial duty was raised for the first time in *Lutz* v. *Post, Governor of Porto Rico*, 14 P.R.R. 830 (1908). In that case the Court recognized that the case law showed two tendencies: one, which solved the problem in the affirmative, and another, in the negative, but the Court decided in favor of the affirmative because it found that this view was based on a more solid rationale than the opposite one, and also because the same was supported by the decisions of the Supreme Court of the United States. After pointing out that "Ours is a Government of law and all officers, from the highest to the lowest, are bound to obey it, without question," the Court stated as follows:

"Then we are amply justified in holding that as to ministerial duties the general principle of allowing relief by *mandamus* against executive officers should be upheld and applied; and the mere fact that it is the Governor of Porto Rico against whom the relief, by this extraordinary writ, is sought, should not impede or deter the courts in or from the exercise of their jurisdiction; since it is well established and cannot be denied that the authority of the courts is supreme in the consideration

---

[35] *Lutz* v. *Post, Governor of Porto Rico*, 14 P.R.R. 830, 834 (1908); Amadeo, *El Control Judicial de los Poderes del Gobernador de Puerto Rico*, 12 *Revista de Derecho, Legislación y Jurisprudencia del Colegio de Abogados de Puerto Rico* 193 (1949), and in 15 *Rev. Jur. U.P.R.* 1 (1945).

and determination of all legal questions, judicially submitted to them, within the proper limits of their jurisdiction; and no man is exempt from the operation of the law; and the duty of faithfully executing the laws is incumbent on the Governor by virtue of his official oath, and should the relief sought be refused, the applicants might be utterly without redress."

As to the merits of the case, the Court decided that what petitioner requested was a discretionary act and not a ministerial duty, and that therefore, the mandamus did not lie.[36] The Court also decided that the petitioner had no standing to commence proceedings because he did not show that he had a special interest in the matter.[37]

In *Jiménez* v. *Reily*, 30 P.R.R. 582 (1922), the issue was the power of the Governor to remove public officers. In that case the Court compelled the Governor, through a writ of mandamus, to reinstate to his office a public officer who had been appointed for a term fixed by law and who had been removed by the Governor without previous preferment of charges and without opportunity to be heard.

Another case of mandamus is *Romero* v. *Gore, Governor*, 46 P.R.R. 394 (1934). In that case, as in *Jiménez* v. *Reily*, *supra*, the Court found that the Governor had arbitrarily removed the petitioner, Antonio Romero Moreno, from his office, and issued a peremptory writ of mandamus ordering the reinstatement of the petitioner to his post. We decided likewise in *Abella* v. *Piñero, Governor*, 66 P.R.R. 651 (1946).

---

[36] The question at issue was whether the Governor had the ministerial duty to furnish the editor of a newspaper a certified copy of an answer to certain charges preferred against a District Judge.

[37] This opinion has a *dictum* which states that in Puerto Rico, under the Organic Act then in effect, there was no separation of powers. The latter being an academic question we need not discuss it, but the validity of such a statement is highly questionable. *Springer* v. *Philippine Islands*, 277 U.S. 189 (1928); *Banco Popular de Puerto Rico* v. *District Court*, 63 P.R.R. 63 (1944).

In a community ruled by laws and not by men, under the rule of law, the cases previously cited could not have been decided otherwise. The writ of mandamus is one of the classic remedies for guaranteeing and maintaining the rule of law. It was thus conceived since the days of Sir Edward Coke. Jaffe, Judicial Control of Administrative Action 179, 180 (1965).

After having examined the origins of the constitutional law principle of separation of powers and the pertinent cases, let us get into the core of the problem we are considering at this point of the opinion. Why cannot this Court accept, without failing to discharge its solemn and principal duty of upholding the rule of law, that it suffices to invoke the principle of separation of powers to have this Court declare itself without jurisdiction? The answer is very simple. It can be stated in a few sentences. We do it in the following paragraph.

Ours is a government of laws and not of men. The law is equal for each and every one. There is no person, neither private nor public, no matter how high or common, who may be above the law. As far as legal controversies are concerned, this Court is the supreme arbiter of the Commonwealth. If a public officer could use the principle of separation of powers as a bar to keep this Court from exercising its jurisdiction over legal actions, that officer would place himself above the law. He could act capriciously, arbitrarily. The rights and the property of the citizens who would come in contact with that officer would be without protection, at the mercy of his whim or arbitrary desire. The state based on law would crumble. The rule of law would disappear from our lives. That would mean a step back in centuries. Of course, this cannot be. Just in case it were necessary to mention it, it has been decided that neither the Executive Branch of the Govern-

ment of the United States[38] nor the Congress of that country,[39] can act arbitrarily or beyond the law.[40]

The theory that the Chief Executive is immune from judicial review is contrary to the whole tradition of constitutional law which we apply and is inconsistent with the concept of constitutional government. Said concept does not recognize any officer whosoever as being *legibus solutus*, above the law. Such an idea was not accepted by the ancient constitutionalism nor is accepted by modern constitutionalism. The medieval idea that the ruler is subject to the law was recovered and validated by the common law. As a result of the constitutional crisis of Seventeenth-Century England, said idea was definitively established. From there it came to our constitutions.[41]

The foregoing does not mean, of course, that the judicial branch is going to make all final public decisions. The judicial branch decides only cases and controversies. Apart from that, as it is known, the judicial branch has no concern. Public policy over all other matters—which are not cases and controversies—is made by the two political departments of government, the Legislative and the Executive. Those two departments rule. They rule because they are elected. The judicial branch is not a political department of government. It is not elected. It does not rule. That is why it can be, and constitu-

---

[38] *Youngstown Sheet & Tube Co.* v. *Sawyer*, 343 U.S. 579 (1952) (the "Steel-Seizure Case"); *Marbury* v. *Madison*, 5 U.S. (1 Cranch) 137 (1803).

[39] *Powell* v. *McCormack*, 395 U.S. 486 (1969).

[40] See II Schwartz, A Commentary on the Constitution of the United States 79–85 (1963); of the same author: American Constitutional Law 187–206 (1955).

[41] McIlwain, Constitutionalism Ancient and Modern (1940); Holdsworth, A History of English Law (1945 ed. reprinted 1966), Vol. V, 423 *et seq.* and Vol. VI, 3–122; Pound, The Spirit of the Common Law, Ch. III (1921). For an exceptional narration of the life of Sir Edward Coke and the English constitutional developments of the 17th Century, see Bowen, The Lion and the Throne (1956).

tionally it is, the arbiter between private parties as well as between private parties and the government.

### The "Political Question"

This brings us to another defense raised by respondent: that the controversy before us is one of political and not of a legal nature and for such reason it is not justiciable. Is this true? Are we concerned here with public policy making—a function of the legislative and executive branches—or with the decision of a case, of a controversy?

Are we going to devise a government program, let us say, one of economic development or public works, etc., or are we going to decide what is the meaning of § 45 of the Plebiscite Act? Are we going to exercise *gubernaculum* or are we going to exercise *jurisdictio?* The first is not a function of ours, the second is solely incumbent upon the judiciary.

The doctrine of "political question" is judge-made. In North American case law it was first brought forth in *Foster* v. *Neilson*, 27 U.S. (2 Pet.) 253 (1829). That case involved the interpretation of the Treaty of Paris of 1763, made between Great Britain, France, and Spain, and it had to be decided whether in or about the year 1804 certain lands to the east of the Mississippi River belonged to Spain or to the United States. The Court held that the matter involved belonged to the realm of the foreign relations of the Government of the United States and that therefore it should be decided by the President or by Congress and not by the Court. Like many other constitutional doctrines (freedom of contract, racial segregation, etc.), this doctrine of the political question has changed considerably.

As the frontiers of individual and collective freedoms have expanded and the rule of law has become a reality in the ground thus conquered, the area of no man's land where there is no law has contracted. As a result of this development of

the law, the doctrine of political question has been considerably limited. The cases of *Baker* v. *Carr*, 369 U.S. 186 (1962) and *Powell* v. *McCormack*, 395 U.S. 486 (1969), are excellent examples of judicial limitation of said doctrine. See, also, *Williams* v. *Rhodes*, 393 U.S. 23 (1968); *Westberry* v. *Sanders*, 376 U.S. 1 (1964); Scharpe, *Judicial Review and the Political Question: A Functional Analysis*, 75 Yale L.J. 517.

The case at bar is a classic example of statutory interpretation. As a result of a controversy which arose between petitioner and respondent, concerning the interpretation of § 45 of the Plebiscite Act, the same is before us and, in order to decide it, we must construe said section. The interpretation of a law and its application to concrete situations is eminently a judicial function. That is what *jurisdictio* is: to expound the law. Courts cannot avoid their responsibility to interpret the law and to adjudicate cases because it might be alleged that doing so would violate the separation of powers or would constitute an undue judicial incursion into political matters. *Powell* v. *McCormack, supra* at pp. 548–49.

### Ministerial Duty

Let us now turn to discuss the last of the defenses raised by respondent, and upon doing so, we shall reach the core of this controversy. Said defense consists in alleging that the function respondent is requested to perform—to appoint the members of the advisory groups—is discretionary and not ministerial, and therefore, the *mandamus does not lie.*

The old differentiation between ministerial and discretionary administrative acts is no longer as vigorous as it used to be. It has been attacked by commentators of great prestige. Jaffe points out that the courts have been "obsessed" with the question; that the classification is illusory, unsound, and unworkable; that it merely decides the problem a priori, without examining or explaining it.[42]

---

[42] Judicial Control of Administrative Action 180–181 (1965).

Davis states that said classification is not justified; that although historically the writ of mandamus was of an "extraordinary" nature, and although it was and still is so when it is directed to a court because the ordinary proceeding in such cases would be an appeal, as a means of reviewing administrative actions, the mandamus today is the usual and ordinary remedy.[43] Some writers propose that the courts should abandon the "ministerial-discretionary" classification of administrative actions as a step toward the formulation of a more rational law about mandamus.[44] In view of the conclusion we have reached as to this last defense raised by respondent, we need not decide now the problem raised by those writers.

In order not to make this opinion unnecessarily lengthy we would prefer not to do it, but for the sake of exactness and objectivity, we feel we should copy verbatim § 45 of the Plebiscite Act, Act No. 1 of December 23, 1966, 16 L.P.R.A. § 888. We think that it is necessary to do so since, in essence, this case boils down to the judicial interpretation of said § 45. The same reads as follows:

"The General Supervisor of Elections shall certify to the Governor the result of the plebiscitary consultation. The Governor, in his turn, shall certify said result to the President and the Congress of the United States, to the Resident Commissioner, and to the Legislature of the Commonwealth of Puerto Rico.

"If one of the formulas wins, as provided in section 2 of this act, the Governor shall, in his certification to the President, ask for the joint constitution of the advisory groups recommended in the report of the Status Commission and described in the Statement of Motives of this act.

---

[43] 3 Administrative Law Treatise 355, 356 (1958).

[44] Byse, Clark & Fiocca, *Section 1361 of the Mandamus and Venue Act of 1962 and Nonstatutory Judicial Review of Federal Administrative Actions*, 81 Harv. L. Rev. 308, 334 (1967). See, also, Patterson, *Ministerial and Discretionary Official Acts*, 20 Mich. L. Rev. 848, 886 (1922).

"According to that report, the joint advisory groups shall consider the necessary transition measures toward statehood or toward independence, in the event one of these formulas wins. In such case the members of the advisory groups that must be appointed by the Governor of Puerto Rico shall be designated on proposal of the party or the Directing Committee that has represented the winning formula in the plebiscitary process. If the representation of the formula in the plebiscitary process has been dual, the party and the Directing Committee shall be entitled to propose an equal number of members.

"In the event that Commonwealth be the winning formula, the Governor shall propose to the President the joint constitution of the advisory groups in conformity with the findings that from time to time may be made on the measures of development of the Commonwealth, to be considered to the basis of the authorization granted at the plebiscite.

"A majority vote in favor of any of the status formulas constitutes a mandate of the People of Puerto Rico to the Resident Commissioner, as their representative in the federal sphere, to act in the discharge of his official duties in accordance with the will of the people expressed through the said vote."

The foregoing section is not a model of statutory drafting and that is precisely why judicial interpretation is necessary. Petitioner alleges that said section, interpreted in the context of the whole Plebiscite Act and its legislative history and historical background, establishes its right to the remedy requested because it imposes on respondent the ministerial duty to designate the Puerto Rican members of the advisory groups on proposal of the Popular Democratic Party, which was the party that defended the winning formula in the plebiscite.

Respondent, on his part, argues that § 45 confers him discretionary power to designate said persons, without extraneous interventions, and that said section "does not even grant to the Popular Democratic Party the right to make any kind of proposal to the Governor," since he understands that the statute grants him "maximum discretion."

It might be argued that § 45 provides that in the event statehood would have been the winning formula, the members of the advisory groups would be appointed by the Governor, on proposal of the party or the Directing Committee which had represented said formula at the plebiscite, and that, in the event independence would have been the winning formula, the appointment mechanism would have been the same as the one described above, but that, in the event Commonwealth would have been the winning formula, then the Governor would freely appoint said members of the advisory groups, without being subject to designate them on proposal of the party which represented said formula at the plebiscite.

We cannot accept such an interpretation of § 45, because aside from the reasons we shall set forth later on, such an interpretation would inevitably lead us to determine that said § 45 is affected with a serious constitutional infirmity—that of denying the Commonwealth formula the equal protection of the laws—and we would be bound to declare it void for being unconstitutional. This is so because the interpretation to which we have referred would result in an unfair treatment for the Commonwealth formula, unfair treatment which has no rational justification and which is not permissible.[45]

But, as it is well known, it is a wise and old rule that the courts must construe the laws, whenever it is reasonably possible, in such a manner as to avoid the conclusion that they are unconstitutional.[46] Likewise, if a statute is susceptible of two constructions, one of which would render it unconstitutional, while the other one would not, it is the duty of the

---

[45] *McDonald* v. *Board of Election*, 394 U.S. 802, 809 (1968) ; *Moore* v. *Ogilvie*, 394 U.S. 814, 818–819 (1969) ; *Williams* v. *Rhodes*, 393 U.S. 23, 29–34 (1968) ; *Avery* v. *Midland County*, 390 U.S. 474, 479 (1968) ; *Harper* v. *Virginia Board of Elections*, 383 U.S. 663, 669–670 (1966) ; Tussman and tenBroek, *The Equal Protection of the Laws*, 37 Calif. L. Rev. 341 (1949) ; *Developments in the Law—Equal Protection*, 82 Harv. L. Rev. 1065 (1969).

[46] *Panamá Railroad Co.* v. *Johnson*, 264 U.S. 375, 390 and cases cited therein; *Buscaglia, Treas.* v. *Tax Court*, 71 P.R.R. 278, 281 (1950).

Court to adopt that construction which, without violating the legislative intent, would render it constitutional.[47]

## Legislative Intent

In view of the necessity already mentioned of construing § 45, we encounter the real problem involved in this case. The problem is: Which was the *legislative intent* upon enacting said section? To find and to give effect to the legislative intent is the true, permissible, and sound judicial statutory construction.[48]

The contention that § 45 vests the Governor with "maximum discretion" as to the appointment of the advisory groups does not stand analysis. In the first place, said section does not state anything of the sort. Secondly, let us submit it to rational analysis.

Respondent correctly states in his reply brief that:

"We must not forget that at the time of the enactment of the Plebiscite Act, the Legislature of Puerto Rico was constituted in its vast majority by members of the Popular Democratic Party, defenders of the Commonwealth formula."

It is incredible that that Legislature, or any other, would intend to confer upon one person, a future Governor, unknown at the time of the enactment of the Plebiscite Act, "maximum discretion" to guide the political destiny of the country. Such an abdication of power in favor of a person unknown at the time of the enactment of the Act, aside from its probable constitutional defects, cannot be presumed.[49] And, if such had

---

[47] *Wong* v. *McGrath*, 339 U.S. 33, 50; *Rescue Army* v. *Municipal Court*, 331 U.S. 549, 569; *People* v. *Mantilla*, 71 P.R.R. 35, 43 (1950).

[48] "The most effectual and universal manner of discovering the true meaning of a law, when its expressions are dubious, is by considering the reason and spirit thereof, or the cause or motives which induced its enactment." Civil Code, § 19.

[49] Of course, we are not saying that Luis A. Ferré was an unknown person in Puerto Rico on December 23, 1966, date of the approval of the Plebiscite Act. What we are saying is that on that date it was not possible to know who would be the Governor in 1969.

been the intent of the Legislature, then, why should a plebiscite be held? since the consequence of that total unipersonal delegation, if that maximum discretion had been conferred, would have been that the course which that future governor would have given to the destiny of the country would have depended on his own personal political ideology.

It is inconceivable that the Legislature would intend that the Plebiscite Act be administered in the manner it would be administered if respondent's view would prevail. We cannot assume that any lawmaker, regardless of political affiliation, would intend that, in the event the winning formula in the plebiscite were the formula of his preference, said formula would be guided and developed by persons believing in a formula distinct from and adverse to his.

We cannot assume that the legislative intent was that, had the statehood or the independence advocates won at the plebiscite and had the Popular Party won in the 1968 election, a Popular governor would have had maximum discretion to guide and develop the political ideologies of his adversaries. We cannot assume either that the legislative intent was that, the Commonwealth formula having been the winning one at the plebiscite, said formula were to be guided and developed by its political adversaries.

After a thorough examination of the Plebiscite Act, we have reached the conclusion that the legislative intent was to give equal treatment to the three formulas of political status. This intent appears repeatedly from the text of the Act. Besides, it had to be so as a matter of justice and sound public policy.

Thus, § 4 grants *equal* representation in the Commonwealth Board of Elections to the three status formulas; § 11 establishes the right of each status formula to have *equal* representation in each poll board; § 92 provides that the funds appropriated for general expenses of plebiscitary campaign and propaganda be divided into *equal* parts; it also provides

*equal* time and treatment for each one of the formulas in case that a radio broadcasting or telecasting station of the Commonwealth of Puerto Rico would permit any of the formulas the use of its facilities.

The correct interpretation of § 45 must be, not the one leading to the constitutional defect of lack of equal protection of the laws previously mentioned nor the one which would thwart the clear legislative intent, but the one which carries out said intent. That intent, of course, is abundantly clear in the sense that the lawmaker intended to legislate so that the decision reached at the plebiscite be carried out, not to thwart that decision. The contrary would be to assume that the law contemplates a futility and it is also an old and wise rule of statutory construction that a law must not be presumed to have futile purposes. The judge owes undeniable obedience to statutes and, in the face of an ambiguous text that needs interpretation, the best way to serve them is to perform their underlying purpose.[50]

The Plebiscite Act, upon organizing a mechanism so that Puerto Rico may in a democratic and peaceful way continue its constitutional development, necessarily had to provide that certain political parties and certain officers would perform certain functions. That is why some of these functions are ministerial. It makes no difference that some of these functions have been placed in the hands of the Chief Executive. The distinguished counsel for respondent tells us that the law cannot have the purpose of turning the Governor into a robot. As we shall explain hereinafter, such an interpretation is not correct.

Does it belittle the Governor to perform a ministerial duty? In no way whatsoever. In order to see this clearly it is necessary to understand the nature of the government which the Governor presides. In parliamentary-type govern-

---

[50] See Castán, *La Formulación Judicial del Derecho* 115, 2d ed. (1954).

ments, the Prime Minister is the ruler and the King, or in default thereof, a President is the ceremonial head of the state. The King or the President performs an endless number of ministerial duties which are important because of their symbolism. In presidential-type governments (like ours and that of the United States), the Chief Executive is at the same time ruler and ceremonial head of the state. That is why he has the duties of a ruler and also innumerable ministerial and ceremonial duties. When the Governor gives instructions to his cabinet and when he signs or vetoes a law, he is exercising substantive duties of government. When he so acts, he has unquestioned discretion. On the other hand, when the Governor cuts the ribbon at the inauguration of a public work, welcomes the carnival queen, or presses the switch that puts on the Christmas lights at the executive mansion, he is exercising ceremonial functions. The one and the other form part of his many duties and none of them belittles him or turns him into a robot.[51]

In this manner the Plebiscite Act has entrusted the First Executive with the appointment of the Puerto Rican members of the advisory groups. As a ceremonial act. It is obvious that the lawmaker sought to invest such a function with a very high symbolic content. But the Plebiscite Act does not vest on the Governor the power to determine the persons who are going to form part of those advisory groups. That would be tantamount to giving him substantive powers to interfere, if he wished, with the will of the people expressed in the plebiscite. That, of course, is not the legislative intent.

The plebiscite and the Act have the purpose that the will of the people, as manifested in the plebiscite, be carried out. It cannot be assumed that the plebiscite was held with no

---

[51] On the foregoing, see Jennings, Cabinet Government, 3d ed. (1961); Finer, The Major Governments of Continental Europe (1960); Shotwell, Governments of Continental Europe, rev. ed. (1952); Rossiter, The American Presidency (1956); Corwin, The President, 4th rev. ed. (1957).

purpose in mind and in order that a future governor would make the substantive decisions on the political status. The legislative intent is to the effect that the members of the advisory groups should be believers of the status formula which would win in the plebiscite. That is why § 45 provides that those members shall be appointed on proposal of the political party or Directing Committee representing the winning formula in the plebiscite. The formal and ceremonial act of appointment was placed by the Act in the hands of the Chief Executive as a matter of symbolism.

The lawmaker knows that the Chief Executive is elected every four years and that the political ideology of the incumbent may change according to the swaying of partisan politics. That is why the lawmaker could not grant him maximum discretion to appoint those advisory groups: because it could happen, as in fact it happened, that at a given time the Chief Executive could have a political ideology different from the one favored by the people at the plebiscite. If respondent had under the law the discretion that he claims he has, the will of *one* person—the Chief Executive of a given moment—could thwart the democratic mandate of the plebiscite. Naturally, such a thing is at variance with the most basic principles of the democratic philosophy.

It was precisely for this reason that a separate voting was made on the political status—the Plebiscite—in order that it would be separate from the ordinary elections held every four years to elect the government. The Plebiscite Act implements a process of constitutional development apart from the regular tasks of the government which is elected every four years.

Already in 1926, in *Pagán* v. *Towner*, 35 P.R.R. 1 (1926), this Court came quite close to the point we are here dealing with. In that case the law provided that the Insular Board of Elections would be composed of three members, two

of whom should be appointed "by the Governor on the recommendation of the central governing boards of the respective principal political parties." After stating that if the Governor abused his power mandamus would lie, the Court stated at p. 5, as follows:

"For instance, the Governor, as we have said, could not appoint any person not recommended by the party and must select a name from among those proposed, if there be no valid reason for rejecting all of them."

As we stated before, the Status Commission expressed in its report that "an *expression of the will* of the citizens of Puerto Rico by popular vote on the [status] question . . . would be helpful to all concerned." (Italics ours.)

Respondent himself, who was a distinguished member of the Status Commission, appointed by the Governor of Puerto Rico after being certified by the Statehood Republican Party, in his Supplemental Views to the Report, expressed himself as follows:

". . . [W]e pledge to work, in good faith, to achieve 'the expression of will' by the citizens of Puerto Rico, which the Commission recommends. . . ."

The summary of the constitutional development of Puerto Rico which we made at the beginning of this opinion shows, we believe, that this country, different from the thirteen American colonies and from almost all of the rest of the countries in this hemisphere, has not chosen the path of violence to create its own political status. Both under Spain in 1896–97 and at the present with the United States, Puerto Rico has chosen the path of peaceful negotiation. No observer of this long constitutional development fails to notice that the plebiscite was an important step of this development, and that the appointment and work of the advisory groups is a continuation of said development. The construction which we have made of § 45 of the Plebiscite Act is the one we consider

correct and true to the facts. To decide otherwise would prejudice seriously the integrity of the democratic process in Puerto Rico.

We consider it appropriate to conclude this opinion with the words of a distinguished scholar and observer of the Supreme Court of the United States:[52] We do not enjoy a superabundance of institutions engaged in the rational pursuit of truth. . . . Students and judges are trained to turn up their collars against windy sloganeering, no matter from which direction it is blown. . . . When a judge, upon deciding a case, exposes the factors that trouble the judgment, strives for as particularistic a decision as he can make, and gives a reasoned elaboration, he is providing a lesson in the rational solution of human conflicts.

In this spirit we have written the foregoing.

For the above stated reasons we are of the opinion that the writ of mandamus should be issued.

### Addendum

I presented before the Court the foregoing opinion on December 15, 1969. Now, on January 28 and 29, 1970, Mr. Chief Justice Negrón Fernández and Mr. Justice Santana have presented their respective opinions. As I do not wish to spend more time or use any more space on this matter, so that the case may be settled as soon as possible, I shall limit myself to a brief discussion of three points.

As to certain doubts raised by my colleague, Mr. Justice Santana, in his opinion, I consider that the best thing to do is to remember his own language when he delivered in 1964 the opinion of this Court in the case of *R.C.A.* v. *Government of the Capital*, 91 P.R.R. 404 (1964). In that case, after making an exposition of the events and of the documents

---

[52] Freund, The Supreme Court of the United States 189, 190 (1961).

which form the constitutional basis of the Commonwealth of Puerto Rico, he wrote at p. 415, as follows:

"From those evident facts in which the leading parts were played by the people of the United States, through its Congress and maximum exponent, and the Puerto Rican community, directly through its qualified inhabitants, *and by virtue of the clear and simple expressions* of those people contained in the various documents which perpetrated the political events which took place, *it is clear in law* that, unlike the territorial systems of the Foraker Act and the Organic Act of 1917 consisting of authority and powers merely delegated by Congress . . . the public and governmental powers of the Commonwealth of Puerto Rico . . . flow from itself and from its own authority. . . ." (Italics ours.)

As to the opinion of Mr. Chief Justice, I believe that it is not correct to affirm that to agree with petitioner is tantamount to believing that the Popular Party was authorized by the people to perform the "subsequent steps" concerning this matter with the exclusion of others. The advisory groups, known as ad hoc committees, can only make recommendations. They cannot execute anything. Any change in our political relations with the United States must be approved by the Puerto Rican people at the polls. Unless democracy is violated, the President and the Governor, or any other persons or parties, can only act on this matter in accordance with the will of the people as expressed at the polls.

Mr. Chief Justice fears that if the Court decides this case it would be bringing political debate to the judicial forum. I have given sober consideration in my mind and in my conscience to this point since this case came before us. Although I realize that the contention is serious, I do not agree with it. I recognize that it is quite unpleasant for us justices to decide cases in which the Governor or the political parties are parties. But I understand that our duty is not confined to decide only pleasant cases. We have also the duty to decide the unpleasant ones.

464

What we have before us is a judicial case: We are concerned here with the interpretation of § 45 of the Plebiscite Act. As I pointed out before, the construction of the statutes and the decision of cases is the function, par excellence, of the courts. But if there were factors or circumstances which would validate in part the undesirability of considering the issues of this case, even then, because of the democratic values involved, I think that it is justified to consider those issues and to decide them as I propose. I do not believe that, for the sake of the alleged undesirability, the democratic principle that the will of the majority should determine political questions, should be thwarted. I do not believe that we can turn our backs to the case in the name of our peace of mind. Peace of mind is desirable, but it cannot be bought at any price. I understand that the will of the majority of the people as expressed in the plebiscite would be thwarted by the majority opinion of this Court. In my conscience and in the light of the democratic values involved and of the service which I think we owe to our country, I think that even at the expense of suffering painful uneasiness, the Court should have faced the problem.

—O—

Separate opinion of MR. JUSTICE RAMÍREZ BAGES.

San Juan, Puerto Rico, February 2, 1970

1.—I concur with my Brother Mr. Justice Rigau in,

(a) that none of the defenses adduced by the respondent can be sustained,

(b) that it is proper to construe § 45 of the Plebiscite Act to the effect that the legislative intent is in the sense that the members of the advisory groups be persons who believe in the Commonwealth status, that is to say, persons with "a public and acknowledged record as defenders" of said formula as stated by Mr. Justice Blanco Lugo in his opinion, and that

the Governor should designate them on proposal of the Popular Democratic Party which was the party representing the Commonwealth formula which was the winning one in the plebiscite and,

(c) that the writ of mandamus should be issued.

2.—I concur with my Brother Mr. Justice Blanco Lugo in that,

(a) the implementation of the result of the plebiscite of 1967 on the political status of Puerto Rico requires a full and complete, and not a fractional and groping development of the winning formula and,

(b) the Plebiscite Act itself sets forth the necessary guidelines for delimiting the general boundaries of the steps to be taken for the growth of the Commonwealth in accordance with the principles contained in Resolution No. 1 of December 3, 1962 and Joint Resolution No. 2 of March 19, 1959, and thus determine the measures for the development of the Commonwealth which are to be considered by the advisory groups.

3.—I also conclude that § 45 of the Plebiscite Act should be construed to the effect that the Governor should select the aforementioned measures on proposal of the Popular Democratic Party.

4.—In my opinion the Plebiscite Act does not suffer from the constitutional vice of denying equal protection of the laws.

—O—

Separate opinion of MR. JUSTICE TORRES RIGUAL, in which MR. JUSTICE RIGAU concurs.

San Juan, Puerto Rico, February 2, 1970

I agree fully with the opinion rendered by my Brother Mr. Justice Rigau, and, for that reason, I join my vote to his for the issuance of the writ. I am firmly convinced that

the fundamental controversy in this petition boils down to the interpretation of a statute, a matter which traditionally and by constitutional provision is of the exclusive province of the Judicial Branch. *Marbury* v. *Madison*, 5 U.S. (1 Cranch) 137 (1803).

I believe it is significant that although our position to the effect that the Governor is bound to designate the members of the advisory groups on proposal of the Popular Democratic Party, does not prevail, nevertheless, six of the eight judges who participated in this case are of the opinion that the members of said advisory groups to be designated by the Governor should be persons "of the highest ability and prestige" and with "a public and acknowledged record as defenders" of the Commonwealth as the definitive solution of the political status of Puerto Rico.